**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON BLACK, EZEKIEL BLACK, I.B. by and through his next friend Michelle Black, AMANDA PALMUCCI, BEATRIZ GONZALEZ, individually, and as representative for the estate of NOHEMI GONZALEZ, PAUL GONZALEZ, REYNALDO GONZALEZ, RON GREENFIELD, PNINA GREENFIELD, GILI GREENFIELD, LIRON GREENFIELD, SHERE GREENFIELD, SHYE GREENFIELD, and MYESHIA JOHNSON, | No.: 24-cv-8901 |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| LAFARGE S.A.; LAFARGE CEMENT HOLDING LIMITED; and LAFARGE CEMENT SYRIA S.A., | |
| Defendants. | |

## COMPLAINT FOR VIOLATION OF THE ANTI-TERRORISM ACT

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................... 1

DEFENDANTS AND THEIR AGENTS ................................................................... 5

JURISDICTION AND VENUE ................................................................................ 7

FACTUAL ALLEGATIONS .................................................................................... 8

I.     ISIS AND ANF WERE DESIGNATED TERRORIST GROUPS THAT OPENLY
       WAGED A TERRORIST CAMPAIGN AGAINST THE UNITED STATES IN
       IRAQ, SYRIA, AND ELSEWHERE ................................................................. 8

II.    DEFENDANTS PROVIDED MATERIAL SUPPORT TO ISIS AND ANF,
       INCLUDING BY PAYING THEM MILLIONS OF DOLLARS ................................... 14

       A.     Defendants Made Fixed Monthly Payments To ISIS And ANF .......................... 20

       B.     Defendants Made Volume-Based Payments To ISIS And ANF ......................... 22

       C.     Defendants Paid ISIS-Controlled Suppliers For Raw Materials......................... 23

       D.     Defendants Sold Cement To ISIS .................................................................. 24

       E.     Defendants Conspired With ISIS To Undercut Their Competitors ..................... 25

III.   DEFENDANTS KNEW, AND TRIED TO CONCEAL, THAT THEY WERE
       SUPPORTING U.S.-DESIGNATED TERRORIST GROUPS ...................................... 29

IV.    DEFENDANTS' PAYMENTS TO ISIS AND ANF SUBSTANTIALLY ASSISTED
       THE TERRORIST ATTACKS THAT KILLED AND INJURED PLAINTIFFS ........... 33

       A.     Defendants' Payments Made A Vital Contribution To ISIS's And ANF's
              Terrorist Attacks In Iraq, Syria, And Elsewhere.................................................. 33

       B.     Defendants' Material Support Contributed To The Individual Attacks That
              Targeted Plaintiffs And Their Family Members.................................................. 40

V.     DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO
       NEW YORK AND THE UNITED STATES .................................................................. 52

       A.     Defendants Purposefully Used New York Banks To Clear The U.S.-Dollar
              Transactions They Used To Finance Terrorism.................................................. 52

              1.     Defendants Executed U.S.-Dollar Transactions Using New York
                     Correspondent Banks .................................................................................. 52

2.    Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York .............. 75

3.    Defendants Purposefully Benefited From New York Clearing ................ 89

B.    Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme.................................................................... 102

C.    Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States............................................. 108

VI.    PLAINTIFFS AND THEIR FAMILY MEMBERS WERE KILLED OR INJURED IN TERRORIST ACTS BY ISIS OR ANF .................................................... 115

A.    The November 13, 2015 Complex Attack in Paris (Amanda Palmucci and Gonzalez Family).................................................................................... 115

B.    The March 19, 2016 Suicide Bombing Attack in Istanbul (Greenfield Family)..................................................................................................... 117

C.    The October 4, 2017 Complex Attack in Tongo Tongo (Black and Johnson Families) ................................................................................................. 118

CLAIMS FOR RELIEF .............................................................................................. 121

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2)... 121

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2).. 122

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) ............................................................................................ 124

JURY DEMAND ........................................................................................................ 125

PRAYER FOR RELIEF .............................................................................................. 125

## INTRODUCTION

1.      This lawsuit seeks civil damages from the first corporation in U.S. history convicted of bribing a Foreign Terrorist Organization.  On October 18, 2022, the U.S. Department of Justice announced that Lafarge S.A. ("Lafarge") and its Syrian subsidiary had pleaded guilty to conspiring to provide material support to two such terrorist groups.  As an Assistant Attorney General said in announcing the plea, Lafarge "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations – ISIS and al-Nusrah Front ["ANF"] in Syria – at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."  Based on those shocking admissions, a court in this District sentenced the companies to pay about $778 million in criminal fines and forfeiture.

2.      In accepting Lafarge's guilty plea, the court found that Lafarge's crime "impacts the victims of terrorist acts."  Plaintiffs here are among those victims.  They are U.S. civilians and service members – and their families – who were killed and injured by the very terrorist groups Lafarge bribed.  Just as Lafarge is guilty of a crime under the Anti-Terrorism Act, it is civilly liable under the same statute to the victims of its criminal conspiracy.

3.      Lafarge has already admitted most of the facts confirming its liability.  In pleading guilty, Lafarge and its Syrian subsidiary stipulated to a Statement of Facts – which they agreed "they will not dispute"[1] – laying out in granular detail how the companies bribed and conspired with anti-American terrorists, including the Islamic State of Iraq and Syria ("ISIS").  In the words of Deputy Attorney General Lisa Monaco, the admitted facts show that, through its

---

[1] Plea Agreement ¶ 19, *United States v. Lafarge S.A.*, No. 22-cr-444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10.  The Statement of Facts (the "Plea Statement") was filed as Docket No. 10-1.  Unless specified, all citations to sources originally in English contain original spelling.  Allegations based on sources originally in French or other languages are based on translations.

"support and funding, Lafarge enabled the operations of a brutal terrorist organization."  Those terrorist operations foreseeably targeted Plaintiffs and their family members.

4.     Lafarge's support for ISIS and ANF ran deep.  It operated a lucrative cement plant in northern Syria, and it decided that bribing Syrian terrorists offered the best way to protect its profits from the plant.  To that end, Lafarge – in concert with two subsidiaries, the other Defendants here – paid millions of dollars to ISIS and ANF.  The payments included flat monthly donations; additional kickbacks keyed to Lafarge's sales volumes; and money to buy materials (like petroleum and volcanic ash) sourced from terrorist-controlled suppliers.  Throughout, Lafarge sought to align ISIS's incentives with its own.  It even entered a revenue-sharing agreement with ISIS that its executives likened to paying "taxes," touting in internal emails the "principle that we are ready to share the 'cake'" with ISIS.  Sharing the "cake" had its benefits.  In exchange for Lafarge cutting ISIS into its cement-plant revenues, ISIS agreed to block imports from Lafarge's competitors, allowing Lafarge to grow its market share even more.

5.     Defendants knew their conduct was illegal and went to great lengths to conceal it.  Defendants' internal discussions reflected an acute awareness that they were bribing U.S.-designated terrorists in violation of U.S. and French law.  For that reason, they knew they had to hide what they were doing.  They routed their terrorist payoffs through multiple intermediaries they controlled; demanded that the intermediaries create shell companies to receive payment outside of Syria; generated fake invoices to disguise the nature of the payments; and opened a web of hard-to-trace bank accounts to circumvent U.S. sanctions.  Defendants' personnel also often used pseudonyms to describe the conspiracy and communicated about their crimes – at the direction of a Lafarge lawyer – using personal Gmail accounts rather than corporate email.  They did all this so they could later falsely deny knowledge of Defendants' criminal conduct.

6.    Defendants' payments aided the terrorist attacks that targeted Plaintiffs and their family members.  Money was essential to ISIS's and ANF's ability to execute successful terrorist operations, and so-called "tax" payments – like the ones Defendants made – supplied a crucial funding stream for both groups.  Those payments, as explained by a former U.S. Ambassador to the United Nations, enabled ISIS to "pay its followers and fund attacks around the world." Indeed, Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their heinous attacks, including against Plaintiffs.  And given the relatively low marginal cost of each individual attack, the causal effect of Defendants' payments was substantial.  Their multimillion-dollar bribes were sufficient to finance *thousands* of ISIS and ANF terrorist attacks – enough to kill and maim every Plaintiff in this case many times over.

7.    Defendants' payments also aided the specific terrorist cells that attacked Plaintiffs and their family members.  ISIS's fundraising was highly institutionalized, and ISIS's leader Abu Bakr al-Baghdadi supervised the collection and disbursement of the "taxes" Lafarge paid in Syria.  Indeed, Baghdadi's ISIS Leadership Cell used Lafarge's funds directly to help plan, authorize, and commit each attack alleged below.  Other terrorist cells that received Defendants' money – including the Raqqa cell run by terrorist commander Abu Luqman – likewise played a key role in the attacks alleged below.  Defendants directly conspired with Luqman's Raqqa cell, which controlled the local territory around Lafarge's cement plant in northern Syria.  The Raqqa cell, in turn, supervised and perpetrated the individual attacks against Plaintiffs.

8.    Defendants' scheme depended on connections to the United States.  Throughout, Defendants exploited New York's banking system by executing at least 15 U.S.-dollar wire transfers they caused to clear through New York.  That was no coincidence.  Defendants chose to pay in U.S. dollars – they called "USD" their "preferred option" – and they deliberately routed

their U.S.-dollar wires through New York banks.  By using New York correspondent banks to clear those U.S.-dollar wires, Defendants advanced their criminal scheme:  they made the payments look legitimate; avoided the operational risks posed by unreliable foreign-clearing options; supplied the terrorists with their preferred currency; and hedged against the foreign-exchange risk posed by the collapsing Syrian pound.  New York clearing helped them capture all those benefits.  True, Defendants had a sophisticated understanding of U.S. sanctions, which sometimes forced them to avoid New York banks.  But they learned first-hand that doing so made their scheme less effective, more expensive, and harder to conceal.  That is why they used New York clearing when they could, in a manner carefully designed to avoid triggering U.S. sanctions.  And they knew, as Lafarge's accounting manager explained in one illustrative email, that their U.S.-dollar wires required the involvement of "US correspondent bank[s]."

9.      Defendants also formed U.S. contacts by relying on American email providers – mainly Gmail – to communicate about their terrorist payoffs.  Again, this was no coincidence.  Defendants often coordinated their payments using Gmail, rather than corporate email, so they could hide their conduct from French auditors and regulators.  And in using Gmail to do so, Defendants relied on a U.S. service provider and benefited from U.S. infrastructure, U.S. engineering, and U.S. law.  Because Gmail is an American service, U.S. legal protections also impeded foreign agencies from easily accessing Defendants' Gmail messages.  By sending their emails through the United States, Defendants sought to make it harder for French law enforcement – the authority otherwise most likely to criminally charge their executives (as has now in fact happened) – to discover their scheme.

10.     Defendants' conspiracy further linked its conduct to the United States.  As the U.S. Attorney for this District explained, Lafarge supported ISIS "not merely in exchange for

permission to operate its cement plant – which would have been bad enough – but also to leverage its relationship with ISIS for economic advantage." It was to Lafarge's economic advantage for ISIS to remain strong. The stronger ISIS's territorial control – and the more credible its threats against Lafarge's competitors – the more Lafarge benefited from its unusual willingness to do business in ISIS-held territory. And ISIS's terrorist violence was vital to that arrangement. There was no more potent way for ISIS to convey fear, and thus to stay in power, than to publicly terrorize Americans like the families of the victims who are Plaintiffs here. Simply put, when ISIS attacked Americans in a show of terrorist strength, it bolstered the credibility of its protection racket and furthered the aims of the conspiracy Lafarge joined.

11.    As alleged below, Plaintiffs are entitled to recover for their injuries under the Anti-Terrorism Act's secondary-liability provisions. *See* 18 U.S.C. § 2333(d)(2). Defendants aided and abetted the ISIS and ANF attacks that killed and injured Plaintiffs and their family members. Defendants also conspired with ISIS and ANF, making Defendants liable for the terrorist attacks that ISIS and ANF foreseeably committed in furtherance of their conspiracy.

## DEFENDANTS AND THEIR AGENTS

12.    Defendant Lafarge S.A. ("Lafarge") is a multinational building materials business. It is organized under the laws of France and headquartered in Paris, France. Lafarge is a wholly owned subsidiary of Holcim, Ltd. ("Holcim"), which is a multinational building materials business based in Zurich, Switzerland.

13.    Defendant Lafarge Cement Holding Limited ("Lafarge Cyprus") is a direct subsidiary of Lafarge. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus was the entity through which Lafarge held nearly all its shares in Lafarge Cement Syria S.A. until Lafarge and its subsidiaries merged with Holcim in 2015.

14.    Defendant Lafarge Cement Syria S.A. ("LCS") was a direct subsidiary of Lafarge Cyprus and an indirect subsidiary of Lafarge.  LCS was organized under Syrian law and headquartered in Damascus, Syria.  Lafarge owned approximately 98.7% of LCS through Lafarge's subsidiaries, principally Lafarge Cyprus.  Lafarge operated the Jalabiyeh cement plant through LCS from approximately May 2010 to September 2014.

15.    Bruno Lafont is a citizen and national of France and was Lafarge's Chairman and CEO until Lafarge's merger with Holcim in 2015.  He then became Co-Chair of LafargeHolcim's Board of Directors and served in that capacity until May 2017.  He was based at Lafarge's headquarters in Paris, France.

16.    Jean-Claude Veillard is a citizen and national of France and was Lafarge's Vice President of Security from approximately October 2008 to September 2017.  He was based at Lafarge's headquarters in Paris, France and was a member of Lafarge's Security Committee.

17.    Christian Herrault is a citizen and national of France and was Lafarge's Executive Vice President of Operations from approximately January 2012 to December 2015.  Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria.  Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.  Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Bruno Lafont.

18.    Bruno Pescheux is a citizen and national of France and was LCS's CEO from approximately 2008 to July 2014.  While CEO of LCS, Pescheux was based at LCS's headquarters in Damascus, Syria until Lafarge evacuated its European employees from Syria in 2012.  He then relocated to Cairo, Egypt.  Pescheux reported directly to Christian Herrault.

19.     Frédéric Jolibois is a citizen and national of France who became LCS's CEO in approximately July 2014, succeeding Pescheux, and remained in that role until about January 2016.  Jolibois reported directly to Herrault until Herrault left Lafarge.

20.     Guillaume Roux is a citizen of the United States and France.  He was a Lafarge Executive Vice President until January 2016, a member of Lafarge's Security Committee during the same time, a member of LCS's Board of Directors until January 2016, and LCS's Chairman from 2008 to July 2013.  Roux was based at Lafarge's headquarters in Paris, France and reported directly to Bruno Lafont.

21.     Firas Tlass is a citizen and national of Syria and the son of the country's longtime Minister of Defense, Mustafa Tlass.  He was a minority shareholder in LCS until the Syrian regime confiscated his shares in or about 2012.  LCS, with Lafarge's knowledge and approval, paid Tlass to negotiate with and deliver payments to terrorist groups, including ISIS and ANF.

22.     Amro Taleb is a citizen of Canada and Syria and a former consultant to LCS who acted as Defendants' agent in sourcing raw materials from ISIS-linked suppliers.  LCS, with Lafarge and Lafarge Cyprus's approval, paid Taleb to negotiate with and pay ISIS.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 2338.

24.     Personal jurisdiction exists under Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules § 302(a)(1), based on Defendants' use of New York banks in carrying out their scheme.  Alternatively, personal jurisdiction exists under Federal Rule of Civil Procedure 4(k)(2), based on Defendants' use of New York banks and U.S.-based email service providers in carrying out their scheme.  Rule 4(k)(2) jurisdiction also exists based on Defendants' conspiracy with ISIS, a terrorist group that purposefully targeted the United States,

caused tortious effects on and within the United States, and carried out overt acts in furtherance of the conspiracy within and targeting the United States. If the Court were to find jurisdiction lacking under New York's long-arm statute, Plaintiffs certify based on the reasonably available information that Defendants would not then be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate.

25.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), based on Defendants' use of at least one bank in this District in carrying out their scheme. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) and/or § 1391(c)(3).

## FACTUAL ALLEGATIONS

## I.    ISIS AND ANF WERE DESIGNATED TERRORIST GROUPS THAT OPENLY WAGED A TERRORIST CAMPAIGN AGAINST THE UNITED STATES IN IRAQ, SYRIA, AND ELSEWHERE

26.    Defendants' scheme aided several terrorist groups. The two most relevant to this Complaint are ISIS and ANF, which are two U.S.-designated terrorist groups that attacked Americans – including Plaintiffs and their family members – in Iraq, Syria, and elsewhere. To contextualize Defendants' conduct, this section provides an overview of both terrorist groups.

27.    The origins of ISIS and ANF trace to Abu Musab al-Zarqawi, a Jordanian terrorist who created a training camp in Afghanistan at Osama bin Laden's invitation. By the time of the September 11, 2001 terrorist attacks, Zarqawi had trained several thousand terrorists and established a terrorist network in Iraq, Syria, and other countries in the Middle East and Africa.

28.    On or about October 15, 2004, the Secretary of State designated the Zarqawi terrorist network as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189, under the name Jama'at al-Tawhid wa'al-Jihad.[2] On or about the same day, the Secretary of State also

---

[2] Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group, Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, as a Foreign

designated Jama'at al-Tawhid wa'al-Jihad under Executive Order No. 13,224 as a Specially

Designated Global Terrorist ("SDGT").[3]

29.     In or around October 2004, Zarqawi formally pledged allegiance to al-Qaeda and

renamed his terrorist network al-Qaeda in Iraq ("AQI").  By then, Zarqawi and his organization

were among the most prominent terrorists attacking Americans in Iraq and elsewhere.

30.     A U.S. airstrike killed Zarqawi in June 2006.  But AQI continued after his death

as a formidable terrorist group waging a violent campaign against the United States.  In 2010, a

new AQI leader – Abu Bakr al-Baghdadi – took control of the AQI terrorist network.  Baghdadi

eventually became the world's most-wanted terrorist mastermind, with the U.S. government at

one point offering a record-breaking $25 million bounty for his capture.

31.     In early 2011, shortly after Baghdadi's emergence, Syria spiraled into civil war.

Many terrorist groups and other armed factions began vying for power, precipitating a near-total

breakdown in Syrian governance and other civil institutions.  In August 2011, the U.N. High

Commissioner for Human Rights reported "a pattern of widespread or systematic human rights

violations by Syrian security and military forces, including murder, enforced disappearances,

torture, deprivation of liberty, and persecution."[4]

32.     In late 2011, sensing the opportunity amid the chaos, Baghdadi sent an AQI

operative, named Abu Muhammad al-Julani (also spelled al-Jawlani), to establish an AQI branch

---

Terrorist Organization Pursuant to Section 219 of the Immigration and Nationality Act, 69 Fed.
Reg. 61,292, 61,292 (Oct. 15, 2004).

[3] Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to the
Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group,
Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, 69 Fed. Reg. 61,292, 61,292
(Oct. 15, 2004).

[4] Statement by Ms. Navi Pillay, U.N. High Commissioner for Human Rights to the Human
Rights Council 17th Special Session on "Situation of Human Rights in the Syrian Arab
Republic" in Geneva (Aug. 22, 2011), https://tinyurl.com/3pfs5p5j.

in Syria.  Baghdadi also sent Abu Muhammad al-Adnani (who would later lead ISIS's global Intelligence Cell) to assist Julani.  The resulting Syrian branch was called al-Nusrah Front ("ANF"), which Baghdadi and Julani formed officially in January 2012.

33.    By the end of 2012, the U.S. government recognized ANF as AQI's Syrian branch.  In December 2012, the Secretary of State amended the FTO designation for AQI to include the following aliases:  al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.[5]  At the time, the State Department reported that ANF had already claimed responsibility for nearly 600 terrorist attacks throughout Syria.  The State Department characterized ANF as carrying out AQI's campaign to "hijack the struggles of the Syrian people for its own malign purposes."[6]

34.    In 2013, reflecting AQI's expansion into Syria, Baghdadi changed AQI's name to the Islamic State of Iraq and Syria ("ISIS").  On May 15, 2014, the Secretary of State again amended the AQI terrorist designation, this time to list the "Islamic State of Iraq and the Levant" as the organization's primary name (this is why U.S. government documents sometimes refer to the organization with the shorthand "ISIL").[7]  On September 30, 2015 the Secretary of State amended that same designation to add more aliases:  Islamic State, ISIL, and ISIS.[8]

35.    On May 15, 2014, when the Secretary of State amended AQI's designation to rename it the "Islamic State of Iraq and the Levant," the Secretary also amended that designation

---

[5] Amendment of the Designation of al-Qa'ida in Iraq, 77 Fed. Reg. 73,732, 73,732 (Dec. 11, 2012).

[6] Victoria Nuland, *Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq* (Dec. 11, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

[7] Public Notice 8732, Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014).

[8] Public Notice 9290, Amendment of the Designation of Islamic State of Iraq and the Levant, 80 Fed. Reg. 58,804, 58,805 (Sept. 30, 2015).

to remove the group's then-existing ANF aliases.  Concurrently, the Secretary of State separately designated ANF as its own FTO and SDGT.[9]

36.     Unlike many militants fighting in Syria who aimed mainly to oppose the Syrian government, ISIS had a larger goal:  the construction of a global terrorist caliphate.  But as Defendants knew, the U.S. government categorically rejected any suggestion that ISIS was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence.  ISIS attempted to control territory not through legitimate governance, but through widespread terror, criminality, and intimidation.  Its acts of mass terrorist violence violated international law, including the laws of war.

37.     Many of ISIS's acts were intended to buttress its terrorist strength.  In 2012-2013, ISIS staged its "Breaking the Walls" campaign, attacking prisons holding AQI fighters to grow ISIS's membership.  ISIS also committed acts of violence to intimidate civilians and cement its territorial control.  According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control."[10] Its aim was "to subjugate civilians under its control and dominate every aspect of their lives through terror, indoctrination, and the provision of services to those who obey."[11]

38.     ISIS also publicly displayed the bodies of those it killed, and it executed hostages in public.  It "beheaded, shot, and stoned" those it accused of crimes, notifying nearby residents

---

[9] Public Notice 8733, Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014); Public Notice 8734, Designation of Al-Nusrah Front, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014).

[10] U.N. Human Rights Council, 27th Session Agenda Item 4, *Rule of Terror:  Living Under ISIS in Syria* ¶ 1, A/HRC/27/CRP.3 (Nov. 19, 2014) ("*Rule of Terror*").

[11] *Rule of Terror* ¶ 73.

before public executions were set to occur.  ISIS particularly victimized women and children, whom it systematically abused and exploited.

39.    ISIS and ANF, like their predecessor AQI, targeted U.S. citizens to advance their terrorist objectives.  AQI's founding purpose was to wage a terrorist campaign to expel U.S. forces from Iraq and from the broader Middle East.  To that end, AQI's terrorist campaign openly targeted Americans, perpetrating many attacks against U.S. and coalition forces in Iraq and forcing the U.S. military to engage in near-daily combat with AQI terrorists.  As one DOD report observed in 2006, AQI quickly achieved high-profile "success" in Iraq by "inflicting American casualties (and, thus, demonstrating US vulnerability)" while "portraying the United States and its allies as new 'crusaders' that threaten the very survival of Islam."[12]

40.    After U.S. forces withdrew from Iraq in 2011, AQI and its successors ISIS and ANF "continued to plot attacks against U.S. persons and interests in Iraq and the region – including the brutal murder of kidnapped American citizens in Syria and threats to U.S. military personnel in Iraq."[13]  ISIS also periodically released "kill lists" publicly broadcasting the names of hundreds of U.S. citizens whom it encouraged its operatives and followers to execute around the globe.  It too often succeeded in murdering Americans.  In 2012, just before Defendants' payments to both groups began, "ISIS and ANF gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens."[14]

41.    By 2014, U.S. officials were raising alarm bells about ISIS's terrorist threat to the United States.  For example, on June 27, 2014, Senators Lindsay Graham and John McCain

---

[12] Office of Net Assessment, Office of the Secretary of Defense, *The Global War on Terrorism:  An Assessment* at 7 (Dec. 2006), https://tinyurl.com/2p8csw7s.

[13] Stephen W. Preston, *Legal Framework for the United States' Use of Military Force Since 9/11* (Apr. 10, 2015), https://tinyurl.com/4rvawmkr.

[14] Plea Statement ¶ 23.

observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."[15]

42.    ISIS publicly proclaimed its intent to commit acts of terrorism against the United States.  For example, in July 2012, Baghdadi discussed a wave of AQI attacks and threatened to strike at the "heart" of America, warning the United States:  "You will soon witness how attacks will resound in the heart of your land, because our war with you has now started."[16]  Similarly, in January 2014, Baghdadi released an audio recording addressed to Americans:  "Soon we will be in direct confrontation."[17]  Months later, in June 2014, Baghdadi issued another audio statement, again addressed to "America" and reiterating his January threat:  "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and that "soon enough, you will be in direct confrontation — forced to do so, God willing.  And the sons of Islam have prepared themselves for this day.  So wait, and we will be waiting, too."[18]  As one analyst put it succinctly, "ISIS has made no bones about the fact that it wants to directly target the United States."[19]

---

[15] Senator John McCain and Senator Lindsey Graham, *Statement By Senators John McCain And Lindsey Graham On Developments In Syria And Iraq*, U.S. Congressional News (June 27, 2014), 2014 WLNR 17528820.

[16] James Phillips, *A Resurgent al-Qaeda in Iraq Threatens U.S. Attack*, Heritage Foundation Commentary (July 26, 2012), https://tinyurl.com/4adtw5ke.

[17] Brett McGurk, *quoted in* Roll Call, Inc., *House Committee on Foreign Affairs hearing on Al-Qaeda Resurgence in Iraq* (Feb. 5, 2014), 2014 WL 460041 (quoting Baghdadi).

[18] Alissa J. Rubin et al., *U.S. Jets & Drones Attack Militants in Iraq, Hoping to Stop Advance*, N.Y. Times (Aug. 8, 2014).

[19] Evan Kohlmann, *quoted in* NBC Today Show, *Another Terror Concern Being Closely Watched This Morning Is The Renewed Violence In Iraq In A New Video Putting The Leader Of That* (July 7, 2014), 2014 WLNR 18561583.

43.     ISIS and ANF made good on those promises by escalating their predecessor's terrorist campaign against the United States.  ISIS's abduction and murder of two U.S. journalists – James Foley and Steven Sotloff – are perhaps the most infamous examples.  ISIS beheaded both men on camera and globally publicized their brutal executions in videos that ISIS titled "A Message to America" and "A Second Message to America," respectively. Disseminating those "messages" supported two terroristic aims.  ISIS committed heinous public murders of U.S. journalists both to "horrify Americans to discourage increased U.S. military involvement" and to "spur potential recruits to join in the carnage and incite additional terrorist attacks against the United States."[20]  Both were essential to ISIS's core anti-American ideology. As a high-level DOD official stated in 2015, "ISI[S] continues to denounce the United States as its enemy and to target U.S. citizens and interests."[21]

44.     Using these and other tactics, ISIS seized control of wide swaths of territory, at its height controlling about 30% of Syria and 40% of Iraq.  It was, in the words of Deputy Attorney General Monaco, "one of the most brutal terrorist organizations the world has ever known."[22]

## II.    DEFENDANTS PROVIDED MATERIAL SUPPORT TO ISIS AND ANF, INCLUDING BY PAYING THEM MILLIONS OF DOLLARS

45.     As ISIS and ANF were escalating their terrorist attacks against Americans, Defendants decided to pay those terrorists millions of dollars.  Lafarge – acting through Lafarge Cyprus and LCS – intentionally made recurring payments to ISIS and ANF to facilitate its business operations in northern Syria and to weaken its competitors.

---

[20] James Phillips, *The Message ISIS Wants to Send to America, The World*, Heritage Foundation Commentary (Sept. 10, 2014), https://tinyurl.com/4wr433br.

[21] Stephen W. Preston, *Legal Framework for the United States' Use of Military Force Since 9/11* (Apr. 10, 2015), https://tinyurl.com/4rvawmkr.

[22] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

46.     Defendants paid ISIS and ANF to benefit their Jalabiyeh cement plant in northern Syria.  Lafarge acquired the Jalabiyeh cement plant, then still under construction, when it bought Orascom Cement, Egypt's largest cement company, for nearly $12.9 billion in 2007.  Lafarge borrowed about $8.8 billion to finance the purchase, while also assuming around $2 billion of Orascom Cement's debt.  Lafarge spent another roughly $680 million building the Jalabiyeh plant, which it completed in 2010 – the largest non-oil foreign investment in Syrian history.

47.     Lafarge opened the Jalabiyeh plant in May 2010.  At full capacity, the Jalabiyeh plant could produce approximately 8,000 tons of cement per day, enough to fill 160 large trucks and to generate $500,000 in sales per day.  It was by far the largest cement plant in Syria.

48.     But the rapidly deteriorating Syrian security environment posed economic challenges for Lafarge.  The most severe came from the array of terrorist groups and other armed factions vying for control of Syrian territory, including the area of northern Syria in and around Jalabiyeh.  As Syria descended into a state of civil war, Lafarge realized it needed a strategy for dealing with the various terrorist factions near its cement plant.

49.     Lafarge also faced a political problem in persisting with its Syrian business.  From April to August 2011, as the Syrian security situation worsened, President Obama issued a series of Executive Orders freezing the assets of Syrian officials, barring investment in Syria, and banning financial institutions from clearing U.S.-dollar transactions for Syrian entities.[23]  Those sanctions were designed in significant part to combat terrorism and choke off the flow of dollars to Mideast terrorist groups.  In September 2011, the Council of the European Union likewise suspended the importation and purchase of Syrian petroleum products, as well as the financing of

---

[23] *See, e.g.*, Exec. Order No. 13,582 (Aug. 17, 2011); Exec. Order No. 13,573 (May 18, 2011); Exec. Order No. 13,572 (Apr. 29, 2011).

such transactions.  The World Bank also halted all its activities in Syria, and the 22-member

Arab League suspended Syria's membership.  In response to this international condemnation, in

December 2011, Royal Dutch Shell announced it would cease all operations in Syria.  Total and

Suncor, leading oil companies in France and Canada, followed suit shortly thereafter.

50.    Lafarge chose a different course.  The "exodus of multinational corporations from

Syria" presented Lafarge with an opportunity to corner the Syrian market,[24] so long as it could

devise a strategy for doing business with the terrorists there.  Lafarge therefore evacuated its

non-Syrian employees to Egypt in June 2012 but continued to operate in Syria using LCS's

Syrian employees.  Lafarge, through LCS, then began negotiating with the various terrorists

around Jalabiyeh so it could continue realizing revenue from its cement plant there.

51.    Defendants chose to pay terrorists to protect their Syrian investment and to

enhance their relationship with their foreign lenders.  As Pescheux, LCS's CEO, explained in a

May 2013 report, Lafarge chose "to continue to operate the plant as long as possible" so it could

"preserv[e] the integrity of our physical assets," "keep[] our personnel ready for the end of the

crisis" to leverage Lafarge's "huge investment" in Syria, "stay[] in the market (to keep our

distributors' network and to [keep] Turkish imports [from] flooding" the country, and "mak[e]

some profit to at least repay the interests of the loan and giv[e] some assurance to the lenders."[25]

52.    Lafarge's plan for buying off Syrian terrorists depended on Firas Tlass, its local

agent and business partner.  Tlass was a notorious Syrian industrial tycoon with a widespread

reputation for corruption and terrorist finance.  When Lafarge entered the Syrian market, Tlass

controlled the Syrian conglomerate Min Ajl Suriyya ("MAS"), which had a preexisting joint

---

[24] Plea Statement ¶ 24.

[25] *Id.* ¶ 28.

venture with Orascom to build the Jalabiyeh cement plant. When Lafarge bought Orascom, it inherited Tlass's joint venture and thus became business partners with both MAS and Tlass.

53. Lafarge, through LCS and Tlass, made its first payments to Syrian armed groups in July 2012. LCS executives and agents then began meeting directly with armed groups as early as September 2012, when Veillard, Tlass, and other LCS personnel attended a meeting with numerous factions in Gaziantep, Turkey, across the border from the Jalabiyeh plant. Tlass proposed that LCS pay these groups a monthly fee or alternatively pay them based on how much cement the Jalabiyeh plant produced. Lafarge and LCS quickly agreed to Tlass's proposal and began making monthly "donations" to the armed groups around the plant.

54. This plan led Lafarge and LCS to knowingly pay millions of dollars to ISIS and ANF. Both companies pleaded guilty in this District and admitted paying at least $5.92 million to ISIS and ANF from August 2013 to October 2014. On information and belief, their total payments to terrorist groups were far higher, likely exceeding $15 million. And after Lafarge evacuated the plant in September 2014, ISIS sold the cement Lafarge had left there for a gain of approximately $3.21 million. During its cooperation with ISIS and ANF, Lafarge obtained at least $70.3 million in total sales revenue from its operations at the Jalabiyeh plant.

55. A July 14, 2014 Gmail message from Tlass to Pescheux exemplified Defendants' intentional payments to terrorists. In that Gmail, Tlass discussed his "negotiations with ISIS," highlighted that the negotiations were "going better," proposed providing ISIS with "a monthly statement," and sought input from Pescheux about how much Lafarge's distributors should pay the terrorists "*in addition to the ten millions that we pay directly to them, i.e. to ISIS*."

17



On Mon, Jul 14, 2014 at 9:38 AM, Firas Tlass <firastlass01@gmail.com> wrote:

Dear Bruno

Our negotiations with ISIS are going better now, and I'm confident that we can reach to a logical agreement with them.

What I need to know exactly:

· What are the payments that we have deducted from all the suppliers as compensations for the amounts that they usually pay to ISIS in addition to the ten millions that we pay directly to them, i.e to ISIS?

• Can we give them a monthly statement about the cars sold by the plant every month?

N0014R01-00001461-00001

56.     Each Defendant played a culpable role in providing this material support to ISIS and ANF.  When Plaintiffs refer below to "Defendants" or to "Lafarge" making payments, they mean that all three corporate affiliates cooperated to facilitate the payments.  For ease of reference, this Complaint does not repeat each Defendant's individual role every time it describes their conduct.  Their roles generally remained consistent throughout the alleged course of conduct.  At all relevant times, the three Defendants did the following:

57.     **Lafarge.**  Lafarge oversaw and directed the conduct of the other two Defendants, both of which were subsidiaries it controlled.  When LCS transacted with ISIS and ANF, it did so "at the direction of LAFARGE's and LCS's senior management,"[26] including Herrault, a

---

[26] *Id.* ¶ 16.

Lafarge Executive Vice President based in Paris.  LCS kept Lafarge executives informed of its decisions, and it followed Lafarge's directions in deciding how to interact with terrorists.  As Herrault wrote in 2017, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership.[27]  And Lafarge made those decisions "for the specific purpose of protecting LAFARGE's and LCS's employees, assets, and future economic opportunities in Syria."[28]  Thus, when allegations below refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

58.    **Lafarge Cyprus.**  Lafarge Cyprus was the intermediate subsidiary through which Lafarge owned most of its shares in LCS.  Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and to Tlass and thereby financed Lafarge's payments to terrorists.  When Lafarge Cyprus supplied LCS and Tlass with such financing, it did so knowingly, at Lafarge's direction and with Lafarge's approval.  For example, Lafarge Cyprus (rather than Lafarge or LCS) executed a phony 2014 consulting agreement with Tlass, which Lafarge engineered to conceal its payments to ISIS.[29]  By acting as the conduit through which Lafarge moved its money, Lafarge Cyprus played a key role in Defendants' scheme.

59.    **LCS.**  LCS was Lafarge's Syrian subsidiary that operated the Jalabiyeh cement plant on the ground in Syria.  LCS executives had direct interactions with Tlass and Taleb, gave instructions to both intermediaries, and effectuated payments to terrorists at Lafarge's behest.

60.    Overall, Defendants' payments to ISIS and ANF took three main forms:  (1) flat monthly "donation" payments; (2) volume-based payments guaranteeing LCS's distributors and customers access to the Jalabiyeh cement plant; and (3) payments to ISIS-controlled suppliers to

---

[27] *Id.* ¶ 16.

[28] *Id.* ¶ 16.

[29] *See*, *e.g.*, Plea Statement ¶¶ 96-103.

obtain the raw materials needed for cement production.  Lafarge and LCS also knowingly sold cement to ISIS, which ISIS used directly to support terrorist activities.  Each is discussed below.

### A.    Defendants Made Fixed Monthly Payments To ISIS And ANF

61.    Defendants made fixed monthly payments to ISIS and ANF.  They made these payments primarily by using Tlass as an intermediary.  As Lafarge and LCS admitted in pleading guilty to providing material support to terrorists, their payments to ISIS and ANF occurred from "in or around August 2013, or earlier, through October 2014."[30]  Consistent with the "or earlier" reference, the facts below indicate that Defendants' payments to terrorists began in late 2012 or early 2013.  In total, Lafarge made at least $816,000 in such monthly "donation" payments.

62.    Lafarge began setting up its fixed monthly payments to Syrian armed groups as early as July 2012.  A few months before, in May 2012, unrest had engulfed the areas around the Jalabiyeh plant in Northern Syria.  To allow Lafarge to maintain good relations with the groups responsible, Tlass began buying them off on Lafarge's behalf.  Defendants initially gave Tlass between $80,000 and $100,000 per month to distribute to the armed groups around the factory.  Tlass, in turn, provided periodic lists to Lafarge and LCS executives that identified each of the various groups he was paying on his clients' behalf.  These lists enabled Lafarge executives to understand Tlass's monthly payments and to oversee Tlass's activities.

63.    As part of this process, Defendants, through Tlass, established contact with ANF by November 2012.  On information and belief, Tlass began making monthly donations to ANF shortly thereafter.  Those payments were confirmed by February 2013, when Tlass advised LCS he was paying the "ALRAQA People," a reference to ANF.[31]  Although Defendants did not ask

---

[30] *Id.* ¶ 19.

[31] *Id.* ¶ 38.

Tlass for the identity of "ALRAQA People," Lafarge and LCS executives knew it referred to ANF, given that they had approved Tlass's plan "to establish relations with ANF" in late 2012 and that ANF had taken control of Raqqa in a highly publicized assault in early 2013.[32]  Indeed, LCS's former risk manager candidly admitted that "Al-Nusra Front was 'the group in Rakka,'" further explaining:  "***Lafarge was aware of the sums paid and the recipients***."

64.    Lafarge's and LCS's intentional monthly payments to ISIS likewise began in the spring of 2013.  By the summer of 2013 at the latest, Defendants had concluded that they "could not continue to operate in Syria without negotiating and ultimately making payments to ISIS."[33]  Soon after, Tlass's periodic lists of "donations," circulated among Lafarge executives, began referencing ISIS expressly, memorializing in writing what Defendants already understood.

65.    Defendants made these payments to stay on good terms with ISIS and ANF.  Defendants intended for the payments (among other things) to "unlock" the roads to and from Jalabiyeh for their customers and distributors.  For a while, the payments accomplished their aim.  In a May 2014 email, for instance, Tlass touted Defendants' bribe-enabled "good relations" with ISIS and ANF.[34]  As a former LCS employee stated, "Lafarge paid a high price" by bribing ISIS, but successfully "obtained relative security for the continuation of its activities."

66.    Defendants paid to stay on good terms with ISIS and ANF because it was profitable to do so.  As Tlass noted to Lafarge and LCS executives in March 2014:  "We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection.  Other factories are paying for protection just to exist, without making the profits we

---

[32] *Id.* ¶¶ 27, 38.

[33] *Id.* ¶ 33.

[34] *Id.* ¶ 47.

are."[35]  In fact, profit – not safety – was Defendants' principal motivation.  Defendants'

managers did not face any imminent threat of harm.  Nor was their conduct designed to protect

LCS's local employees.  For example, LCS threatened to fire employees who did not come in-

person to the factory, insisting instead that they expose themselves to personal risk by traveling

to and from Jalabiyeh.  LCS also forced its employees to travel to Aleppo to retrieve cash from

banks there, knowingly subjecting employees to the risk of kidnapping.  On one occasion, LCS

reportedly even fired an employee after he was abducted.  Throughout, Defendants had

alternatives to paying the terrorists:  among other things, they could have closed the plant and

left Syria, as other multinational companies did.  But they stayed to boost their bottom line.

### B.    Defendants Made Volume-Based Payments To ISIS And ANF

67.    In addition to monthly donations, Lafarge and LCS also made volume-based

payments to ISIS and ANF.  These payments totaled at least $1.65 million.

68.    At first, Lafarge paid a volume-based fee of $150 per truck to ANF and ISIS.

Rather than pay directly, Lafarge discounted the price of cement it sold to its customer-

distributors to reimburse them for making the payments to ANF and ISIS.  To make sure the

arrangement worked, Lafarge agreed to provide details to ISIS reporting the amount of cement it

sold to each customer-distributor, so the terrorists could verify the payment amounts.

69.    Lafarge's and LCS's arrangement with ISIS soon evolved into paying volume-

based amounts for the trucks going in and out of the Jalabiyeh plant.  Lafarge and LCS agreed in

November 2013 that LCS would pay ISIS for each ton of cement, in exchange for ISIS ensuring

the safe passage of each truck.  That agreement – dated November 6, 2013 – was memorialized

on ISIS letterhead and was executed by ISIS and LCS (the latter acting on Lafarge's behalf).

---

[35] *Id.* ¶ 46.

70.     Under that agreement, ISIS issued stamped vehicle passes – on ISIS letterhead – granting passage to Lafarge trucks "after they have fulfilled their dues to us."[36]  An example of an ISIS vehicle pass, dated April 26, 2014 and bearing ISIS's letterhead and stamp, is below:



In exchange for these and other passes, Defendants routed millions of additional dollars to ISIS.

### C.    Defendants Paid ISIS-Controlled Suppliers For Raw Materials

71.     Lafarge and LCS also paid ISIS by buying raw materials from ISIS-controlled suppliers.  These additional payments to terrorists totaled at least $3,447,528.

72.     Lafarge again worked through Tlass to negotiate the purchase of such materials from ISIS.  For example, a Tlass associate negotiated a deal between LCS and ISIS in November 2013 to buy pozzolana, a type of volcanic ash used in cement.

73.     Defendants also used another intermediary, Amro Taleb, to negotiate the purchase of key raw materials from ISIS.  Taleb had approval from the highest levels of Lafarge, meeting

---

[36] *Id.* ¶ 36.

in September 2013 with a former CEO of Lafarge who sat on its Board of Directors. The materials Defendants sourced from ISIS-controlled suppliers included coal, fuel, and pozzolana. Taleb negotiated one such purchase from ISIS in September 2013, explaining to Lafarge executives that Defendants' deal was with "Islamic state" and that he "OFFICIALLY REPRESENT[S] ISLAMIC STATE FOR INVESTMENTS."[37]

74.    Defendants' raw-material purchases from terrorists in the fall of 2013 spurred negotiations over a longer-term deal in the ensuing months. In early 2014, LCS agreed to buy large quantities of raw materials from ISIS suppliers: 200,000 tons of pozzolana, 16,000 tons of heavy fuel oil, 15,000 tons of dirty fuel (with an option for 35,000 more), yellow sand, and coal.

75.    Lafarge and LCS executives understood that their transactions with ISIS-controlled suppliers violated U.S. and Syrian law. But they were pleased with the deal, which LCS reported to Lafarge. As Pescheux (LCS's CEO) wrote to Herrault (Lafarge's Executive Vice President) on February 16, 2014, the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm" due to Lafarge's and LCS's payments.[38]

**D.    Defendants Sold Cement To ISIS**

76.    Defendants did not just give money to terrorists. On information and belief, they also provided ISIS with LCS-manufactured cement. In one 2014 email to Jolibois, an LCS risk manager explained that ISIS was "looking for distributors in Syria like ours" to provide 150,000 tons of cement. The request was conveyed via one of LCS's largest customer-distributors, which was closely linked to ISIS. LCS understood at the time, as memorialized in an internal company note, that ISIS was seeking such cement for its "personal consumption" rather than to "market

---

[37] *Id.* ¶ 49.

[38] *Id.* ¶ 54.

it." On information and belief, Lafarge and LCS agreed to ISIS's request for cement. This information includes Veillard's communications, which contain evidence of "cement going to Daesh." Or, as a former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them."

77.    The same LCS employee further observed that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." As the employee put it, Lafarge and LCS "could do anything. They had deals with ISIS." This was reflected in periodic sales reports that an LCS sales manager sent to Pescheux. According to that former sales manager, "it was not our problem that Daesh received our cement." Similarly, a former French intelligence analyst reportedly testified that Lafarge sold cement to ANF and ISIS in Syria. In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them."

78.    Lafarge's provision of cement to ISIS offered the terrorists a valuable form of operational assistance. ISIS used those materials to fortify its network of underground tunnels and bunkers, which its operatives exploited to hide from U.S. and coalition counterterrorism forces, including in Northern Syria and near the Syria-Iraq border. ISIS also used fortified industrial-strength tunnels – which, on information and belief, required LCS's high-grade cement – to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and facilitate attacks. Those cement sales thus directly supported ISIS's terrorist operations, including attacks that targeted Plaintiffs and their family members.

### E.    Defendants Conspired With ISIS To Undercut Their Competitors

79.    Lafarge conspired with ISIS not only to keep the Jalabiyeh cement plant in operation, but also to enlist ISIS's broader assistance. Throughout 2014, Lafarge sought a "durable agreement" with ISIS, because it perceived that ISIS "will stay in the region for a long

term [sic], so we have to deal carefully with them."[39]  In that way, Lafarge came to see ISIS as a business partner it could use to its economic advantage.  As the U.S. Attorney for this District stated in announcing Lafarge's and LCS's guilty plea, Lafarge bribed ISIS "not merely in exchange for permission to operate its cement plant – which would have been bad enough – but also to leverage its relationship with ISIS for economic advantage, seeking ISIS's assistance to hurt Lafarge's competition in exchange for a cut of Lafarge's sales."[40]

80.    In negotiating a long-term agreement with ISIS, Lafarge and LCS consistently pushed for ISIS to take action against its competitors.  In May 2014, Pescheux proposed that ISIS "take a 'toll fee' on each truck loaded with Turkish cement," which would both generate revenue for ISIS and "reduc[e] the attractiveness of Turkish cement" in the Syrian market Lafarge sought to dominate.[41]  In July 2014, Tlass updated Lafarge executives on these negotiations with ISIS.  For Turkish cement, Tlass explained he was seeking an agreement that "costs are imposed on its passage on any of the roads controlled by the ISIS."[42]  Pescheux responded by reiterating his position that ISIS should charge a high fee on Turkish imports.

81.    Lafarge and LCS also sought a broader revenue-sharing arrangement with ISIS in return for ISIS undermining Lafarge's Turkish competitors.  Herrault, Lafarge's Executive Vice President of Operations, wrote in July 2014 that "[w]e have to maintain the principle that we are ready to share the 'cake' . . . .  To me, the 'cake' is anything that is a 'profit', after the amortization and before financial expenses."[43]  Lafarge conditioned this "cake"-sharing on

---

[39] *Id.* ¶ 71.

[40] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

[41] Plea Statement ¶ 69.

[42] *Id.* ¶ 71.

[43] *Id.* ¶ 73.

ISIS's reciprocal agreement to interdict cement from LCS's competitors. To that end, in July 2014, Pescheux wrote to his successor stating that "we need to know more about their promise to block Turkish cement."[44] Jolibois replied by seeking "more information about the way [ISIS] will control turkish cement import: stop it, implement tax? [H]ow much, to be paid how?"[45] And in August 2014, Jolibois again told Tlass that, "[i]f ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase [our] price."[46]

82.    During this period, Tlass worked hard to reach what he called a "logical agreement" with ISIS, suggesting that Lafarge provide ISIS with a "monthly statement" that would enable ISIS to calculate the revenue-share split with precision. As his negotiations progressed, Lafarge and LCS took pains to ensure they would reap a competitive advantage from the final deal. For example, Tlass and Jolibois discussed how to refer to Lafarge when implementing their agreement with ISIS. They did not want ISIS's passes to mention Lafarge's name – as that could arouse suspicion – but they also did not want their payments to wind up protecting Lafarge's competitors. Thus, as Tlass wrote to Jolibois on September 4, 2014, it was better to use a specific "pseudonym" that would protect Lafarge's customer-suppliers but not their competitors, making clear that "ISIS cannot let all the customers pass, just ours."

83.    On August 15, 2014, the United Nations Security Council issued a resolution "condemn[ing] in the strongest terms the terrorist acts of ISIL and its violent extremist ideology, and its continued gross, systematic and widespread abuses of human rights and violations of international humanitarian law," and calling on all member states to "ensure that no funds, financial assets or economic resources are made available, directly or indirectly for the benefit of

---

[44] *Id.* ¶ 75.

[45] *Id.* ¶ 75 (second alteration in original).

[46] *Id.* ¶ 77.

ISIL [or] ANF."[47]  Several days after the U.N. resolution, Veillard informed Herrault and Jolibois about that designation, plus new U.S. sanctions on additional ISIS and ANF leaders.

84.     These U.S. and U.N. designations did not drive Lafarge's decision-making; its operating margins did.  Despite ISIS's heightened demands, and despite the escalating U.S. and U.N. terrorism sanctions, Lafarge decided that its margins were good enough to justify sharing revenue with ISIS.  In mid-August 2014, Jolibois analyzed Lafarge's projected margins and stated, "I recommend acceding to the request of ISIS."[48]  By August 27, 2014, Lafarge executives reported to the company's Executive Committee that they had a deal with ISIS.

85.     On information and belief, Defendants did not withdraw from their conspiracy until 2019 or later, which was after the period (2013-2017) when ISIS and ANF committed every attack that killed and injured Plaintiffs.  Defendants knew their participation in ISIS's conspiracy would aid ISIS's ability to conduct terrorist attacks for years after their last payment.  But Defendants' first public acknowledgement occurred on April 24, 2017, when Holcim issued a press release addressing only some of Lafarge's unlawful activities.[49]  Holcim's press release did not fully disclose the identities of the wrongdoers, did not admit that Defendants had violated any U.S. or French criminal law, and downplayed the severity of what Defendants had done.[50]

86.     On information and belief, Defendants did not begin cooperating with the U.S. Department of Justice until at least 2019 and did not fully disclose their conduct to the U.S. government until a significant time after that.  Even then, their cooperation with the U.S. government was incomplete, which the Department of Justice criticized.  As the Plea Agreement

---

[47] U.N. Security Council Resolution 2170 at 3, 4 (Aug. 15, 2014), https://tinyurl.com/46ekzrzj.

[48] Plea Statement ¶ 83.

[49] *Id.* ¶ 110.

[50] *Id.* ¶ 110.

states, Lafarge's "criminal conduct" was "not voluntarily self-reported to the Department of

Justice," which "did not receive timely and full cooperation with [its] investigation."[51]

## III.    DEFENDANTS KNEW, AND TRIED TO CONCEAL, THAT THEY WERE SUPPORTING U.S.-DESIGNATED TERRORIST GROUPS

87.    At all times, Defendants understood that they were dealing with U.S.-designated

terrorists.  In December 2012, Veillard approved negotiations with ANF despite knowing that

ANF was "on USA's list of terrorist organizations."[52]  In March 2013, an LCS risk manager

further advised Veillard and Pescheux of ANF's "ties to al-Qaeda."[53]  In September 2013,

Lafarge's Security Committee conceded that Lafarge and LCS were "having to directly or

indirectly negotiate with networks classified as terrorists by international organizations and the

US."[54]  And in August 2014, Lafarge executives internally discussed the United States' decision

to add terrorists from ISIS and ANF to the U.S. list of SDGTs.  But such awareness did not

dissuade Lafarge from seeking to preserve its business relationship with ISIS.  Throughout the

negotiations, Lafarge remained willing to engage with ISIS, even as Herrault reminded Jolibois

that "we should not forget that ISIS is a terrorist movement."[55]

88.    In fact, ISIS's and ANF's status as terrorist groups supplied Lafarge's principal

motivation for cooperating with them.  Their penchant for violence was the reason Lafarge

wanted to pay them off:  by sharing revenues and aligning the terrorists' interests with its own,

Lafarge redirected terrorist violence away from itself and to others instead.  In that way, the

threat of terrorist violence presented both risk and opportunity.  The risk – the potential threat to

---

[51] Plea Agreement § 7(f).

[52] Plea Statement ¶ 27.

[53] *Id.* ¶ 27.

[54] *Id.* ¶ 31.

[55] *Id.* ¶ 82.

Lafarge's and LCS's "continued operation of the Jalabiyeh Cement Plant" – motivated Lafarge and LCS to pay ISIS and ANF for protection.[56]  And the opportunity – to leverage terrorist violence against Lafarge's would-be competitors – further motivated Lafarge and LCS to strike a deal "to obtain economic advantage over their competitors in the Syrian cement market."[57]  The resulting arrangement allowed Lafarge to profit from ISIS's terrorism.  That is why it entered a revenue-sharing arrangement in the first place:  to "incentiviz[e] ISIS to act in a manner that would promote Lafarge's and LCS's security and economic interests."[58]

89.    Lafarge and LCS recognized that their conduct was illegal, so they worked hard to conceal it.  One way they did so was paying the terrorists through intermediaries rather than directly.  According to LCS's former risk manager, "it was especially important that the relationship would be handled by [Tlass]'s middlemen, since an exposure of this sort would have been compromising for LCS."  This use of intermediaries did not reduce the significance of Lafarge's and LCS's terrorist financing; it just made the financing harder for others to discover.  As LCS's risk manager observed, Lafarge's payments – nominally indirect, but designed to reach terrorists just the same – "did in fact contribute to the economy of ISIS."

90.    Lafarge and LCS also insisted on keeping the name "Lafarge" off their correspondence with ISIS and ANF.  For instance, Pescheux told Tlass in September 2013 that "the name of Lafarge should never appear for obvious reasons in any document" memorializing Lafarge's illegal payments.[59]  Similarly, in early September 2014, Jolibois complained to Tlass

---

[56] *Id.* ¶ 15.

[57] *Id.* ¶ 15.

[58] *Id.* ¶ 15.

[59] *Id.* ¶ 32.

that ISIS was putting Lafarge's name on vehicle passes (thus suggesting Lafarge had paid), when Lafarge had intentionally routed payment through LCS's customers-distributors instead.

91.    Lafarge and LCS also directed Tlass and Taleb to create fake invoices to paper over their payments to terrorists.  One key reason for those invoices, Pescheux observed, was to "avoid problems with the Syrian authorities and with our Auditors."[60]  To that end, in January 2014, Pescheux instructed Taleb to invoice only for "[e]nvironmental consultancy services," even though Taleb was actually brokering the sale of pozzolana and heavy fuel oil from ISIS-controlled suppliers.  Similarly, Pescheux sent an internal email instructing several LCS employees that "*we all have to stop [using] the acronym of an organization which is on terrorist lists*" and instead use code words, further masking Lafarge's activities.

92.    More broadly, Lafarge and LCS went to great lengths to mask Tlass's involvement in their negotiations with terrorists.  Defendants removed Tlass from the LCS board in mid-2013.  But they wanted to retain his services as an intermediary, so Pescheux told Tlass that Lafarge's "preferred option" was to make "a bank transfer in USD to the account of a duly registered company" secretly controlled by Tlass, which would appear less suspicious.[61]

93.    Tlass and Lafarge eventually reached a deal negotiated by Roux, then a Lafarge Executive Vice President in Paris.  Styled an "External Support Agreement," it provided that Lafarge would deliver $75,000 monthly to Tlass:  $50,000 to compensate Tlass, $25,000 earmarked for distribution to ISIS and other groups.  The agreement was conditioned on the Jalabiyeh plant continuing to produce at least 75,000 tons of cement per month.

---

[60] *Id.* ¶ 57.

[61] *Id.* ¶ 60.

94.     Lafarge and LCS also "falsif[ied] records" regarding their payments to Tlass.[62] For example, Lafarge and LCS documented their $75,000 monthly payment to Tlass at least once as "Operating expenses," with no reference to Tlass or any of his associates.

95.     Lafarge and LCS also tried to cover their tracks after evacuating the Jalabiyeh plant in September 2014.  In October 2014, Tlass sought payment for his final months of service as Lafarge's intermediary.  In return, Lafarge and LCS demanded that Tlass sign a termination agreement backdated to August 18, 2014.  That date suggested falsely that Lafarge and LCS had terminated Tlass in prompt response to the August 15, 2014 U.N. resolution.

96.     Beyond backdating the contract, Lafarge took additional steps to conceal its relationship to Tlass.  It drafted a new "Agreement for Regional Security Consulting Services," to be entered between Lafarge Cyprus and a new Dubai company Lafarge asked Tlass to create. Lafarge agreed to pay Tlass $210,000 for work he had already done and to make additional U.S.-dollar payments of $30,000-per-month moving forward.  Tlass also agreed to keep confidential all information he knew about Lafarge and its activities.  Even as Lafarge compensated Tlass for serving as its conduit to terrorist groups, Lafarge inserted a phony provision nominally requiring Tlass to abide by "all applicable laws," including "the prohibition of financing of terrorism."[63]

97.     Lafarge also concealed its ties to terrorist groups as it consummated a merger in 2014-2015 with Holcim, Lafarge's then-main multinational competitor in the building-materials industry.  Holcim asked Lafont, Lafarge's CEO, whether any important undisclosed issues should be brought to Holcim's attention before the transaction closed in 2015.  Lafont and Lafarge's other executives said nothing and hid their payments to terrorists.

---

[62] *Id.* ¶ 62.

[63] *Id.* ¶ 100.

98.     Lafarge's and LCS's cooperation with terrorists came to light publicly only in 2016, after the merger with Holcim, when a Syrian opposition group publicized Lafarge emails about its payments to ISIS.  Facing public scrutiny over these serious allegations, LafargeHolcim – as the combined entity was then known – launched an internal investigation.  In 2017, the company concluded that Lafarge's leaders had engaged in "unacceptable" actions, made "significant errors of judgement," and "neglect[ed] to focus sufficiently on the legal and reputational implications of their conduct."[64]  French authorities subsequently initiated a criminal investigation.  Many of Lafarge's and LCS's former employees now face criminal prosecution in France for the conduct alleged in this Complaint.

## IV.   DEFENDANTS' PAYMENTS TO ISIS AND ANF SUBSTANTIALLY ASSISTED THE TERRORIST ATTACKS THAT KILLED AND INJURED PLAINTIFFS

### A.    Defendants' Payments Made A Vital Contribution To ISIS's And ANF's Terrorist Attacks In Iraq, Syria, And Elsewhere

99.     Defendants' payments financed ISIS's and ANF's terrorist attacks, including those against Plaintiffs.  Both terrorist groups relied on protection rackets – demanding taxes from local corporations and other entities in exchange for the terrorists' "protection" – to fund their attacks.  In that respect, both groups inherited their fundraising techniques from AQI, their common predecessor, consistent with their status as "AQI 2.0 . . . in the Middle East."[65]  AQI, like other terrorist groups, had long used protection rackets to fund terrorist attacks.

100.    ISIS and ANF continued the same legacy-AQI protection rackets, financing themselves by raising "taxes" from entities doing business in territory they controlled, "done

---

[64] *Id.* ¶ 110.

[65] Michael R. Gordon, *Degrade And Destroy:  The Inside Story Of The War Against The Islamic State, From Barack Obama To Donald Trump* 113 (Farrar, Straus and Giroux 2022).

under the auspices of providing notional services or 'protection.'"[66]  And protection payments, like the ones Defendants made, were vital to both groups' terrorist operations.  According to one study, protection rackets supplied one of ISIS's "most important sources" of funding, providing key "operational support" for the group's violent terrorist attacks.[67]  These "protection rackets," as former Ambassador Samantha Power summarized, enabled ISIS to "pay its followers and fund attacks around the world."[68]

101.    Money is the lifeblood of terrorism, including for ISIS and ANF.  As the United States explained in a criminal case against a member of al-Qaeda's terrorist syndicate, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."[69]  Or, in the words of deceased al-Qaeda financial chief Sa'id al-Masri, "without money, jihad stops."[70]  Defendants' money supplied ISIS and ANF with what they needed to commit terrorist attacks against Americans.

102.    Defendants' payments materially enhanced ISIS's and ANF's ability to commit those terrorist attacks.  Without the "financial resources" supplied by such payments, the Financial Action Task Force concluded, "the capability and activity of terrorist organizations such as ISIL [would have been] degraded."[71]  As Juan Zarate, a former U.S. Treasury Department official, likewise explained in 2015, diversified "[f]inancial flows" were especially

---

[66] Financial Action Task Force, *Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)* at 12 (Feb. 2015) ("*FATF Report*"), https://tinyurl.com/56sskw43.

[67] *FATF Report* at 32.

[68] Ambassador Samantha Power, *Putting ISIS Out of Business*, CNN Wire (Dec. 17, 2015).

[69] Tr. of Arraignment at 19:2-4, *United States v. Khan*, No. 11-cr-20331 (S.D. Fla. May 23, 2011), Dkt. 31.

[70] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 14 (2015), https://tinyurl.com/ymxztbzh.

[71] *FATF Report* at 32.

"important [to] groups like the Islamic State . . . . Money is their enabler but it's also their Achilles heel."[72] Had Defendants refused to pay, they could have materially curtailed ISIS's terrorist violence, impeding their ability to kill and injure Plaintiffs.

103.    Other government reports confirm the direct link between Defendants' payments and ISIS's and ANF's terrorist attacks. For example, the State Department reported that "ISIL and AQ affiliates, including [ANF]," used "criminal activities to raise funds for operational purposes," observing that much of ISIS's and ANF's funding came from so-called "taxation" in Syria.[73] Similarly, the U.N. Security Council documented that ISIS created "a sophisticated, quasi-bureaucratic revenue-generating structure" in Syria – of which Defendants' payments were a material part – to generate "financial resources to support [its] ongoing military campaigns."[74]

104.    Terrorism scholars corroborated the point. As Dr. Daniel Byman at Georgetown wrote in 2015, ISIS raised crucial "money from taxing local populations," including the "tax" Defendants paid. "The Islamic State uses this money," Dr. Byman continued, "to pay its fighters . . . as well as to recruit new fighters and facilitate their travel to the battlefield."[75]

105.    The terrorists themselves described how protection payments played a key role in funding terrorist attacks. For example, ISIS publicly confirmed that it deployed its "taxes," "khums," "zakat," "fay," and "spoils" to support "[t]he mujahidin and jihad" – that is, it used

---

[72] Juan Zarate, *quoted in* Federal News Service Transcripts, *House Financial Services Committee hearing on Task Force to Investigate Terrorism Financing* (Apr. 22, 2015), 2015 WLNR 12099026.

[73] U.S. State Dep't, *Country Reports on Terrorism 2014* at 9 (June 2015) (emphasis added), https://2009-2017.state.gov/documents/organization/239631.pdf. When the State Department (like other U.S. government agencies) says "operational purposes," it means terrorist attacks.

[74] U.N. Security Council, *Report Of The Secretary-General On The Threat Posed By ISIL (Da'esh) To International Peace And Security And The Range Of United Nations Efforts In Support Of Member States In Countering The Threat* ¶ 4 (Jan. 29, 2016) (emphasis added).

[75] Dr. Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement: What Everyone Needs To Know* at 173 (Oxford Univ. Press 2015).

protection payments to finance the ISIS cells conducting terrorist attacks.  Other reports concurred.  In 2011, an Iraqi newspaper documented how AQI-operated rackets in Iraq and Syria – which Baghdadi then had controlled for about a year – extracted protection payments for the stated purpose of aiding the terrorists' "resistance and jihad," principally against U.S targets.[76]

106.    Defendants knew that ISIS and ANF were using their money to commit terrorist acts.  As noted above, Defendants were aware that both groups were U.S.-designated terrorist groups; that is why they worked so hard to conceal their conduct.[77]  They also knew that, in 2012, ISIS and ANF had "gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens."[78]  Against that backdrop, as a former LCS risk manager admitted, Lafarge "should have pulled out" of Syria but instead cooperated with ISIS and ANF, allowing "those groups [to] directly or indirectly benefit[] from our operations."  And Defendants were aware of why local terrorists were running protection rackets. The same LCS employee acknowledged that "their motivation seemed obvious:  ***they wanted money!  Money to use for arms, ammunition, and battalion funding***."

107.    The significance of Defendants' payments was especially pronounced when viewed in light of the low marginal cost of ISIS's and ANF's individual attacks.  According to one study of AQI by four terrorism scholars, "payments to foot soldiers to conduct attacks were fairly low; the costs of paying someone to plant IEDs was reportedly between $40 and $100, while payments for more elaborate attacks cost somewhere between $100 and $2,000."[79]  And,

---

[76] Saut al-Iraq, *Mosul Businessmen:  Al-Qa'ida Has Returned To Collect Money* (Oct. 24, 2011).

[77] *Supra* ¶¶ 87-98.

[78] Plea Statement ¶ 23.

[79] Michael Freeman, Christopher L'Heureux, Dan Furleigh & Duke Pope, *Insurgent And Terrorist Finances In Iraq*, *in* Michael Freeman (Editor), Financing Terrorism:  Case Studies at 35 (Routledge 2017).

although estimates vary, AQI often paid its mid-level commanders between $200-$400 per month, and they could make IEDs for a mere $100. Indeed, al-Qaeda bragged in online publications that it could conduct a sophisticated, transnational bombing targeting Americans for less than $5,000. As ISIS scholars Jessica Stern and J. M. Berger explained in 2016:

> Asymmetrical warfare is defined by asymmetry. Any terrorist ideology that can attract five recruits and the contents of their checking accounts can make headlines for months. ***A terrorist group with twenty willing recruits and half a million dollars can make headlines for years.***[80]

108.    At those rates, even a single payment of $5,000 to ISIS and ANF would have financed substantial terrorist violence. At the time, a $5,000 payment would have put 20 terrorists (at $100 per fighter) and three commanders (at $333 per commander) in the field for a month and would have supplied them with 20 IEDs. Or the terrorists could have spent the $5,000 to purchase dozens of bomb components or to finance multiple complex attacks. Defendants' payments were orders of magnitude higher. Those payments materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs.

109.    U.S. government studies confirm the dramatic impact of even marginal financial contributions to AQI and its progeny. For example, one DOD study found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack in Iraq required on average only $2,732 to execute.[81] The study thus demonstrated that even marginal reductions in AQI's terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every

---

[80] Jessica Stern & J. M. Berger, *ISIS: The State Of Terror* at 191 (Ecco 2016) (emphasis added).

[81] *See* Benjamin Bahney et al., *An Economic Analysis of the Financial Records of al-Qa'ida in Iraq* at 61-67 (2010), https://www.rand.org/pubs/monographs/MG1026.html. Although this study addressed AQI specifically, its findings are substantially applicable to the activities of AQI's successors – ISIS and ANF – which copied AQI's techniques and inherited its resources.

$2,700 (or its rough equivalent) Defendants gave to AQI's successors, they financed roughly one

new terrorist attack.  As a result, even just the $5.92 million Lafarge and LCS admittedly gave

ISIS and ANF (the actual payment amount was likely higher) was more than enough to fund

thousands of attacks – sufficient to kill every Plaintiff in this case multiple times over.

110.    This effect was linear.  Simply put, more money equaled more acts of terrorism.

As Dr. Margaret Sankey of the U.S. Naval Institute and Air University, concluded in 2022:

> With the caveat and reminder that operations don't cost a large amount in proportion to sustainment, VNSAs [Violent Non-State Actors] whose budgets have been reduced have to make hard decisions about maintaining their capabilities.  In some cases, [297] ***there's a clear pattern that more money means more attacks, with al-Qaeda in Iraq consistently increasing by one attack for every $2,700 sent*** by the central leadership to sectors.  Mustafa Abu al-Yazid, an al-Qaeda financing chief, put it starkly:  "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves.  ***So funding is the mainstay of jihad.***"[82]

111.    As shown by evidence gathered in the ongoing French criminal case against

Lafarge and its executives, Defendants' payments were sufficiently pervasive and systemic that

they substantially contributed to a range of ISIS terrorist attacks.  The scale and repeated nature

of Defendants' payments magnified the effect of their contributions.  According to French

criminal investigators, the "amount and duration" of Lafarge's multimillion-dollar bribes in Syria

allowed ISIS to "***plan and carry out violent operations in the area and abroad***."  U.S.

prosecutors concurred in that assessment.  As Deputy Attorney General Monaco noted, "through

their support and funding, Lafarge enabled the operations of a brutal terrorist organization."[83]

112.    Defendants' payments to ISIS in 2013-2014 also assumed an outsized role in

financing ISIS violence through at least the end of 2017.  For ISIS in particular, money had a

---

[82] Dr. Margaret Sankey, *Blood Money:  How Criminals, Militias, Rebels, and Warlords Finance Violence* at 296-97 (Naval Institute Press 2022) (emphases added).

[83] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing a Guilty Plea by Lafarge on Terrorism Charges* (Oct. 18, 2022).

multi-year shelf-life, given the way it hoarded cash and preserved it for future use. The U.S. government, for example, confirmed in February 2019 that "ISIS . . . in Syria . . . continue[d] to draw upon its cash reserves" from its older caliphate-era rackets,[84] with the terrorists continuing to stretch the "stockpiled cash" they collected many years earlier.[85] This reflected, among other things, ISIS's strategic decision in 2014 to conserve resources – including its "tax" revenue and cement for fortifying underground tunnels – for future use years later. Similarly, Lafarge's provision of high-quality cement to ISIS had a long shelf-life. Given these unique-to-ISIS practices, Lafarge's material support in 2014 foreseeably contributed to ISIS attacks through at least 2017.

113.    Despite the substantial nature of Defendants' material support, Plaintiffs do not allege that Defendants' resources aided every ISIS-linked attack anywhere in the world. Many such attacks were ISIS-"inspired," in which ISIS propaganda supplied the inspiration and motivation for a lone-wolf attacker, without any ISIS operational involvement.[86] Such attacks outnumbered the core ISIS-committed attacks against Americans and, while tragic, did not substantially benefit from Lafarge's resources. Nor did Lafarge's resources have a substantial effect on ISIS's commission of terrorist attacks in Western Europe. With a few exceptions, ISIS

---

[84] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2018-December 31, 2018, Pursuant to § 8L of the Inspector General Act of 1978* at 21-22 (Feb. 4, 2019).

[85] *See* Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, April 1, 2019-June 30, 2019*, *Pursuant to § 8L of the Inspector General Act of 1978* at 22 (Aug. 2, 2019) ("USCENTCOM reported that ISIS began to reestablish illicit fundraising capabilities in Syria this quarter through extortion and the collection of 'taxes' from residents and businesses in areas where it operates. . . . However, the funds it obtains using these methods will help it to meet its expenses without depleting stockpiled cash, USCENTCOM said.").

[86] *See, e.g.*, A.J. Willingham, *ISIS Has Mastered The Art Of Creating Lone Wolves*, CNN (Mar. 23, 2017), https://tinyurl.com/4vdt9c7b.

locally funded and organized those attacks, relying on its European cells to supply the fighters, weapons, and funds. This was due in part to European counterterrorism measures, which impeded the flow of funds and fighters from the Middle East into Western Europe. Faced with those measures – which created operational risks for ISIS – ISIS's core leadership in Syria and Iraq instead focused on perpetrating attacks in nearby so-called "conflict zones," where they could move money, fighters, and weapons across borders with greater ease.[87] Resources delivered to ISIS cells in Syria aided such attacks. Such resources, given ISIS's operational structure, typically did not have a major effect on locally organized attacks in Western Europe. But sometimes ISIS in Syria did play a material role in a Western European attack, as in the November 13, 2015 attack in Paris, France discussed further below.

114. The causal links alleged below fit this operational pattern. Although Lafarge's resources did not contribute to every ISIS attack in the world, they materially contributed to the particular ISIS attacks at issue in this Complaint.

## B. Defendants' Material Support Contributed To The Individual Attacks That Targeted Plaintiffs And Their Family Members

115. Defendants' payments aided the specific terrorist cell leaders and operatives who committed, planned, or authorized the attacks that killed and injured Plaintiffs. In each instance, Defendants' support had a close geographical and temporal nexus to the attack.

116. ISIS's and ANF's fundraising apparatus was highly centralized, which enhanced the link between Defendants' payments and both groups' terrorist attacks. As AQI's successors,

---

[87] As the U.N. Security Council's ISIS experts observed, "[t]he threat posed by Da'esh" . . . in conflict zones and, by extension, neighbouring Member States" was due to how ISIS "relie[d] on exploiting conflict-related fragilities" that enabled the "external operations capability of Da'esh." U.N. Security Council, *Fifteenth Report Of The Secretary-General On The Threat Posed By ISIL (Da'esh) To International Peace And Security And The Range Of United Nations Efforts In Support Of Member States In Countering The Threat* ¶ 4 (July 26, 2022).

ISIS and ANF practiced what terrorism scholars Dr. Colin Clarke and Dr. Phil Williams called "Organizing for Crime," and "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets."[88] Relatedly, as the U.N. Security Council's ISIS panel observed, ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over the "[t]he finances of ISIL," including "sources of revenue" that "include[d] . . . 'taxing' of commerce in areas it control[led]."[89] Such systematic financial direction ensured that Defendants' money in Syria financed ISIS's and ANF's terrorist attacks in other areas of the groups' footprint.

117.    Defendants' payments aided ISIS attacks beyond Iraq and Syria, which ISIS and the U.S. government each described as ISIS's "external attacks." ISIS specifically relied on payments in Syria to finance attacks in the Middle East and Africa, including in Turkey. For example, one Middle Eastern newspaper reported in 2016 that "[t]he effects" of when "Daesh [ISIS] filled the caliphate's coffers with [U.S.] dollars" enabled terrorist attacks in Turkey, noting that such "effect" "may lie in the debris of Ataturk airport" after ISIS's attack there.[90]

118.    In addition, ISIS "core" provided funding, terrorists, weapons, and training directly to ISIS branches in Africa, including the branch in Niger, which became known as ISIS-

---

[88] Dr. Colin P. Clarke & Dr. Phil Williams, *Da'esh In Iraq And Syria: Terrorist Criminal Enterprise*, *in* Dr. Kimberley L. Thachuk & Dr. Rollie Lal (Editors), *Terrorist Criminal Enterprises: Financing Terrorism Through Organized Crime* at 38 (Praeger 2018) ("Clarke & Williams, *Da'esh In Iraq And Syria*").

[89] U.N. Security Council, *Seventh Report Of The Secretary-General On The Threat Posed By ISIL (Da'esh) To International Peace And Security And The Range Of United Nations Efforts In Support Of Member States In Countering The Threat* ¶¶ 16-18 (Aug. 16, 2018).

[90] Emirates News Agency (WAM), *Beware The Death Throes Of Daesh: Paper* (June 30, 2016), https://www.wam.ae/en/details/1395297323971.

GS (for "Greater Sahara").  Through that mechanism, the resources ISIS derived from its Syrian

protection racket funded ISIS's terrorist violence in Niger.

119.    The U.S. government confirmed that ISIS's fundraising in Syria facilitated ISIS

attacks against Americans in Turkey and Africa.  For example, in 2022, the Lead Inspector

General for Operation Inherent Resolve reported to Congress that ISIS "core" managed the

"global caliphate" and supplied its African branches with "financial support" for terrorist attacks:

> **ISIS-Core Leads a Global Organization**[.]  The DIA reported ISIS-Core leaders
> in Iraq and Syria continued to manage the group as a global caliphate, maintaining
> *an element in Iraq and Syria dedicated to overseeing the group's branches
> around the world*.  Since 2014, ISIS has incorporated existing jihadist groups or
> upstart elements into its global organization, expanding into the Arabian Peninsula,
> South and Southeast Asia, Eurasia, Turkey, and Africa.  The DIA said that ***ISIS
> leaders provided the group's branches with guidance, media support, and
> funding***.  For example, ISIS-Somalia and ***ISIS-West Africa received resources and
> financial support from ISIS-Core*** leadership in Iraq and Syria.[91]

Many documented examples of this relationship exist, showing that ISIS's core leadership

repeatedly transferred money to other branches of its caliphate, including in Turkey and Niger.[92]

120.    When Defendants provided money to ISIS core leadership in Syria, they knew

they were contributing to ISIS's ability to launch terrorist attacks not only in Syria and Iraq, but

also in places like Turkey and Niger.  Defendants even remarked on that phenomenon in their

internal emails.  As LCS's risk manager warned in a 2013 email, ANF "follow[s] a ***global jihadi***

---

[91] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent
Resolve:  Report to the United States Congress, October 1, 2021-December 31, 2021*, Pursuant
*to § 8L of the Inspector General Act of 1978* at 23 (Feb. 8, 2022) (emphases added; citations
omitted).

[92] *See, e.g.*, U.S. State Dep't, *Country Reports on Terrorism 2019* at 269 (June 2020) (noting
that even in 2019, ISIS still maintained stockpiles of dollars "scattered across Iraq and Syria"
that it had amassed from activities going as far back as 2013, and that "ISIS continues to rely on
trusted courier networks and money services businesses to move its financial resources within
and outside of Iraq and Syria"), https://tinyurl.com/5x89x8a5.

*ideology* (similar to al-Qaida) and are more open to ***receive foreign fighters***."[93]  ANF had "ties

to al-Qaeda," the risk manager continued, "exemplified by participating al-Qaida veterans,

mainly from Iraq."[94]  Defendants' awareness that ANF (and ISIS, which evolved from it)

followed a "global" jihadist agenda using "foreign fighters" allowed them to foresee that Syrian

terrorists would use Defendants' funds to execute so-called "external attacks" in other regions.

121.    Many other sources alerted Defendants that payments to ISIS's core in Syria

foreseeably aided ISIS's attacks against the United States in countries neighboring ISIS's

caliphate in Iraq and Syria, including Turkey, and countries in African conflict zones, including

Niger.  Such sources included, but were not limited to:

a.      **about a decade of media reports** confirming that ISIS, like AQI before it, had a long
        history of planning and executing external attacks in Turkey and Africa from the
        terrorists' safe havens in Syria and Iraq,[95] including from Raqqa;[96]

b.      **public ISIS threats** to conduct such external attacks from ISIS's Syrian/Iraqi caliphate;[97]

---

[93] Plea Statement ¶ 27 (emphases added; brackets in original).

[94] *Id.* ¶ 27.

[95] *See, e.g.*, Ewen MacAskill and Rory McCarthy, *A Thug Who Will Stop At Nothing To Create Pure Islamic Zone In Middle East*, Guardian (UK) (Sept. 23, 2004), 2004 WLNR 23628883 ("Abu Musab al-Zarqawi, leader of [AQI], is regularly portrayed by the US government as a terrorist mastermind, responsible for activity in places as widespread as Hamburg, Chechnya, Madrid and Mombasa[, Kenya]"; "Zarqawi is probably responsible" for a broad range of "[a]ttacks" against the United States in the Middle East and Africa from his safe-havens in Iraq and Syria, including, but not limited to AQI's:  (1) "October 2002" attack against "Laurence Foley, a US diplomat, assassinated in Amman[, Jordan]"; (2) "November 2002 Attack on Mombasa[, Kenya] hotel"; and (3) an "attack on a synagogue in Turkey").

[96] *See, e.g.*, BBC Int'l Reports (Europe), *Turkey Possible Target For Al-Qa'idah Bombs – Police* (Oct. 25, 2013) ("The [Turkish] Gendarmerie General Command sent a classified report to the Interior Ministry saying that [ISIS] was preparing to carry out bombings in Turkey . . . [and] that the Al-Qa'idah affiliated . . . organization active in the Syrian city of Rakka called the Iraq Levant Islamic State has prepared 10 car bombs to use in Turkey.").

[97] *See, e.g.*, BBC Int'l Reports (Europe), *Turkish Daily Views Fighting Between Syrian Rebels, Al-Qa'idah-Linked Group* (Jan. 13, 2014) ("ISIL [] threatened Turkey with a series of suicide attacks in Turkey's big cities"); Anadolu Agency, *Syrian Source:  ISIL Priming Suicide Bombers For Turkey* (Jan. 22, 2014) (a Syrian source from Aleppo "[c]laim[ed] Islamic State of

c.    **public U.S. government warnings** that ISIS could commit such external attacks from its "core" in Syria and Iraq, including warnings published by Lieutenant General Joseph L. Votel, Secretary of State John Kerry, and the *Voice of America*, in 2014;[98] and

d.    **public Turkish government warnings** that ISIS could commit such external attacks through its "core" in Syria and Iraq.[99]

122.    Defendants' payments also had a close nexus to the specific terrorist cells and operatives who killed and injured Plaintiffs. The following ISIS cells used Defendants' payments to help orchestrate the attacks that targeted Plaintiffs and their family members.

123.    ISIS's **Leadership Cell** – sometimes called the "Shura Council," "Governance Council," or "Delegated Committee" – was the most prominent cell that ensured a direct link between Defendants and the attacks that targeted Plaintiffs. Terrorist leadership cells can function as the "mechanism by which insurgent groups plan, coordinate, and execute attacks."[100] No groups better embodied that phenomenon than al-Qaeda and its progeny, AQI, ISIS, and ANF. Under these groups' shared doctrine, each Leadership Cell comprised the group's overall leader and his closest advisers. As terrorism scholar Andrew Mumford noted when reviewing

---

Iraq and Levant [was] responsible for [an] attack . . . into Turkey and [was] preparing suicide bombers for future cross-border raids" and to "strike Turkish . . . population centers").

[98] *See, e.g.*, Lieutenant General Joseph L. Votel, *Armed Forces Nominations: Statement of Lieutenant General Joseph L. Votel, USA Nominee, Commander United States Special Operations Command, U.S. Senate, Committee on Senate Armed Services*, Congressional Testimony via FDCH (July 10, 2014), 2014 WLNR 18705318; Secretary of State John Kerry, *quoted in* States News Service, *Secretary Kerry: Remarks With Secretary Of Defense Chuck Hagel, Australian Minister Of Foreign Affairs Julie Bishop, And Australian Minister Of Defense David Johnston* (Aug. 12, 2014); William Eagle, *Islamic State Declaration Spreads To Nigeria*, Voice of America (Aug. 25, 2014), 2014 WLNR 23409988.

[99] *See, e.g.*, Ibrahim Humaydi, *A 'New Page' Between 'Turkey' and 'Democratic Union': Backing for the Kurds To Join the 'Coalition' and Fighting Extremism*, Al-Hayat (July 30, 2013) ("the Istanbul talks included a Turkish [government] assertion that 'Al-Nusrah' and 'ISIL' pose a threat to Syria, Turkey, and the region"), *republished by* BBC Int'l Reports (Middle East), *Syrian Kurdish Party Leader Says "New page" Opened In Ties With Turkey* (July 31, 2013).

[100] Colin P. Clarke, *Terrorism, Inc.: The Financing Of Terrorism, Insurgency, And Irregular Warfare* at 19 (Praeger 2015).

studies comparing ISIS to other groups, ISIS "represented an aberration in the history of modern global jihadism" because "[n]ever before has a movement been so centralised."[101]

124.    Baghdadi controlled ISIS's Leadership Cell from 2010 until his death on October 27, 2019.  Throughout Baghdadi's reign, the Leadership Cell functioned as his mechanism for financing, aiding, and directing attacks against Americans, including Plaintiffs.  In this capacity, Baghdadi relied on Haji Iman, who served as Baghdadi's "finance minister" and disbursed money to ISIS terrorist fighters and cells at Baghdadi's direction.  Under ISIS's doctrine, every ISIS member worldwide swore the same oath of allegiance (ISIS's *bayat*) directly to the same leader (ISIS's "Caliph," Baghdadi).  Every ISIS terrorist globally served as a member of the same group and operated under Baghdadi's direction.

125.    Consistent with the longstanding "ability of Da'esh leadership to direct and maintain control over the flow of funds" that ISIS deployed to sponsor attacks,[102] Baghdadi and ISIS's Leadership Cell played a direct role in ISIS's protection racket.  Indeed, ISIS structured its cash flows to ensure that 20% of all income ISIS derived from its "taxes" in Syria went to Baghdadi and his Leadership Cell for use in planning and committing attacks.

126.    Scholars have confirmed that AQI policy, as adopted by AQI's successors ISIS and ANF, provided for the Leadership Cell to keep 20% of the group's income from so-called "taxation."  According to terrorism scholar Brian Fishman, "Islamic State's bureaucracy" was "organized . . . much as the ISI's [*i.e.*, AQI's] was in 2006,"[103] under which the terrorists'

---

[101] Andrew Mumford, *The West's War Against Islamic State:  Operation Inherent Resolve In Syria And Iraq* at 12 (I.B. Tauris 2021).

[102] U.N. Security Council, *Fifteenth Report Of The Secretary-General On The Threat Posed By ISIL (Da'esh) To International Peace And Security And The Range Of United Nations Efforts In Support Of Member States In Countering The Threat* ¶ 10 (July 26, 2022).

[103] Brian H. Fishman, *The Master Plan:  ISIS, Al-Qaeda, And The Jihadi Strategy For Final Victory* at 218 (Yale Univ. Press 2016) ("Fishman, *The Master Plan*").

"fundraising, largely organized at the sector level, combined taxation and extortion" and under which "ISI provinces carefully tracked both revenue and expenditures and **passed 20 percent of their income to the national-level ISI** [*i.e.*, Baghdadi and the Leadership Cell here], which redistributed the funds as needed."[104]

127.    ISIS itself publicly confirmed that Baghdadi and his Leadership Cell captured 20% of all value that ISIS extracted from taxation.  For example, a 2014 ISIS publication outlined ISIS's taxation practices and documented its "rulings" confirming that:  (i) 20% of all tax payments made to any member or cell of ISIS went to Baghdadi; and (ii) as Caliph, Baghdadi had authority to deploy the 20% to support operations at his discretion:

> And *rikaz* has *Zakat* on it, and **its extent is the fifth share, without consideration of the nisab, so the obligation of Zakat of rikaz applies absolutely in its small and large quantity, just the passing of the year is not conditional on it**.  And the evidence for these aforementioned rulings is the hadith of Abu Huraira (may God be pleased with him): that the Prophet (SAWS) said:  'On rikaz is the fifth share.'  As for the masraf of Zakat of rikaz, **the matter goes back to the Caliph of the Muslims and their Imam, who disposes it wherever the interest requires it**.

128.    AQI doctrine, as practiced by ISIS and ANF, also provided a religious justification for Baghdadi's receipt of 20% of all sums paid to ISIS because it styled those payments as "khums" – that is, religiously mandated donations.  According to the ISIS-published treatise *Sultaniya Wealth:  Types and Rulings*, "one fifth" of all income transfers to ISIS reached Baghdadi, for use by the Leadership Cell in planning and executing attacks.

129.    ISIS's public statements confirmed that Baghdadi received 20% of all payments.  In early 2015, for example, ISIS issued a memorandum discussing recent fundraising and noting that ISIS's process ensured "that the *amir al-mu'mineen*," *i.e.*, Baghdadi, would control "a fifth part of the spoils."  Similarly, "[a]ccording to ISIS's propaganda magazine, *Dabiq*, one-fifth of

---

[104] *Id*. at 218.

the captives taken from Sinjar were distributed to ISIS's central leadership to do with as it so chose; the remainder was divided among the rank and file . . . as the spoils of war."[105]  Indeed, Kayla Mueller (whose estate and family are Plaintiffs), was personally "given" to Baghdadi to torture and rape, pursuant to ISIS's 20% rule.

130.    Defendants' payments helped the ISIS Leadership Cell play a key role in the attacks that killed and injured Plaintiffs.  From 2010 through 2017, ISIS's Leadership Cell typically captured a percentage of the group's protection income – likely 20% – including the payments that Defendants delivered.  Given this standard practice, Defendants' protection payments likely delivered more than $1 million to ISIS's Leadership Cell.

131.    Baghdadi and the Leadership Cell directly participated in the attacks that killed and injured Plaintiffs as follows:

a.    <u>External Attacks</u>:  Baghdadi and the Leadership Cell directly participated in ISIS's so-called "external attacks," *i.e.*, attacks committed by ISIS outside of its "caliphate" in Iraq and Syria, including ISIS's decision to:  (1) establish a branch in the geography in question and extract a loyalty pledge from the branch members; (2) deploy ISIS operatives to the geography in question; (3) transfer "start-up" seed capital-like resources to the ISIS branch in question when accepting their loyalty pledge; (4) target the United States through ISIS's external attacks; and (5) supply logistical, training, and financial support for ISIS's external attacks, all of which enabled the deaths or injuries of Plaintiffs.  As a result, ISIS's Leadership Cell played a key role in ISIS's external attacks in Turkey, which injured Plaintiff Ron Greenfield, and in Niger, which killed Staff Sergeant Bryan Black and Sergeant LaDavid Johnson, whose family members are Plaintiffs.

132.    Considering al-Qaeda's protection money playbook as practiced by ANF, Lafarge's protection payments to ANF from 2011 through 2013 likely delivered more than $100,000 to ANF head ("emir") Abu Mohammad al-Julani, before Julani committed, planned, and/or authorized the attack against Plaintiff Matthew Schrier.

---

[105] Michael Weiss and Hassan Hassan, *ISIS:  Inside The Army Of Terror* at x (Regan Arts 2020).

133.    ISIS's **Raqqa Cell** likewise ensured a direct link between Defendants and the attacks against Plaintiffs.  The Raqqa Cell served as a nerve center for ISIS operations worldwide.  As French Prime Minister Manuel Valls observed, Raqqa functioned as the "terror group's Syrian stronghold, as that [was] where most ISIS leaders live[d]" because "Raqqa [was] the de facto capital of the so-called caliphate" and was "where the ISIS masterminds" were "whose job [was] to plot barbaric attacks against the West."[106]

134.    The United States government agreed.  For example, Secretary of State John Kerry observed that "Raqqa" was "at the core where they're planning" ISIS's "[external] attacks" in places like "Lebanon," "Egypt," and "Turkey."[107]  Director of Central Intelligence John Brennan also observed that "ISIL's . . . external operations group, which is based mainly in Syria in the Raqqa area, is really trying to generate activity.  And we also see the increasing interaction between that external operations element and some of their franchises, whether it be Islamic State in West Africa . . . .  They want to have this type of global reach."[108]  Similarly, General Joseph Votel, who pursued ISIS as Commander of U.S. Central Command, explained that "[t]he importance of Raqqa is that is where ISIS plans their external [terrorist] operations. That is what is driving us to get on this [*i.e.*, roll-back ISIS's caliphate] as quick as we can, because [Raqqa] is where [ISIS's] plotting takes place. . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State, so that's what makes it important."[109]  A

---

[106] French Prime Minister Manuel Valls, *quoted in* Romina McGuinness, *French PM Says Destroying ISIS In Mosul Has 'Little Value' Without Capturing Raqqa*, Express Online (UK) (Oct. 21, 2016), 2016 WLNR 32343536.

[107] Secretary of State John Kerry, *quoted in* Bassem Mroue and Zeina Karam, *IS Militants Dig In, Anticipating Assault On Syria's Raqqa*, Associated Press (Nov. 18, 2015).

[108] John Brennan, *A View From The CT Foxhole:  An Interview With John Brennan, Director, CIA*, CTC Sentinel (Sept. 2016), https://tinyurl.com/ycxmcvju.

[109] General Joseph Votel, *quoted in* Peter Bergen, *A Conversation With The General Running The War Against ISIS*, CNN (Oct. 30, 2016), https://tinyurl.com/bdz3wcpk.

Pentagon spokesperson likewise confirmed that, before 2017, "IS leaders" and "IS 'bureaucrats'" who served as "the administrative backbone of [ISIS's] militant organization" were based in "the Islamic State group's self-declared capital of Raqqa."[110]

135.    ISIS's Raqqa Cell was led by Abu Luqman (aka Ali Musa al-Shawakh) from early 2014 until his death in an airstrike on April 23, 2018.  Luqman became a powerful ANF terrorist following his release from prison in 2011.  In 2013, Luqman switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa.  Luqman was considered "the most feared jihadist in Raqqa" and became an integral part of ISIS's leadership structure there, including by heading its intelligence efforts.  In that role, one of Luqman's responsibilities was to oversee ISIS's detention of foreign hostages, "including executions, interrogations, and transfers of ISI[S] prisoners."[111]  In addition to leading the Raqqa Cell, Luqman also served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell.

136.    Luqman's role confirms that Defendants' payments assisted the ISIS attacks against Plaintiffs.  Luqman personally benefited from Defendants' conspiracy with ISIS.  Indeed, intelligence reports reportedly indicated that Luqman served "on the shadow board of Lafarge's factory in Syria."  And according to LCS's former risk manager, Defendants – typically through Tlass – negotiated their payments with ISIS's representatives in Raqqa (which was near Jalabiyeh), which further ensured Luqman's personal involvement.  Through his high-ranking office in Raqqa, Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

---

[110] Navy Capt. Jeff Davis (Pentagon Spokesperson), *quoted in* Robert Burns, *Pentagon Cites Evidence Of Islamic State 'Exodus' From Raqqa*, Associated Press (Feb. 17, 2017).

[111] U.S. Dep't of Treasury, *Treasury Sanctions Major Islamic State of Iraq and the Levant Leaders, Financial Figures, Facilitators, and Supporters* (Sept. 29, 2015).

137.    Abu Luqman and the Raqqa Cell directly participated in the attacks that killed and injured Plaintiffs as follows:

a.    <u>External Attacks</u>:  Luqman, the Raqqa Cell, and Luqman's commander Adnani were directly involved in vital aspects of ISIS's so-called "external attacks," including by: (1) vetting and establishing new ISIS affiliates and "provinces" beyond Iraq and Syria, including branches in Libya; (2) serving as the "bridge" between ISIS's Leadership Cell the local cells on the ground in other geographies; and (3) supplying the necessary logistical, training, and financial support for the external attack.  As a result, Luqman and the Raqqa Cell played a key role in ISIS's external attack in Turkey, which injured Plaintiff Ron Greenfield, and in ISIS's external attack in Niger, which killed Staff Sergeant Bryan Black and Sergeant LaDavid Johnson, whose family members are Plaintiffs.

138.    Considering al-Qaeda's protection money playbook as practiced by ANF, Lafarge's payments of more than $1 million to ANF from 2011 through 2013 likely delivered at least $100,000 to ANF's Raqqa Cell (including Luqman before his switch to ISIS).

139.    ISIS's **Intelligence Cell,** also referred to as the "amniyat" or "Emni," was a third cell that directly linked Defendants' aid and the attacks that targeted Plaintiffs.  As the *New York Times* reported based on "thousands of pages of French, Belgian, German, and Austrian intelligence and interrogation documents," this intelligence cell was "a combination of an internal police force and an external operations branch, dedicated to exporting terror abroad," serving as a key cog in ISIS's "machinery for projecting violence beyond its borders."[112]

140.    From 2010 until his 2016 death, ISIS's Intelligence Cell was led by Abu Muhammad al-Adnani.  Luqman also played a key role in ISIS's Intelligence Cell by first serving as Syria-level Emni director and then Adnani's deputy, before succeeding him in 2017.

141.    Defendants' payments financed Abu Muhammad al-Adnani's, Abu Luqman's, and ISIS's Intelligence Cell's participation in the attacks that killed and injured Plaintiffs.  From

---

[112] Rukmini Callimachi, *How A Secretive Branch Of ISIS Built A Global Network Of Killers*, N.Y. Times (Aug. 3, 2016).

2010 through 2017, the Intelligence Cell typically captured a substantial percentage of ISIS's protection revenue, including Defendants' payments. Given this standard practice, Defendants' payments likely delivered more than $1 million to Adnani, Luqman, and the Intelligence Cell.

142. ISIS's public statements confirm that link. According to a 2014 ISIS publication, originally published by ISIS's propaganda arm *al-Himma Library*, ISIS used tax payments, like those made by Defendants, to aid "[t]he mujahidin and jihad." That meant ISIS's cells in Syria, Iraq, and elsewhere ("the mujahidin") responsible for ISIS's attacks against the United States (ISIS's "jihad"), including the Intelligence Cell, which advanced "interests of war and fighting [for the sake of] Allah, like . . . keeping watch over the enemy and . . . and other things from what serves the interest of the fighting." ISIS also deployed those tax payments to "the collectors, preservers and dividers of" ISIS's tax income. This allowed the ISIS cells that played a role in ISIS's protection rackets and associated hostage-taking attacks – both of which were true of the Intelligence Cell – to have more direct control over their terrorist operations.

143. Adnani and the Intelligence Cell directly participated in the attacks that killed and injured Plaintiffs as follows:

a.  <u>External Attacks</u>:  Adnani, Luqman, and the Intelligence Cell were directly involved in vital aspects of ISIS's so-called "external attacks," including by:  (1) vetting and establishing new ISIS affiliates and "provinces" beyond Iraq and Syria, including branches in Libya; (2) serving as the "bridge" between ISIS's Leadership Cell the local cells on the ground in other geographies; and (3) supplying the necessary logistical, training, and financial support for these external attacks.  As a result, ISIS's Intelligence Cell played a key role in ISIS's external attack in Turkey, which injured Plaintiff Ron Greenfield, and in ISIS's external attack in Niger, which killed Staff Sergeant Bryan Black and Sergeant LaDavid Johnson, whose family members are Plaintiffs.

144. Considering al-Qaeda's protection money playbook as practiced by ANF, Lafarge's payments of more than $1 million to ANF from 2011 through 2013 likely delivered at least $100,000 to ANF's Intelligence Cell.

## V.    DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES

145.    Defendants' scheme to finance ISIS and ANF relied on substantial touchpoints with New York and the United States.  In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge and LCS admitted that their "offense occurred in part within the United States."[113]  That concession reflected several U.S. contacts that Defendants formed in effectuating their scheme.  Those U.S. contacts included: (1) Defendants' intentional use of New York banks to clear their U.S.-dollar transactions; (2) Defendants' intentional use of U.S.-based email services; and (3) Defendants' conspiracy with ISIS and ANF, designated terrorist groups that purposefully targeted the United States and reached into U.S. territory to further the scheme.

### A.    Defendants Purposefully Used New York Banks To Clear The U.S.-Dollar Transactions They Used To Finance Terrorism

146.    Defendants purposefully availed themselves of New York's banking system by executing wire transfers they intentionally caused to clear through New York banks.

#### 1.    Defendants Executed U.S.-Dollar Transactions Using New York Correspondent Banks

147.    Defendants' payments to terrorists relied on correspondent and intermediary banks located in New York.  Correspondent banking is often defined as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."[114]  Such arrangements are needed when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the

---

[113] Plea Agreement ¶ 3, *United States v. Lafarge S.A.*, No. 22-cr-444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10.  On information and belief, this Plea Agreement was heavily negotiated by Lafarge's lawyers and does not disclose every U.S. contact supporting personal jurisdiction.

[114] Bank for International Settlements Committee on Payments and Market Infrastructures, *Correspondent Banking* at 9 (July 2016).

sender's bank.  In that scenario, the sender must rely on additional banks – typically called

"correspondent" or "intermediary" banks – to establish a chain of banking relationships that can

complete the transfer from sender to recipient.  Correspondent banking is "an essential

component of the global payment system, especially for cross-border transactions."[115]

148.    New York banks are vital to this global system of correspondent banking.  As the

Treasury Department reported in 2006, most cross-border transactions depended on "major funds

transfer payment and messaging systems" located in New York.[116]  Those systems used a

"relatively small number of major money center banks" that "specialize in facilitating

international funds transfers" and thus "form a key link in the vast majority of all international

funds transfers."[117]  The large money center banks that facilitate international U.S.-dollar

transactions are based predominantly in New York.  Thus, when a company like Lafarge wires

U.S. dollars to a recipient with which its bank lacks a direct banking relationship, it typically

relies on New York correspondent banks to ensure that its dollars reach the intended recipient.

149.    New York banks typically perform the *clearing* process for U.S.-dollar wire

transfers.  "Clearing" generally refers to the process of transmitting, reconciling, and confirming

payment on electronic-funds transfers.  The Clearing House Interbank Payments System

("CHIPS") is the dominant electronic-funds-transfer system for clearing U.S.-dollar transfers

among international parties.  Defendants' U.S.-dollar wires relied on CHIPS, which handled both

the transmission of interbank messages and the settlement of payment for the wires.

---

[115] *Id.* at 6.

[116] U.S. Dep't of Treasury, Financial Crimes Enforcement Network ("FINCEN"), *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act* at 57 (Oct. 2006).

[117] *Id.*

150.    To use CHIPS's clearing services, a foreign money sender must involve a U.S. bank that is subject to supervision by U.S. banking regulators.  As the Treasury Department explained, access to CHIPS "is conditional upon a financial institution's U.S. presence," in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions.[118]  And given New York's status as a global financial hub, the major U.S. banks responsible for clearing transactions through CHIPS reside overwhelmingly in New York.  For that reason, as *Reuters* reported, "[t]o legally transact (clear) the U.S. dollar globally, correspondent banks are required to maintain a New York branch and comply with U.S. [anti-money-laundering] regulations."[119]

151.    Defendants relied on New York banks to clear many of their transactions supporting ISIS and ANF.  That reliance reflected Defendants' choice to transact in U.S. dollars. As Pescheux wrote in a June 30, 2013 email to Tlass, Defendants' "preferred option" for paying Tlass was to make "bank transfer[s] in USD to the account of a duly registered company" – and "USD" meant U.S. dollars.[120]  Consistent with that preference, Defendants specified in their contracts with Tlass that they would pay him in U.S. dollars.[121]  Defendants also often paid Taleb in U.S. dollars, knowing he would in turn use the U.S. dollars to pay ISIS.[122]  And Defendants at

---

[118] *Id*. at 62.

[119] Joshua Fruth (Thomson Reuters Regulatory Intelligence), *'Crypto-Cleansing:' Strategies To Fight Digital Currency Money Laundering And Sanctions Evasion*, Reuters (Feb. 14, 2018), https://tinyurl.com/4p27pwzs.

[120] Plea Statement ¶ 60; *see* Ex. 1 (7/1/2013 Tlass-Pescheux Email String) ("Preferred Option Email"). All Exhibits cited in this Complaint were appended to the Amended Complaint (Dkt. 89) filed in *Foley, et al. v. Lafarge S.A., et al.*, No. 23-cv-5691 (E.D.N.Y.) on December 17, 2024.

[121] Ex. 2 ("2009 Tlass Agreement," ATA0020920 at -922) art. 4 ("US Dollars"); Ex. 3 ("2010 Tlass Agreement," ATA0010207 at -211) art. 4 ("US Dollars"); Ex. 4 ("Feb. 2014 Tlass Agreement," ATA0021426 at -427) art. 4 ("75,000USD"); Ex. 5 (Oct. 2014 Tlass Agreement) § 3.1 ("210,000US$").

[122] *E.g.*, Plea Statement ¶ 63; Ex. 6 (ATA0000244) (paying Taleb "USD 4,836.00").

all times considered it a business imperative to combat the "scarcity of USD" in Syria, going to extreme lengths to ensure LCS's liquidity in U.S. dollars specifically.[123]

152.    Defendants' decision to transact in U.S. dollars led them to use New York banks. That is the ordinary practice for sophisticated companies executing cross-border U.S.-dollar transactions.  Indeed, CHIPS estimated in 2015 that it "process[ed] more than 95 percent of U.S. dollar-denominated cross-border transactions."[124]  The dominance of a U.S. clearing center in processing U.S.-dollar wires was no accident.  As a practical matter, at the time of Defendants' unlawful conduct, "any financial institutional doing business in dollars need[ed] to hold accounts in correspondent U.S. banks in order to complete transactions."[125]  Because typically "all dollar transactions are cleared via the American banking system,"[126] nearly all U.S.-dollar wires necessarily passed "through correspondent accounts" in New York.[127]

153.    Defendants chose to follow the norm and exploit New York banks in orchestrating the U.S.-dollar wire transfers on which their conspiracy depended.  Plaintiffs have identified at least 15 such transfers that Defendants executed in connection with their terrorist-funding scheme.  All cleared through New York banks.  The chart below depicts each one:

---

[123] Ex. 7 (ATA0009139); *see infra* ¶¶ 167-69.

[124] U.S. Dep't of Treasury, *National Money Laundering Risk Assessment* at 35 (2015).

[125] Christian Caryl et al., *Pocketbook Policing:  Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

[126] Economist, *Digital Currencies:  A New Species* (Apr. 13, 2013), 2013 WLNR 8890628.

[127] *Role of U.S. Correspondent Banking in International Money Laundering:  Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs*, 107th Cong. 287 (Mar. 6, 2001) (quoting Minority Staff, *Report on Correspondent Banking: A Gateway For Money Laundering* (Feb. 5, 2001)).

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|------|----------|------------------------|--------------------------|---------------------|------------|
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $8,454,183 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,714 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $2,857 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $2,857 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $12,710,000 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $8,592 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $4,296 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $4,296 |
| 4/14/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $20,000,000 |
| 7/7/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,000,000 |
| 8/8/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Lebanon (AUDBLBB) | **Citibank N.A.** (CITIUS33) **JPM NY** (CHASUS33) | $10,000,000 |
| 8/15/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,000,000 |
| 9/12/13 | LMEA | Unknown | NSGB Egypt (NSGBEGC) | **BNY Mellon** (IRVTUS3) | $200,000 |
| 9/26/13 | LMEA | Al Baraka (ABRKEGCA) | NSGB Egypt (NSGBEGC) | **BNY Mellon** (IRVTUS3) | $299,810 |
| 10/24/14 | Tlass | BNPP Paris (BNPAFRPP) | Abu Dhabi Islamic Bank (ABDIAED) | **BNPP NY** (BNPAUS3) **JPM NY** (CHASUS33) | $210,000 |

154.    This chart is based on Defendants' bank records, SWIFT messages, and other transaction data and documents they maintained in the ordinary course of business.  The "Date" column describes the transaction's value date.  The "Category" column describes the transaction types:  "Upstream Equity" means Lafarge's equity contributions to LCS through four affiliated LCS shareholders; "Upstream Loan" means loan disbursements by Lafarge (through Lafarge Cyprus) to LCS; "LMEA" means payments LCS accepted into its illegal bank account in Egypt; and "Tlass" means payments to Firas Tlass.  The "Originating Bank" is the bank that initiated the wire transfer on the sender's behalf.  The "Beneficiary Bank" is the bank that received the wire transfer on the recipient's behalf.  And the "NY Bank" is the New York correspondent bank (or banks) that cleared the wire transfer.  All were material to Defendants' terrorist payoffs.

155.    **Tlass Payments.**  Tlass was an original LCS shareholder and Lafarge's first business partner in Syria.[128]  Defendants initially transacted with Tlass through his Syrian company, MAS Group ("MAS"), with which LCS executed a Local Project Support Agreement on February 15, 2009.[129]  The next year, LCS amended the contract and agreed to pay Tlass "One Million and Five Hundred Thousand (1,500,000) US Dollars per annum" for his work in 2009 and 2010.[130]  In exchange, Tlass provided "overall advisory services," helping Defendants with "the smooth operation" of the Jalabiyeh plant and cultivating a "[r]elationship with stakeholders and relevant regulators."[131]  Tlass acted under this Local Project Support Agreement when paying terrorists on Defendants' behalf.  It remained in force until February 2014, when Defendants renegotiated to pay Tlass $75,000 per month under a similar agreement

---

[128] Ex. 8 (ATA0031879) (detailing Tlass's equity contributions to LCS since inception).

[129] 2009 Tlass Agreement at -920.

[130] 2010 Tlass Agreement art. 4.  Starting in 2011, the contract called for LCS to pay Tlass in an amount equal to 1% of LCS's annual net sales.  *Id*.

[131] 2010 Tlass Agreement arts. 1, 1(d).

with his new front company, North Logistics Consultancy Service JLT ("North Logistics").[132]
Under both contracts, which continuously governed Tlass's work during the conspiracy,
Defendants' payments to Tlass were "explicitly conditioned on [his] continuing to make
payments on LAFARGE's and LCS's behalf to armed groups, which included ISIS and ANF."[133]

156.    Early in the scheme, Defendants used MAS – Tlass's company – to pay Tlass his
annual fees and to funnel him money to distribute onward to terrorists.[134]  To that end,
Defendants regularly transferred money into MAS's bank account, including in U.S. dollars.  On
January 17, 2011, LCS used its U.S.-dollar account at Bank Audi Syria S.A. ("Audi Syria") to
send $375,000 to MAS's account.[135]  That payment compensated Tlass for his "advisory" work
and served as an inducement for him to continue providing LCS the same services under the
contract moving forward.[136]  LCS made this payment under the same contract that governed
most of Tlass's terrorist payoffs giving rise to Plaintiffs' claims, and LCS funded the payment
through the upstream dollars it sourced via New York banks, alleged below (*infra* ¶¶ 161-75).

157.    The final entry in Paragraph 155 depicts a payment to Tlass that Defendants
cleared through New York.  In late 2014, Jolibois directed Tlass to issue a $210,000 invoice
from North Logistics for his services negotiating with ISIS.[137]  To provide cover for that illegal

---

[132] Plea Statement ¶ 61; Feb. 2014 Tlass Agreement art. 4.  The 2014 agreement appears to
have a typo referring to Tlass's company as "Nort Logistics."  *Id*. at -426.

[133] Plea Statement ¶ 61.

[134] Ex. 9 ("Project Alpha Report," ATA0004181 at -226).  The Project Alpha Report was
prepared by Baker McKenzie and PwC, which LafargeHolcim retained in 2016 to investigate
their payments to terrorists.  *Id*. at -223.

[135] Project Alpha Report at -260 (denoting "Electronic Transfer" to "Mass Co."); Ex. 10
(ATA0005778, Row 101) (describing this as a bank "Transfer" to "Mas Group," with value date
of January 17, 2011 and a "Bank fee" of $5); Ex. 11 (ATA0005465, Row 19) (confirming Audi
Syria executed the transfer).

[136] Ex. 10 (ATA0005778, Row 101) ("Payment against Services rendered by MAS").

[137] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -165) (identifying North Logistics).

payment, Lafarge's senior regional counsel Jean-Jerome Khodara drafted a sham consulting contract between LCS and Tlass, which the parties executed in conjunction with a back-dated agreement purporting to terminate their prior arrangement months earlier.[138]  Tlass then issued the $210,000 invoice Jolibois had requested from North Logistics.  It specified a new U.S.-dollar bank account at Abu Dhabi Islamic Bank that Tlass had opened to receive U.S.-dollar wires.[139]

158.    On October 24, 2014, Lafarge paid Tlass by wiring $210,000 through New York banks.  To initiate payment, Khodara sent the invoice to Richard Benattar, Lafarge's accounting manager, and told Benattar the invoice "should be paid quickly if possible."[140]  Upon reviewing the invoice, Benattar realized it was in U.S. dollars and thus required the use of U.S. correspondent banks.  He responded to Khodara:  "I just need the invoice with the original [Herrault] signature **and the US correspondent bank of the supplier's bank (the invoice is in USD)**."[141]  Benattar needed to know North Logistics' "U.S. correspondent bank" because he needed to enter North Logistics' payment details into Quantum, Lafarge's electronic payment software.[142]  Benattar soon concluded that he and his accounts-payable colleague, Narkice Vaisoul, could verify the routing details themselves.[143]  And once they confirmed that the money needed to go to JPMorgan Chase in New York, they initiated the wire.  Benattar personally confirmed payment by signing the wire record with his initials "RB."[144]

---

[138] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -161-64); Ex. 17 (ATA0000032).

[139] Ex. 16 (ATA0000160 at -160).

[140] Ex. 18 (ATA0032474 at -474) (certified English translation).

[141] Ex. 19 (ATA0004739 at -739) (certified English translation).

[142] *Infra* ¶¶ 200-01.

[143] Ex. 18 (ATA0032474 at -474) (certified English translation) (telling Khodara and Jolibois, "We'll take care of it – we've got the supplier's email address").

[144] Ex. 20 ("210k Wire Instruction," ATA0000071 at -075).

159.    Benattar effectuated payment by instructing BNP Paribas's Paris branch to originate a $210,000 wire transfer from Lafarge Cyprus to North Logistics.[145]  Following Lafarge's directions, BNP Paribas's Paris branch executed the wire through its New York correspondent account at BNP Paribas's New York branch, which wired the money to JPMorgan Chase's New York branch, which transmitted the money to Tlass's U.S.-dollar account at Abu Dhabi Islamic Bank.[146]  As Defendants later admitted, the money passed through the "Eastern District of New York" and involved multiple "intermediary banks in New York City."[147]  Once Benattar and Vaisoul verified payment, Vaisoul wrote to Khodara and Jolibois to "confirm that this invoice has just been paid," and included the full prior email chain with Benattar's discussion of "the US correspondent bank."[148]  Jolibois replied:  "Good."[149]

160.    This $210,000 wire was instrumental to Defendants' terrorist-funding conspiracy. As Defendants admitted, "the $210,000 lump sum payment compensated [Tlass] for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly 'donation' payments to armed groups, including ISIS."[150]  At ISIS's and ANF's going per-attack cost, the $210,000 alone was enough to pay for every attack in this case.[151]

161.    **Upstream Equity and Loan Payments.**  Paragraph 155 also includes 12 upstream U.S.-dollar payments to LCS:  eight equity contributions and four loan disbursements. Lafarge made the equity contributions through Lafarge Cyprus and three other Lafarge-affiliated

---

[145] 210k Wire Instruction at -071; Ex. 21 (Interrog. Resp. No. 4).

[146] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[147] Plea Statement ¶ 103.

[148] Ex. 24 (ATA0032468 at -468) (certified English translation).

[149] Ex. 24 (ATA0032468 at -468) (certified English translation).

[150] Plea Statement ¶ 101.

[151] *Supra* ¶¶ 107-11 (describing per-attack cost and causation).

LCS shareholders: Lafarge Aggregate Holdings, Cemitalia Ltd., and Lafarge Building Materials Egypt.[152]  The payments occurred via eight wire transfers totaling $21,192,525.  Lafarge initiated each wire from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York branch, and then to LCS's U.S.-dollar account at Audi Syria.[153]

162.    Lafarge paid the four U.S.-dollar loan disbursements under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS.[154]  Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the disbursements it made.[155]  As his involvement demonstrates, Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control.  Lafarge used Lafarge Cyprus to funnel money to LCS because the latter was LCS's majority shareholder, "through which LAFARGE held nearly all of its shares in LCS."[156]  Indeed, Lafarge admitted it was responsible for the October 24, 2014 payment to Tlass, even though it structured that payment as nominally originating from Lafarge Cyprus.[157]  The other Lafarge Cyprus payments similarly occurred at Lafarge's direction.

163.    Lafarge Cyprus made these loan disbursements by wiring U.S. dollars from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York branch, and then to LCS's U.S.-dollar accounts in Syria and Lebanon.[158]  For three of the four, Lafarge Cyprus sent the wire to LCS's account at Audi Syria.[159]  For the fourth, Lafarge Cyprus

---

[152] Ex. 25 (ATA0005192 at -200); Ex. 26 (ATA0005437 at -437-39).

[153] Ex. 12 (ATA0031866 at -866-68) (SWIFT confirmations for January 2011 transfers); Ex. 26 (ATA0005437 at -442-43) (SWIFT confirmation showing routing details for February 2011 transfer); *id*. at -437 (confirming "Citibank NY" routed each wire and charged fees for doing so).

[154] Ex. 27 (ATA0000316) ("2011 Loan Agreement").

[155] 2011 Loan Agreement at -327; Project Alpha Report at -227.

[156] Plea Statement ¶ 99.

[157] Plea Statement ¶¶ 99, 103.

[158] Ex. 21 (Interrog. Resp. No. 4); Ex. 13 (ATA0000358 at -358).

[159] Ex. 21 (Interrog. Resp. No. 5, Transfer Nos. 1, 2, and 4).

sent the wire to LCS's account at Bank Audi Lebanon SAL ("Audi Lebanon"), which was cleared by both Citibank New York and JPMorgan Chase New York.[160]  In each instance, Defendants obtained a SWIFT message confirming the New York banks' involvement.[161]

164.    This upstream funding was vital to Defendants' terrorist-funding scheme.  By injecting U.S. dollars into LCS, Lafarge enabled LCS to pay Tlass and Taleb in U.S. dollars. Indeed, the accounts LCS used to receive the upstream funding were the same ones it used to pay its terrorist intermediaries.[162]  As PwC explained in a forensic review it performed at Defendants' direction after Defendants' terrorist-funding scheme became public, the "***[f]unds within the receiving bank accounts were used*** by LCS for capital expenditure and operating expenses and also ***to pay the monthly USD remuneration of Firas Tlass, make USD payments to Amro Taleb and for three alleged USD Security Payments [to ISIS].***"[163]

165.    LCS routinely used the U.S. dollars it acquired to pay Tlass and Taleb.  Relying in part on the upstream dollars Defendants sourced through New York banks, LCS made many downstream payments to Tlass and Taleb in U.S. dollars.[164]  Nine were monthly $75,000 stipends LCS paid to Tlass via an agreement contemplating that Tlass would "retain $50,000 and

---

[160] Ex. 21 (Interrog. Resp. No. 4, Transfer No. 3); Ex. 28 (ATA0000220 at -223-24).

[161] Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer).

[162] Project Alpha Report at -238-39.

[163] Project Alpha Report at -227.

[164] Project Alpha Report at -190-91 ("LCS maintained US dollar denominated bank accounts . . . used to make and receive numerous US dollar payments, including the monthly fee of USD 75,000 to Tlass and commission payments for Taleb, as detailed above.").

the remaining $25,000 would be disbursed to armed groups."[165]  Under that agreement, Defendants paid Tlass a monthly $75,000 stipend at least from November 2013 to July 2014.[166]

166.    Defendants similarly used LCS's supply of U.S. dollars to make at least five "commission" payments to Taleb.  As PwC's forensic review concluded, "Taleb received a small monthly commission for sales of pozzolana and heavy fuel sourced" from ISIS-linked suppliers.[167]  The "total value of these commissions" was roughly "USD 10,356."[168] Defendants' financial records indicate that this $10,356 comprised five separate U.S.-dollar payments LCS made to Taleb:  (1) $4,836 on February 24, 2014; (2) $3,265 on April 25, 2014; (3) $976 on July 1, 2014; (4) $597 on July 1, 2014; and (5) $682 on October 7, 2014.[169]  LCS made each of these payments from its U.S.-dollar accounts at Audi Lebanon.  As with the Tlass stipends, Lafarge's upstream provision of U.S. dollars helped LCS finance these commissions.

167.    LCS's unique U.S.-dollar liquidity constraints amplified the nexus between Lafarge's upstream payments and LCS's downstream payments to terrorists.  Starting in 2011, LCS faced a severe liquidity crunch in U.S. dollars.[170]  For LCS to come up with the money to

---

[165] Plea Statement ¶ 61.

[166] Ex. 29 (ATA0000256) (Nov. 2013); Ex. 30 (ATA0000291) (Dec. 2013); Ex. 31 (ATA0000289) (Jan. 2014 #1); Ex. 32 (ATA0000288) (Jan. 2014 #2); Ex. 33 (ATA0000292) (Mar. 2014); Ex. 34 (ATA0000293) (Apr. 2014); Ex. 35 (ATA0000294) (May 2014); Ex. 36 (ATA0000290) (June 2014); Ex. 37 (ATA0032008) (July 2014).

[167] Project Alpha Report at -190.

[168] Project Alpha Report at -190.

[169] Ex. 38 (ATA0008287, In.Out Flow Tab, Rows 1838, 1840, 2550, 3143, 3144, 3195, 4194).

[170] Ex. 39 ("Feb. 2012 Exec. Presentation," ATA0059026 at -039) (describing "cash shortage" and challenges of "Foreign Currency sourcing"); Ex. 40 ("Cash Shortfall Memo," ATA0009065 at -065-67) (noting need for "additional funding" and "cash shortage"); Ex. 41 (ATA0005040 at -040) (stressing "urgency of payments" in U.S. dollars); Ex. 14 (ATA0000047 at -047) (noting need for new "Lebanon Bank account" to hold U.S. dollars to give LCS "Cash Management flexibility").

pay terrorists, therefore, Lafarge had to devise a plan to ensure that LCS had a steady supply of U.S. dollars.[171]  But it was difficult for LCS to raise money, given sanctions affecting Syria.[172] The best way for LCS to access the capital it needed to pay terrorists was thus to obtain U.S. dollars from Lafarge Cyprus and other affiliates.  In fact, had Lafarge not agreed to loan U.S. dollars to LCS in April 2011, LCS would have defaulted on its debt covenants with its senior lenders and would likely have had to shut down its Syrian plant altogether.[173]

168.    U.S. and U.N. sanctions regimes targeting Syria were designed to promote just that sort of U.S. dollar scarcity, to restrict the flow of U.S. dollars to violent actors.  U.S. Treasury Department officials publicly confirmed that intent.  In 2011, for example, after a raft of counterterrorism sanctions, "[a] US Treasury spokeswoman said that 'designating' companies made it difficult for them to operate, especially if business involved US dollar transfers, which all passed through the New York banking system" when "payments[ ] were made in US dollars."[174]  In 2014, likewise, senior Treasury official David Cohen explained how U.S.

---

[171] Ex. 42 (ATA0000938 at -938) (Pescheux emphasizing to CFO that "I really rely on you to review . . . the way we have been managing our cash so far and our practices in terms of currency conversion," stressing "need to improve our reactivity in this period of high volatility"); *id*. at -940-42 (detailing cumbersome process "to source FX to pay our foreign commitments").

[172] Feb. 2012 Exec. Presentation at -028, -039 (detailing challenges); *see* Exec. Order No. 13,573 (May 18, 2011); Exec. Order No. 13,572 (Apr. 29, 2011) (2011 sanctions orders).

[173] *E.g.,* Ex. 43 (ATA0018237 at -239) (describing need for "rapid[ ]" cash infusion "to avoid a payment default"); Ex. 15 (ATA0000060 at -067-68) (demanding "hectic" loan payment "to urgently ensure a transfer of 3 Musd ASAP" to cover "daily Cash needs" and to allow LCS "to disburse 5 Musd" in compliance with outstanding letter of credit); Cash Shortfall Memo at -065 (similarly noting "need" in February 2012 for "additional funding from Lafarge" to avoid "default under the loan repayment").  If LCS missed a repayment to its external lenders, the lenders could have cancelled their commitments and accelerated all remaining secured liabilities. *See* Ex. 44 (ATA0020635 at -726, -731-32) §§ 33.1 (default for non-payment), 35.1 (remedies, including cancellation and acceleration).

[174] Keith Wallis, *Law Firms Cautioned On Iran Sanctions British Government Warns Companies*, South China Morning Post (Jan. 26, 2011), 2011 WLNR 1534856.

policymakers sought to leverage the power of New York's banking system to impede terrorists from raising money and funding their operations.[175]

169.    U.S. sanctions designations were similar.  In 2014, for example, the Treasury Department emphasized that U.S. sanctions sought to deprive violent Syrian actors of U.S. dollars and force them to use the collapsing Syrian pound.[176]  The United States reinforced that the same logic applied to ISIS when it sanctioned ISIS financiers from 2016 through 2019: allowing ISIS to access U.S. dollars through New York banks directly financed ISIS's attacks by giving ISIS more purchasing power than it would have had by using Syrian pounds.[177]

170.    The 2011 upstream payments were likewise linked to Defendants' terror-financing scheme through their connection to Tlass.  When Defendants decided to go into business with Firas Tlass, his father Mustafa had been Syria's long-time defense minister and confidant of Bashar al-Assad's father.  Firas was himself close with the Assad family, too.  The Tlass family's long-established connections with and patronage of the al-Assad regime were lucrative.  Indeed, MAS's growth was largely attributable to contracts it received to supply the Syrian Arab Army with food, medicine, and clothing.[178]  Those connections to the Assad regime also made Tlass and MAS attractive to Lafarge as a joint-venture partner in Syria.

---

[175] *Interview with David Cohen; Interview with Nabil Fahmy; The Sultan and the Sharia Law*, Fareed Zakaria GPS (May 4, 2014), 2014 WLNR 11967166.

[176] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[177] *See, e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Senior IsiL Financier and Two Money Services Businesses* (Dec. 13, 2016); Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Iraq-Based ISIS Financial Facilitation Network; Action Underscores Continued U.S. Collaboration with the Government of Iraq on Countering ISIS's Terrorism Financing Operations* (June 15, 2017).

[178] Ayman Aldassouky, *The Families of Rastan and the Syrian Regime:  Transformation and Continuity*, Wartime and Post-Conflict in Syria, Issue 2021/14, at 8-9 (Aug. 6, 2021).

171.    When Defendants made their 2011 upstream payments while in business with Tlass, they knew terrorist violence was a foreseeable consequence.  From 2003 through 2014, many public sources – including U.S. and U.N. counterterrorism findings – alerted Defendants that the Syrian regime sponsored AQI attacks targeting the United States.  DOD, for example, reported that Syria provided "safe haven, border transit, and limited logistical support" to "Iraqi insurgents," including AQI.[179]  U.N. Security Council reports similarly highlighted the "nexus between large numbers of Al-Qaida affiliated foreign fighters and Jabhat-al-Nusrah" in Syria, which risked "new pan-Arab and pan-European networks of extremists emerg[ing]."[180]

172.    Media reports also warned before 2011 that the Assad regime supported AQI attacks against the United States.  As early as May 2004, the *Washington Times* reported on the "mounting body of evidence link[ing] the Assad regime with the Zarqawi network and terrorist activities in Iraq."[181]  The *National Post* corroborated that point in February 2013, noting that "experts believe Mr. Assad provided critical support" for "weapons and money coming through Syria to . . . Iraq" for "extremists" who would "bring pain to the Americans."[182]  As "[n]umerous

---

[179] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress in Accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289)*, at 16-17 (Mar. 2, 2007); *see* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with the Department of Defense Appropriations Act 2006 (Section 9010)*, at 28 (May 26, 2006); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress in Accordance with the Department of Defense Supplemental Appropriations Act 2008 (Section 9204, Public Law 110-252)*, at vii, 8 (Jan. 29, 2010).

[180] U.N. Security Council, *Fifteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities* ¶ 8 (Jan. 23, 2014).

[181] *Assad's Terror Network*, Wash. Times  (May 26, 2004) (Editorial), 2004 WLNR 777961; *see* Frederick W. Kagan & William Kristol, *Now Can We Fight the Enemy?*, Weekly Standard (June 4, 2007), 2007 WLNR 30043601 ("The Syrian regime permits al Qaeda terrorists to move into Iraq" to "kill as many Americans as possible.").

[182] Scott Barber, *Islamic Extremism Threatens Stability; Gaining Sympathy, Recruiting Radicals, Breeding Terrorists*, Nat'l Post (Canada) (Feb. 9, 2013), 2013 WLNR 3252489.

courts" later found after considering the evidence, "Syria supported ISIS and its predecessor organizations."[183]  Defendants' U.S.-dollar financing in 2011, used to pay a notorious Syrian regime fixer, thus was linked to Syrian terrorism from the very outset.

173.    The suite of U.S. and U.N. antiterrorism sanctions on Syria – which Defendants schemed to circumvent – strengthened the nexus between their 2011 payments and terrorism.[184] Because Defendants knew that Tlass was a prominent Assad ally and regime cutout facilitating Defendants' business interests in a heavily sanctioned country, it was foreseeable that their dealings with him in 2011 would enable AQI/ISIS terrorist attacks against the United States.

174.    Defendants also knew Tlass personally (including through MAS) had facilitated AQI terrorism by brokering arms deals, participating in U.S.-dollar-denominated illicit Oil-for-Food program transactions, and channeling hundreds of millions in Iraqi oil revenue stranded in Syrian banks to terrorist financiers in Iraq and Syria.[185]  Those dollars and illicit weapons supported the Zarqawi network, which powered AQI's regional expansion and its evolution into

---

[183] *Fields v. Syrian Arab Republic*, 2021 WL 9244135, at *3 (D.D.C. Sept. 29, 2021).

[184] *See*, *e.g.*, White House (Office of the Press Secretary), *Fact Sheet:  Implementing the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003* (May 11, 2004) (sanctions designed "to address the Syrian government's support for terrorist groups" and "actions to undermine U.S." efforts to stabilize Iraq), https://tinyurl.com/mr46kwf6; U.S. Dep't of Treasury, *Treasury Designates Commercial Bank of Syria as Financial Institution of Primary Money Laundering Concern* (May 11, 2004) (designating Commercial Bank of Syria as an institution of primary money laundering concern "in response to the Syrian government's continued support of international terrorism").

[185] David Rennie, *Tough Questions For 270 Named In Iraqi Documents*, Daily Telegraph (Apr. 23, 2004), 2004 WLNR 4205658 (reporting congressional testimony identifying Tlass as being on a "list" of "non-end users" who helped evade sanctions under Oil-for-Food and observing that Mr. Tlass was on a "list" containing "someone with a lot of explaining to do"); Niles Lathem, *Syrian Bigs Conned U.N.*, N.Y. Post (July 27, 2005), 2005 WLNR 23207829 (reporting IRS report documents naming Tlass as an "intermediar[y] in many Iraq-Syrian transactions that earned [him] 10 to 15 percent commissions on each deal [he] handled").

ANF and ISIS.[186]  By funding a joint venture with a notorious AQI financier, Defendants' 2011

upstream payments implemented a scheme of which terrorism was a foreseeable consequence.

Had Defendants been unwilling to pay AQI or similar FTOs in Syria, they never could have

hired Tlass because their ordinary due diligence would have never "cleared" him.

175.    Although the specific identity of the terrorists Tlass supported evolved over the

years, the core concept remained the same:  Lafarge and LCS continuously paid Tlass in U.S.

dollars to maintain good relations with violent Syrian actors.  Those efforts focused at first on the

Assad regime and AQI, and they later evolved to include ISIS and ANF.  All reflected a

continuous course of conduct dating back at least to 2010.  When Lafarge used New York's

banking system to cover LCS's payments to Tlass in 2011, therefore, it knew it was paying him

to maintain LCS's relationships with Syrian terrorists.  Lafarge's decision to extend that strategy

to ISIS and ANF in 2013 and 2014 was a foreseeable outgrowth of the same conduct.

176.    **LMEA.**  The remaining two New York-cleared wires in Paragraph 155 were

transfers LCS accepted into its LMEA account.  Defendants opened that account in Egypt to

allow LCS to make and receive illegal U.S.-dollar payments.  They called it their "LMEA

account" because it was held in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East

& Africa Building Materials.[187]  But LCS was the one that controlled the money.  The account's

---

[186] *See*, *e.g.*, Daniel L. Glaser, *quoted in* U.S. Dep't of Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("[T]he Zarqawi Network and other jihadist groups use a variety of classic al Qaida-type terrorist financing mechanisms, including:  Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in *Syria*, Lebanon, Jordan, Iran, and Europe."), https://tinyurl.com/56j2r5t8.

[187] Project Alpha Report at -227.

purpose, as described by Defendants' external forensic review, was to allow LCS "to receive US dollar . . . payments for sales to customers in Syria and to make payments on LCS's behalf."[188]

177.    Defendants opened the LMEA account to circumvent U.S. sanctions on Syria.  By July 2013, U.S. sanctions had caused a rapid "devaluation of the Syrian pound."[189]  The resulting foreign-exchange risks imperiled LCS's business.[190]  Indeed, LCS struggled to acquire U.S. dollars – the currency in which it preferred to operate – because U.S. sanctions barred New York banks from clearing dollars for Syrian entities like LCS.[191]  So LCS came up with a workaround: a U.S.-dollar account in Egypt that looked like it was for a non-sanctioned Egyptian affiliate instead.[192]  It devised that workaround after Bank Audi refused LCS's request to open an Egyptian bank account in its own name.  Bank Audi's refusal convinced Valery Mirakoff, LCS's CFO, that "no bank" would allow LCS to open an Egyptian account because "they would be faced with the same 'compliance' limitation that Bank Audi faced to deny us such account."[193]

178.    The LMEA account offered an elegant, if illegal, solution to that problem.  The Egyptian company nominally owned the account for compliance purposes, but "Lafarge Syria solely ha[d] all the rights on [the] amounts" in it.[194]  The point was to allow Lafarge to transact in U.S. dollars for LCS without external correspondent banks blocking the transfers as required by

---

[188] Project Alpha Report at -191.

[189] Ex. 45 (ATA0014297 at -302).

[190] Ex. 45 (ATA0014297 at -302) (noting "high difficulties in managing our Syrian cash exposure due to the on going devaluation of the Syrian pound"); Ex. 7 (ATA0009139) (Pescheux describing LCS's "scarcity of USD" as a "nightmare" for LCS's business).

[191] Ex. 46 ("S&S Memo," ATA0018284 at -286-88) (noting that sanctions meant that "commercial banking services by US banks, wherever located, to Syria became impermissible"); Ex. 47 (ATA0018291 at -291) (blaming "US sanctions" for inability to execute "USD transfer").

[192] Ex. 48 ("LMEA Cooperation Agreement") § 2 ("LMEA to receive and deposit in its bank account such dues on behalf, and under the disposal, of Lafarge Syria.").

[193] Ex. 45 (ATA0014297 at -302) (email from Mirakoff).

[194] LMEA Cooperation Agreement § 3.

international sanctions.[195]  LCS and LMEA memorialized their arrangement in a July 10, 2013 contract.  The agreement enlisted LMEA's cooperation, among other things, in helping LCS satisfy its "external financial obligations."[196]  It required LMEA "to receive and deposit in its bank account" incoming payments "on behalf, and under the disposal, of Lafarge Syria," and to make payments from the account to "specified third part[ies]" as LCS directed.[197]

179.    Benattar personally approved the LMEA account for Lafarge and Lafarge Cyprus, after a conversation with Mirakoff.[198]  Yet even then, Lafarge's Egyptian affiliate remained hesitant and demanded "Group and legal clearance" before the parties could "proceed" with the LMEA account.[199]  In urging Mirakoff to obtain the necessary internal approvals, Pescheux warned him to avoid emails with his LMEA counterpart, advising him "to call him on the phone or even to meet with him, it might prove more efficient than communicating by email."[200]  A few weeks later, after LCS opened the account, Mirakoff urged the Egyptian treasury employees responsible for the new account "not to copy Bruno Pescheux anymore o[n] the exchanges of [e]mails" about the payments they were making out of the LMEA account.[201]

---

[195] Ex. 49 (ATA0000503 at -506) ("[A] significant percentage of our wire transfer to beneficiary outside of Syria were rejected because of international sanctions and the foreign correspondent banks reluctance to operate any transfer originating from . . . a Syrian company.").

[196] LMEA Cooperation Agreement at 1 (Preamble).

[197] LMEA Cooperation Agreement §§ 2, 4.

[198] Ex. 45 (ATA0014297 at -298) (LCS's CFO writing, "I spoke personally to Richard Benattar whose opinion [h]as been required by LMEA on the subject.  Richard confirmed that . . . he would not object to such operation.").

[199] Ex. 45 (ATA0014297 at -297).

[200] Ex. 45 (ATA0014297 at -297).

[201] Ex. 50 (ATA0010065 at -065).

180.    LCS officially opened the "LMEA USD bank account" on July 15, 2013.[202]  LCS held this U.S.-dollar-denominated account at National Societe Generale Bank's ("NSGB") branch in Egypt.[203]  LCS then instructed its customers to send U.S. dollars into that account.[204]

181.    LCS used the LMEA account to execute hundreds of U.S.-dollar transactions. According to PwC's forensic review, LCS used the account for 73 outgoing U.S.-dollar payments totaling $13,245,747 and 111 incoming payments totaling $13,260,125.[205]  "At least some of the payments in and out of the US dollar accounts," the report concluded, "were transfers that are *likely to have been processed by a US financial institution*."[206]

182.    The report was correct.  NSGB Egypt maintained standard settlement instructions calling for U.S.-dollar clearing through New York.  Most banks maintain such standard instructions, which describe the bank's processes for routing electronic-funds transfers in various currencies.[207]  Those instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects.  For example, if a customer instructs its bank to execute a U.S.-dollar-denominated wire transfer, the bank's standard settlement instructions provide the names, locations, and account numbers of the correspondent accounts the bank will use to complete the transfer.  And those standard instructions typically remain consistent from transaction to transaction.  That means that, if a

---

[202] Ex. 50 (ATA0010065 at -066).

[203] Ex. 50 (ATA0010065 at -066); Project Alpha Report at -237.

[204] Ex. 50 (ATA0010065 at -067) (LCS CFO asking for the LMEA "account number to be given to our customers for their deposit").

[205] Project Alpha Report at -237.

[206] Project Alpha Report at -191.

[207] *E.g.*, Ex. 51 (ATA0058827 at -827) (Lafarge deputy international treasurer verifying bank's "SSIs," or standard settlement instructions); Ex. 52 (ATA0031601 at -602) (European Investment Bank sending Lafarge its "Standard Settlement Instructions"); Ex. 53 (ATA0024767 at -767) (attaching Citibank's "SSIs").

financial institution transacts one U.S.-dollar-denominated transfer through a particular U.S.

bank account, its other U.S.-dollar-denominated transfers will likely route via the same account.

183.    Before the relevant period, NSGB Egypt published its standard settlement

instructions in the Bankers Almanac, an authoritative compendium of international banking

information.  Those instructions, available and well-known to Defendants,[208] specified that

NSGB Egypt settled U.S.-dollar wire transfers through "The Bank of New York, New York."[209]

For that reason, when Defendants directed an LCS customer to wire U.S. dollars into the LMEA

account, they knew the dollars would arrive via a New York correspondent account.

184.    Paragraph 155 details two examples of New York-cleared wires LCS accepted

into the LMEA account.  The first was a $200,000 wire sent by an LCS customer on September

12, 2013.[210]  The second was a $299,810 wire sent by another LCS customer, with a September

26, 2013 value date, from an account at Al-Baraka Bank in Egypt.[211]  Both cleared via New

York, in accordance with NSGB Egypt's standard settlement instructions.  Indeed, LCS received

a SWIFT message confirming that the latter wire cleared through NSGB's account at "THE

BANK OF NEW YORK MELLON" at "ONE WALL STREET NEW YORK, NY."[212]

---

[208] Ex. 51 (ATA0058827 at -829) (Lafarge's deputy international treasurer writing to ask "[d]o we still have the Bankers Almanac" so he could verify "the USD correspondent" for a counterparty); *id.* at -827 (after subordinate says he is unaware of Almanac, deputy international treasurer "contact[s] [bank] directly to get the [standard settlement instructions]").

[209] Ex. 54 (Bankers Almanac at 3216 (Vol. 2, 2008)) (identifying NSGB's "USD" standard settlement instructions as routing through "The Bank of New York, New York").

[210] Ex. 55 (ATA0035605) (referring to "swift of the USD 200k transfer"); Ex. 56 (ATA0008289, In.Out Flow Tab, Rows 120-21) (recording incoming $200,000 transfer and associated $8 bank fee charged by NSGB).  NSGB charged "USD 8" on "incoming transfers" involving a foreign "correspondent bank."  Ex. 57 (ATA0035592 at -592).

[211] Ex. 58 (ATA0024362 at -362-64); Ex. 57 (ATA0035592 at -592-93).

[212] Ex. 58 (ATA0024362 at -364).

185.    The LMEA account played a key role in Defendants' terrorist-funding scheme. That account functioned as a slush fund that gave LCS a pool of U.S. dollars it could spend at will, including for its criminal conspiracy.[213]  In fact, one of the first things Defendants planned for the LMEA account was to pay Tlass's monthly $75,000 stipend for July 2013.  As Pescheux emailed Herrault on August 5, 2013, Defendants intended to cover "the recently agreed remuneration of FT" (*i.e.*, Firas Tlass) by wiring U.S. dollars "directly to his offshore account from an account LCS is having through LMEA in Egypt."[214]  The reason for using the LMEA account was simple.  Routing U.S. dollars from the LMEA account was how Defendants "intend[ed] to proceed in the future to sever[ ] any suspicion in connecting LCS and FT."[215]

186.    Defendants considered the $75,000 payment to Tlass to be "very critical to be finalized urgently."[216]  So LCS initiated a U.S.-dollar wire transfer from its LMEA account, which was "in process by the bank" and which was going to clear through New York.[217]  But LCS was foiled by "a problem with the compliance department in the bank to transfer the USD" – stemming from requirements imposed by New York clearing banks – and so had to re-issue the wire in Euros.[218]  Lafarge Egypt's head of treasury circulated a SWIFT message confirming that LCS had paid the wire from its LMEA account to Tlass's account at Audi Lebanon.[219]

187.    Defendants did not like paying in Euros and so immediately reverted to paying Tlass's monthly $75,000 stipend in U.S. dollars.  But because New York banks would not clear

---

[213] *See*, *e.g.*, Ex. 49 (ATA0000503 at -507-09) (identifying "cash pooling" via the "LME account in Egypt" as one key way to "secure our FX needs").

[214] Ex. 59 (8/5/2013 Pescheux-Herrault Email) ("Suspicion Email").

[215] Suspicion Email at 1.

[216] Ex. 60 (ATA0004874 at -876).

[217] Ex. 60 (ATA0004874 at -875).

[218] Ex. 60 (ATA0004874 at -875).

[219] Ex. 60 (ATA0004874 at -874, -878).

U.S.-dollar wires from Egypt to Tlass's account at Audi Lebanon,[220] Defendants had to come up with another way to pay him.  So they devised a new workaround in which LCS paid Tlass through an internal book transfer between Audi Lebanon accounts[221] and then reimbursed itself on the back-end out of the LMEA account.  PwC's forensic review identified two such intracompany transfers coded as "Adv to Mr. Bruno/LMEA Acc."[222]  Those transfers used the U.S. dollars stockpiled in the LMEA account to finance Pescheux's payments to Tlass.[223]

188.    More broadly, LCS repeatedly used its LMEA slush fund to preserve its U.S.-dollar liquidity and cover its U.S.-dollar expenses, including by making large interest payments to its lenders.[224]  Without the supply of U.S. dollars from this account, LCS would have had a harder time covering its expenses and freeing up the U.S.-dollar cash it needed to pay Tlass, Taleb, and the terrorists they were paying.  Paying LCS's operating expenses from the LMEA account also enabled the Jalabiyeh plant to manufacture the cement LCS sold to ISIS.[225]  And the U.S.-dollar wires LCS routed into that account – relying on NSGB's correspondent account with BNY Mellon – were vital to sourcing the U.S. dollars on which the whole scheme depended.

---

[220] Ex. 47 (ATA0018291 at -291-92) (noting that "US sanctions prohibit Syrian persons and organizations to enter the US Financial System, i.e. no USD transfer involving Lafarge Cement Syria can be made," so "USD may probably not be received in our bank account in Lebanon").

[221] *E.g.*, Ex. 32 (ATA0000288) (example of Jan. 2014 payment instruction).

[222] Project Alpha Report at -237-38; *see* Ex. 61 (ATA0003037, Rows 7510, 7511) (recording both transfers in Defendants' master bank file).

[223] *See e.g.*, Project Alpha Report at -230, -237-38.

[224] Ex. 62 (ATA0003359, In.Out Flow Tab, Rows 120, 238, 268, 928, 964, 1138, 1183, 1194, 1248, 1625, 1739, 1952, 2016, 2105, 2244, 2387, 2416, 2502).

[225] *E.g.*, Ex. 63 (ATA0018621 at -623) ("It is critical for us to receive money from abroad and manage our cash flows in an efficient manner if we want to be able to continue paying our loan.").

## 2. Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York

189.    When Defendants ordered the U.S.-dollar transfers in Paragraph 155, they instructed their banks to execute the wires knowing they would clear through New York.

190.    Defendants' internal documents reflected their understanding that U.S.-dollar wires typically require New York clearing.  In November 2011, Bank Audi sent a memo from Shearman & Sterling to several LCS executives, including Pescheux, Mirakoff, and LCS's treasury manager, addressing LCS's loan-repayment obligations.[226]  The memo conveyed the widely held understanding that U.S.-dollar wires clear through New York, warning LCS: "[b]ecause the proposed repayment[s] to the Lenders *are in US dollars*, *they would be processed through some New York correspondent bank*."[227]  Lafarge emails echoed the same theme. Defendants often expressed the view that U.S. sanctions blocked LCS from wiring U.S. dollars because "*USD transfer[s]*" necessarily required LCS "*to enter the US Financial System*."[228]

191.    Defendants also revealed that understanding in other contexts.  Benattar conveyed his knowledge of U.S. correspondent banks when wiring Lafarge's October 2014 payment to Tlass, informing his colleagues that he "need[ed]" to know "*the US correspondent bank* of the supplier's bank" because "*the invoice is in USD*."[229]  The year before, BNP Paribas – Lafarge's main bank – had similarly clarified to Benattar and others that "*USD flows transit through our*

---

[226] Ex. 64 (ATA0018518 at -518) (Bank Audi sending memo to Valery Mirakoff and copying Pescheux and Alzaim); *see id*. at -540-46.

[227] S&S Memo at -287.

[228] Ex. 47 (ATA0018291 at -291); *see*, *e.g.*, Ex. 65 (ATA0002153 at -153) (LCS treasury manager telling counterparty, "As you for sure are aware, all payments in USD from Syria are being blocked."); Ex. 66 (ATA0005162 at -167) (same LCS official emphasizing that "[d]ue to US sanctions no more payments in US Dollars are possible from Syria" given the compliance policies followed by "the correspondent banks"); Ex. 67 (ATA0002227 at -229) (attributing foreign-currency challenges to "political restriction on usage of US financial system").

[229] Ex. 19 (ATA0004739 at -739) (certified English translation).

*subsidiary BNP Paribas New York*."[230]  And a few months after, Lafarge's International Treasurer told a counterparty that, "to properly execute [a] payment" "in USD," Lafarge's "Back Office will need the *intermediary bank & its details for a USD transfer*."[231]  Lafarge did not think a "European" bank could process a U.S.-dollar wire, he explained, which is "*why we expect it [to] work with a partner bank in the USA*."[232]  Lafarge thus recommended using "Bank of NY Mellon" as the intermediary bank to clear U.S. dollars through New York.[233]

192.    Defendants' experience with failed U.S.-dollar wires cemented that understanding.  In late 2011, for example, LCS tried to pay U.S. dollars to an affiliate's account at HSBC Singapore, but the affiliate warned that the funds would "be blocked" due to sanctions because they would have to go through "HSBC USA (USD)."[234]  The same month, LCS tried to send U.S. dollars to an Indian company's account at Standard Chartered New Delhi.  The SWIFT message confirmed that Standard Chartered used its New York branch as the correspondent, which had "reject[ed]" the transfer.[235]  Mirakoff explained the reason:  "the rejected transfer went through SCB New York" and "a US bank will not transfer funds to a Syrian bank," leading him to worry that "the funds could be blocked in NY forever."[236]  Likewise, in 2015, Lafarge's Treasury Back Office team had a U.S.-dollar wire fail because of an error using "SCB [Standard Chartered] Frankfurt" as the "USD correspondent bank."[237]  Lafarge quickly discerned that "the

---

[230] Ex. 68 (ATA0032337 at -337) (certified English translation).
[231] Ex. 69 (ATA0025059 at -060) (certified English translation).
[232] *Id.*
[233] *Id.*
[234] Ex. 70 (ATA0002267 at -275).
[235] Ex. 71 (ATA0002156 at -156); *see id.* at -157 (using SWIFT code SCBLUS33XXX for intermediary bank).
[236] Ex. 72 (ATA0002286 at -286).
[237] Ex. 73 (ATA0024796 at -796).

issue is fully related to the correspond[e]nt, as it should be SCB NY."[238]  So Lafarge's treasury team corrected the payment by "adding USD Correspondent bank SWIFT of SCB NY."[239]

193.    Defendants fared better in executing other U.S.-dollar transactions through New York correspondent accounts.  Lafarge often received invoices calling for U.S.-dollar execution through New York, such as a Jordanian consultant's April 2012 invoice calling for U.S.-dollar payment to "Jordan National Bank" in Amman "[t]hrough:  JP Morgan Chase, New York – USA."[240]  Lafarge also periodically received Standard Settlement Instructions from the European Investment Bank instructing it to use BNY Mellon in New York as the correspondent bank.[241]  Lafarge even made regulatory filings in a foreign jurisdiction that demanded filing fees be paid through a "Correspondent Bank" at "111 Wall Street" in "New York, USA."[242]  Benattar, Vaisoul, and Khodara all had similar experiences with New York clearing.  Each of them – the people most involved in the mechanics of wiring Tlass money through New York – was intimately familiar with using New York correspondent banks in other contexts.[243]

194.    Lafarge's outside consultants had the same understanding.  LafargeHolcim retained Baker McKenzie and PwC in 2016 to review Lafarge's payments to Syrian terrorists, and they produced a report for Lafarge entitled "*Project Alpha* Forensic Transaction Review."[244]  That report further manifested the view that U.S.-dollar transfers virtually always clear through

---

[238] Ex. 73 (ATA0024796 at -796).

[239] Ex. 73 (ATA0024796 at -796).

[240] Ex. 74 (ATA0032118 at -219).

[241] *E.g.*, Ex. 52 (ATA0031601 at -602).

[242] Ex. 75 (ATA0009182 at -185).

[243] Ex. 76 (ATA0032717 at -717, -719-20) (certified English translation) (Benattar); Ex. 77 (ATA0027565 at -565, -569) (Benattar); Ex. 78 (ATA0039494 at -494, -503) (Vaisoul); Ex. 79 (ATA0060118 at -118, -121) (Vaisoul); Ex. 80 (ATA0023925 at -925) (Khodara).

[244] Project Alpha Report at -223.

U.S. correspondent banks.  Indeed, without knowing the precise routing details of several "bank transfer[s]," Baker McKenzie opined:  "PwC's review reflects that these payments were ***made in USD and it is therefore presumed that they were processed through the US financial system***."[245]  Defendants shared that same presumption at all relevant times.

195.    Non-privileged client alerts by Defendants' counsel also alerted them that their transactions used the U.S. banking system.  For example, while Shearman & Sterling LLP was advising Lafarge, it published an alert warning its clients that U.S. courts endorsed an "expansive assertion of territorial jurisdiction over non-U.S. defendants," extending to "overseas financial transactions involving US dollars, premised on the fact that virtually all such transactions clear through correspondent banking accounts in the U.S."[246]  Similarly, Baker & McKenzie represented Lafarge during and after the scheme, and in the earlier period published a "client alert" warning that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" could confer U.S. jurisdiction based on "the use of correspondent bank accounts."[247]

196.    Syrian government decrees likewise alerted Defendants that their U.S.-dollar transactions depended on the U.S. banking system.  For example, in February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros,

---

[245] Project Alpha Report at -190.

[246] Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke & Brian C. Wheller), *Shearman & Sterling Client Publication:  The New FCPA Guide:  The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings* at 3 (Nov. 15, 2012), https://tinyurl.com/5dx8mndc.

[247] Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), *Baker & McKenzie Client Alert:  Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide* at 2 (Nov. 16, 2012), https://tinyurl.com/5n7xus77.

specifically to avoid U.S.-dollar clearing by New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that "US laws stipulate that any dollar transfers must pass through the US banking system."[248]

197.    Defendants also received confirmations specific to the transactions in Paragraph 155. Those confirmations typically took the form of SWIFT MT103 messages.[249] SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending wire-transfer messages between financial institutions. An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. Defendants' "usual" practice in executing a wire transfer was to request from their banks the "swift message" identifying the correspondent banks involved.[250]

198.    Defendants have produced the SWIFT confirmations they received for 10 of the 15 New York-cleared wires identified in Paragraph 155; each informed Defendants that a specific New York bank had processed their payment.[251] Defendants likely once had, but have

---

[248] BBC International Reports (Middle East), *Syria Replaces Dollar With Euro For State Transactions* (Feb. 24, 2006) ("Text of report by Hayam Ali headlined 'The euro used in state transactions', published by Syrian newspaper Al-Thawrah website on 13 February [2006]").

[249] *See*, *e.g.*, Ex. 28 (ATA0000220 at -220) (LMEA treasury employee informing LCS that a U.S.-dollar "transfer is being done now, will provide you with the swift within the coming hour"); *id*. at -223-24 (also providing MT103 for earlier transfer wired into LCS account).

[250] Ex. 81 (ATA0060033 at -034) (certified English translation) (Lafarge's back-office team telling BNP Paribas that Lafarge "received an amount of 32,519.64USD . . . of which we do not have any details" and asking bank to "send us a swift message regarding this receipt" consistent with "usual support"); *see id.* at -033-34 (providing SWIFT message); Ex. 82 (ATA0032366 at -367-68) (sharing "MT 103 confirming the transmission of funds" through New York); Ex. 83 (ATA0021482 at -483-84) (SWIFT message for New York wire); Ex. 84 (ATA0032193 at -193, -197) (attaching "transfer swift" confirming wire through "BNP PARIBAS U.S.A-NEW YORK BRANCH"); Ex. 85 (ATA0001916 at -916) (requiring "SWIFT letter so I can trace the transfer with our bank"); Ex. 28 (ATA0000220 at -226) ("will send you the swift once [I] get it").

[251] Ex. 12 (ATA0031866 at -866-68) (four 1/18/2011 transfers); Ex. 26 (ATA0005437 at -442-43) (2/28/2011 transfer); Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14

since destroyed, the SWIFT confirmations for the other five that also indicated the participation

of a New York bank.

199.    Defendants sometimes obtained the MT103 as part of their approval process for

the transaction.  For example, Pescheux specifically "[a]pproved" the August 8, 2011 upstream

loan disbursement to LCS's Audi Lebanon account after receiving the SWIFT message

disclosing that JPMorgan Chase's and Citibank's New York branches had routed the payment.[252]

200.    Defendants also typically verified the correspondent-bank routing before ordering

a wire.  They did so through Quantum, Lafarge's electronic-payment software.  As explained by

Lafarge's Deputy International Treasurer, before wiring money to a counterparty, Lafarge

"need[ed] to create" the counterparty "as [a] beneficiary in Quantum to be able to make a

transfer."[253]  And that process of adding information to be "created in Quantum" required

Lafarge to enter the payment currency, beneficiary bank, correspondent bank, and correspondent

bank address.[254]  As Lafarge's International Treasurer confirmed, "*[n]ormally there is an

intermediary bank to be entered in Quantum*," which was "necessary for international payments

in a currency other than that of the beneficiary's country."[255]  Defendants thus investigated the

correspondent "bank accounts' information" before setting up new "counter-parties in our

---

(ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011
transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer); Ex. 58 (ATA0024362 at -364)
(9/26/2013 transfer).

   [252] Ex. 28 (ATA0000220 at -221) (Pescheux's approval); *id.* at -223 (MT103 confirming that
Citi and JPM Chase New York branches were involved).

   [253] Ex. 86 (ATA0050870 at -870).

   [254] Ex. 86 (ATA0050870 at -870) (listing fields).

   [255] Ex. 69 (ATA0025059 at -059) (certified English translation).

system" for wire transfers.[256]  It was what Lafarge's back office demanded:  "to properly execute

[a] payment," Lafarge "**need[ed] the intermediary bank & its details for a USD transfer**."[257]

201.    A Quantum screenshot, taken from a Lafarge email, illustrates the point.[258]  As

the screenshot demonstrates (red boxes added), Quantum provided an interface for Lafarge to

enter its "Approved Counterparty Delivery Instructions."  The interface required Defendants to

select the payment currency and to choose whether to follow the beneficiary bank's "Standard

Settlement Instruction."  The interface also contained a tab called "Intermediary Bank:"



[256] Ex. 87 (ATA0024476 at -476); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?"); Ex. 88 (ATA0025152 at -152); Ex. 89 (ATA0000383 at -383).

[257] Ex. 69 (ATA0025059 at -060) (certified English translation); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?").

[258] Ex. 90 (ATA0050876 at -876).

For each of the U.S.-dollar wires described in Paragraph 155, Defendants used this interface to execute the wire. That required Defendants to type into Quantum the "Intermediary Bank" that would clear the wire – *including its New York address* – before they executed the first transfer to any payee, and to rely again on that same set of instructions for each subsequent transfer.

202. Even apart from Quantum, Defendants had bank-specific knowledge of the New York financial system's role in clearing their 15 suit-related U.S.-dollar wires.

203. **BNP Paribas Paris.** Defendants specifically knew that BNP Paribas's Paris branch – which originated the $210,000 wire to Tlass in October 2014 – used BNP Paribas's New York branch to clear Lafarge's U.S.-dollar wires. Lafarge was telling its own counterparties as early as 2012 that Lafarge's account with "BNP Paribas, Paris" used a "USD correspondent bank : BNP NEW YORK (SWIFT code :BNPAUS3N)."[259] In early 2013, Lafarge's International Treasurer reiterated that the "Lafarge SA bank account reference for USD remains unchanged," with a "Correspondent bank" of "BNP NEW YORK."[260] In July 2013, BNP Paribas reminded Lafarge's International Treasurer – copying Benattar and Lafarge's entire Treasury Back Office team – that *"USD flows transit through our subsidiary BNP Paribas New York"*.[261] And in 2015, Benattar told a law firm that the "bank address for the USD transfer to Lafarge SA" must use "BNP NEW YORK" as the "Correspondent bank."[262] So when Benattar and his colleagues instructed BNP Paribas to send Tlass a U.S.-dollar wire, they had no doubt where it was going: through the same BNP Paribas New York account they always used.

---

[259] Ex. 91 (ATA0058766).

[260] Ex. 92 (ATA0057787 at -787).

[261] Ex. 68 (ATA0032337 at -337) (certified English translation).

[262] Ex. 93 (ATA0032069 at -069).

204.    BNP Paribas's use of its New York branch to clear U.S.-dollar transfers also tracked its standard settlement instructions.  Before the relevant period, BNP Paribas published its standard settlement instructions for its Paris branch in the Bankers Almanac, which specified that it typically settled "USD" transfers through "BNP Paribas SA, New York."[263]

205.    **Bank Audi.**  Defendants likewise knew their U.S.-dollar transfers through Bank Audi relied on New York correspondent banks.  For the upstream payments Lafarge made into LCS's Audi Syria accounts, they received SWIFT MT103 confirmations specifically reporting that each cleared through Citibank New York.[264]

206.    Defendants gained even more precise knowledge that their Audi Lebanon account relied on a New York correspondent bank.  The account-opening process made that clear.  In July 2011, LCS became uncomfortable with Audi Syria, viewing the continued reliance on a Syrian bank as posing risks to LCS's "Cash Management flexibility."[265]  So LCS set out to open a new Lebanese account from which it could more freely send and receive U.S. dollars.  It initiated that process on July 12, 2011, when Mirakoff met with the "Audi Lebanon Team" to discuss the new account.[266]  A few weeks later, on July 28, Bank Audi approved LCS for a new "US Dollar Operating Account with Bank Audi SAL – Audi Saradar Group" in Lebanon.[267]

207.    Audi Lebanon immediately informed LCS that its new account would use JP Morgan Chase's New York branch as the U.S.-dollar correspondent.  Once the account was

---

[263] Ex. 54 (Bankers Almanac at 1424 (Vol. 1, July 2008)).

[264] *Supra* ¶¶ 161-63 (citing SWIFT messages, each referencing Citi NY's SWIFT code).

[265] Ex. 14 (ATA0000047 at -047).

[266] Ex. 14 (ATA0000047 at -047).

[267] Ex. 94 (ATA0002147 at -148-49).

officially approved, LCS's treasury manager asked for the "account's references as soon as available."[268]  Bank Audi responded by emailing LCS the account "coordinates" as follows:

> Correspondent Bank Name:  JP Morgan Chase
> Address:  New York
> SWIFT of Correspondent Bank:  CHASUS33
> BANK Name:  Bank Audi SAL – Audi Saradar Group
> BANK Account No with Correspondent: [. . .]9027
> SWIFT of BANK:  AUDBLBBX[269]

208.    Roughly two weeks after opening the Audi Lebanon account, Lafarge wired $10 million (via Lafarge Cyprus) into that account, using the designated JP Morgan Chase correspondent account in New York.  The SWIFT message confirming the transfer, which Defendants circulated internally, described JP Morgan Chase's involvement.[270]  LCS's treasury manager forwarded the SWIFT confirmation to two LCS accountants, while also attaching the "Lebanon Account references."[271]  Those references reiterated to both LCS employees that the "***Correspondent Bank Name***" was "***JP Morgan Chase***" in "***New York***."[272]

209.    Audi Lebanon's use of JPMorgan Chase to route U.S.-dollar wires also matched its public settlement instructions.  Before the relevant period, Audi Lebanon published its standard instructions in the Bankers Almanac, which specified that it typically settled U.S.-dollar wire transfers through correspondent accounts at "The Bank of New York" and "JPMorgan Chase Bank, National Association," which is JPMorgan's New York branch.[273]

---

[268] Ex. 94 (ATA0002147 at -148).

[269] Ex. 94 (ATA0002147 at -147).

[270] Ex. 95 (ATA0000186 at -187) (field 56A).

[271] Ex. 95 (ATA0000186 at -186).

[272] Ex. 95 (ATA0000186 at -192).

[273] Ex. 54 (Bankers Almanac at 772 (Vol. 1, 2008)).

210.    U.S. government findings also alerted Defendants that Bank Audi relied on U.S. correspondent banks.  On February 17, 2011, for example, the Treasury Department published findings that "[t]here are 66 banks incorporated in Lebanon, and all major banks" – which included Bank Audi – "have correspondent relationships with U.S. financial institutions."[274]

211.    **NSGB Egypt.**  Defendants had similar knowledge about their LMEA account at NSGB Egypt.  Shortly after LCS opened the account, it received a SWIFT message about an incoming U.S.-dollar wire disclosing that BNY Mellon in New York had routed the money.[275] Once again, that confirmation tracked NSGB's standard settlement instructions, which publicly alerted Defendants to NSGB's practice of routing U.S. dollars through BNY Mellon.[276]

212.    As these transactions demonstrate, all three Defendants were intimately involved in directing and routing the U.S.-dollar transfers they executed.  They did not simply leave the routing decisions to their banks; the details were too important to Lafarge.[277]  Defendants belonged to a sophisticated multinational conglomerate that employed large treasury and back-office teams to supervise their banks and to manage their currency exposure across several

---

[274] U.S. Dep't of Treasury (FinCEN), *Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern*, 76 Fed. Reg. 9403, 9404 (Feb. 17, 2011) (footnote omitted), https://tinyurl.com/b2tpah7r.

[275] Ex. 58 (ATA0024362 at -364).

[276] *Supra* ¶ 183.

[277] *Compare*, *e.g.*, Ex. 94 (ATA0002147 at -147) (LCS describing plan to open a new Lebanese bank account to wire U.S. dollars instead of Syrian account) *with* Ex. 41 (ATA0005040 at -040) (LCS instructing Lafarge Egypt to "transfer the amount to the Syrian Account" rather than Lebanon account, to avoid "additional useless days" in routing).

markets.[278]  For that reason, Defendants regularly communicated with their banks about how to

route their money, including with respect to the correspondent banks used.[279]

213.    Defendants were not indifferent to the choice of correspondent banks.  LCS knew

its struggles to source "USD" were "mainly depend[ent] on the banks emitting the transfer."[280]

That recognition led LCS to observe, for all transactions touching Syria:  "*we have to cho[o]se*

*wisely the bank correspondant*."[281]  Defendants thus often took steps to verify the

"correspond[ent] USD bank" clearing their wires, so they could "pass it on to our [own]

correspondents" to facilitate the smooth flow of currency across geographic jurisdictions.[282]

214.    When Defendants instructed their banks to process U.S.-dollar wires, they

intended to (and did) cause their banks to wire money through New York correspondent

accounts.  And when Defendants' banks carried out those instructions, they did so as

Defendants' agents.  In a cross-border wire transfer, the originating bank – the bank that first

---

[278] *See*, *e.g.*, Ex. 69 (ATA0025059 at -059-60) (certified English translation) (copying "treasury.backoffice@lafarge.com" and informing counterparty that "Back Office" needed to verify "intermediary bank").

[279] *See*, *e.g.*, Ex. 96 (ATA0035568 at -568) (detailing "our pressure on Audi Lebanon to by themselves practice continuous pressure on the foreign banks," to ensure that correspondent banks "process the payments" despite the "embargo . . . effected by the US"); Ex. 97 (ATA0021174 at -176) (Lafarge finance personnel noting urgent need to funnel "fresh cash" into LCS and to "channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria").

[280] Ex. 47 (ATA0018291 at -292).

[281] Ex. 47 (ATA0018291 at -292).

[282] Ex. 68 (ATA0032337 at -337-38) (certified English translation); *see* Ex. 98 (ATA0005043 at -046) (supplying "details of the correspondent bank"); Ex. 66 (ATA0005162 at -167) (verifying that transfer was workable for "all the correspondent banks involved"); Ex. 63 (ATA0018621 at -627) (promising to "communicate" with counterparty about "the transfer process and route"); Ex. 99 (12/5/2013 Khayer-ElAnsary-Sandook Email String at 2) (identifying "correspondent bank to be transferred through"); Ex. 100 (ATA0018698 at -701) (instructing counterparty to provide new account "that will accept transfers from Syria going through Commerzbank Frankfurt as Correspondent"); Ex. 101 (ATA0014184 at -186-88) (describing laborious process to find workable transfer route from Syria to India).

receives the order from the wire originator – carries out the transfer on the originator's behalf. The originator also exercises substantial control over the originating bank. Among other things, Defendants here specified each transfer's date, amount, and currency denomination. Each time, Defendants' originating bank had to follow Defendants' instructions. Those instructions effectively mandated that the banks rely on New York's financial system, on Defendants' behalf.

215.    Defendants also had the right to dictate the use of specific correspondent or intermediary banks.[283]  Defendants sometimes exercised that control by dictating to their originating bank a particular intermediary Defendants wanted to use.[284]  Lafarge also routinely instructed its counterparties to send money to its chosen U.S.-dollar correspondent account at BNP Paribas, New York.[285]  Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have dictated use of a non-U.S. correspondent bank but consciously declined to do so. More often, Defendants simply instructed their banks – using Quantum's Counterparty Delivery Instructions interface – to follow their standard settlement protocol.[286] Defendants understood that those instructions here dictated the use of New York banks.

216.    Defendants' control extended still further over their outgoing wires, including for the $210,000 they wired to Tlass in October 2014.  For example, Defendants input into Quantum North Logistics' U.S.-dollar correspondent bank – JPMorgan Chase, New York – and instructed

---

[283] Ex. 69 (ATA0025059 at -059) (certified English translation) (describing Lafarge's right to "impos[e] an intermediary bank on the issuing bank (BNPP in this case)").

[284] Ex. 102 (ATA0024755 at -755) (LCS treasury manager "called Sandra/Audi Lebanon Bank and told her that we can not execute the payment through JP Morgan Chase Bank," instead requesting use of "another bank account"); Ex. 103 (ATA0008980 at -985-87) (discussing strategy to avoid "designated intermediary" bank); Ex. 101 (ATA0014184 at -190) (rejecting designation of "Bank of America" and demanding "Commerz Bank" as "correspondent bank").

[285] *E.g.*, Ex. 104 (ATA0032527 at -548) (Benattar signing payment form that included in the "Payment Instructions" field:  "Correspondent bank : BNP New York").

[286] *Supra* ¶ 200.

BNP Paribas to execute through that intermediary, thus requiring the use of New York's clearing services.[287]  In addition, Defendants knew BNP Paribas would route the money to JPMorgan Chase via its own New York branch, consistent with its standard settlement instructions.

217.    Defendants also paid banking fees to the New York banks that cleared their transactions.  Correspondent banks typically charge a fee for each wire transfer that they process.  Those fees can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103.  Option one – denoted by "OUR" – has the originator cover the fees separately, on top of the amount transferred.  Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred.  Option three, denoted by "SHA," is a mix of the two.  In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction.  Thus, when Defendants relied on New York banks to clear their transactions, they knowingly sent money into New York to compensate those banks for the service.

218.    Defendants paid New York banking fees to clear every U.S.-dollar wire for which they have produced a SWIFT confirmation.  For 11 of those wires, the SWIFT message designated "SHA" in Field 71A, meaning that the sender and recipient split the banking fees.[288]  In all but one of those 11 transfers, Defendants were on both sides of the wire, so Lafarge or Lafarge Cyprus split the fees with LCS.  For two more, Field 71A stated "OUR," meaning that the sender – in both cases, Lafarge Cyprus – covered the fees.[289]  In every instance, therefore, at least one Lafarge entity paid some of the fee the New York bank charged for its service clearing

---

[287] *Supra* ¶¶ 158, 200-01.

[288] Ex. 12 (ATA0031866 at -866-68); Ex. 26 (ATA0005437 at -437-42); Ex. 13 (ATA0000358 at -358); Ex. 14 (ATA0000047 at -050); Ex. 58 (ATA0024362 at -364).

[289] Ex. 28 (ATA0000220 at -224); Ex. 15 (ATA0000060 at -060).

the wire.  And Defendants were aware of those fees, observing in March 2011 that their upstream equity contributions had yielded "differences between the credited amount and the transferred amounts" due to "***bank charges from Citibank NY***."[290]  They made a similar observation for the September 2013 LMEA transfer, noting they had to pay "the ***charges deducted by the remitter and the correspondent bank***"[291] – in that case, BNY Mellon in New York.

### 3.    Defendants Purposefully Benefited From New York Clearing

219.    Defendants' New York contacts enhanced the potency of the aid they gave to ISIS and ANF.  Not every payment made was in U.S. dollars.  But Defendants' preference was to pay in U.S. dollars when possible, and using U.S. dollars (even if not exclusively) was critical to the conspiracy.  Indeed, Defendants' ability to reliably transfer U.S. dollars – which depended on their access to New York's banking system – was vital to the scheme's success.  Defendants' conscious choice to use U.S. dollars and New York banks offered at least three benefits.

220.    *First*, transacting in U.S. dollars through U.S. banks helped Defendants legitimize their payments and reduce unwanted scrutiny from outside auditors.  Given the deteriorating security situation in Syria, and the resulting U.S. and international sanctions, Lafarge's Syrian operations faced significant financial scrutiny.[292]  To continue making payments to terrorists in that environment, Defendants had to design a system to "arouse less suspicion by LCS's external auditors and conceal the purpose of the payments."[293]  U.S. dollars helped Defendants avoid such suspicion.  At the time, Syria's financial system was in severe distress, plagued by rapidly spreading black markets for illicit financial activity.  By contrast, the U.S. dollar was the global

---

[290] Ex. 26 (ATA0005437 at -437).

[291] Ex. 57 (ATA0035592 at -592).

[292] *E.g.*, Ex. 105 (ATA0009218 at -218) (Herrault telling Tlass that his preferred method of paying dollars in his "Account in Beirut" was "put[ting] the company at risk at it has to stop").

[293] Plea Statement ¶ 56.

reserve currency for legitimate transactions among established, multinational businesses. Lafarge's "preferred option" was thus to make "bank transfer[s] in USD," so that its wire transfers would have the imprimatur of legitimacy associated with U.S.-dollar transactions.[294]

221.    Defendants' contract machinations confirm the point.  Until July 2013, LCS was paying Tlass in Syrian pounds by making so-called "turnover" payments equal to 1% of LCS's net revenue.[295]  But as Defendants' unlawful payments escalated, they grew uncomfortable with that arrangement.[296]  Defendants thus insisted on a new contract – not with Tlass personally, but with a Tlass-controlled shell company in Dubai – calling for payment in U.S. dollars.  And rather than structure those payments as a percentage of net revenue, they agreed on a flat $75,000 monthly fee, denominated in U.S. dollars.[297]  Pescheux explained the logic in an August 5, 2013 email to Herrault, a Lafarge executive and his direct report.  As Pescheux wrote, wiring $75,000 in "USD" from the "LMEA Account" to Tlass's "offshore account" was how Defendants wanted "to proceed in the future to sever[ ] any suspicion in connecting LCS and FT."[298]

222.    Defendants' use of U.S. dollars to mask their activities matched their broader concealment efforts.  Among other things, Defendants funneled their payments through a web of

---

[294] *Id.* ¶ 60; Preferred Option Email at 2.

[295] 2010 Tlass Agreement art. 4 ("Service Fees shall be 1% of the net sales of LCS").  In addition to the "turnover" payments, Defendants also "pa[id] him a monthly donations which normally is supposed to be entirely distributed" to terrorists.  Ex. 106 (ATA0000541 at -541).

[296] Preferred Option Email at 2 ("As discussed many times, we cannot continue the way we are settling the turnover invoices.").

[297] Feb. 2014 Tlass Agreement at -426 (contract with "Nort Logistics Consultancy Service JLT"); *id*. art. 4 ("From July 1, 2013, the Employer shall pay a monthly remuneration of 75,000USD."); Ex. 107 (ATA0009228 at -228) (Pescheux demanding new contract with "company you control").

[298] Suspicion Email at 1; *see* Plea Statement ¶ 62.

54 different bank accounts, which PwC called "[un]usual[ ] and excessive."[299]  By using so many accounts, Lafarge made it more difficult for others to detect the scheme.

223.    *Second*, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk.  Due to international sanctions and Syria's civil war, the value of the Syrian pound plummeted during Defendants' scheme.[300]  When Defendants' arrangement with Tlass began, the Syrian pound was trading against the U.S. dollar at roughly 47:1.  By the middle of 2013, it had depreciated to roughly 220:1 (having lost roughly 3/4 its value).[301]  The Syrian pound's rapid "depreciation" prompted Tlass to demand payment from LCS in U.S. dollars.[302]  Indeed, in a meeting with Pescheux in August 2013, Tlass "***ended by saying he would prefer a fixed monthly fee in USD***."[303]  And Defendants – which constantly monitored the USD-SYP exchange rate[304] – had similar preferences, going to great lengths to hold as much of LCS's cash as possible in U.S. dollars.[305]  LCS became so desperate for U.S. dollars that it was even willing to buy them on the Syrian "grey market" at exorbitant exchange rates.[306]

---

[299] Project Alpha Report at -227.

[300] Ex. 7 (ATA0009139) (identifying "swift depreciation of the Syrian Pound" as a "nightmare" that ranked among LCS's "major problems").

[301] Ex. 106 (ATA0000541 at -541).

[302] Ex. 106 (ATA0000541 at -541) ("remuneration based on turnover is now challenged by FT" in part due to "depreciation of the Syrian Pound vs USD").

[303] Ex. 106 (ATA0000541 at -541).

[304] Ex. 108 (ATA0022737 at -738) ("LCS observes and determines USD/SYP rate as the parallel market is driven by the USD/SYP exchange rate.").

[305] Ex. 109 (ATA0020481 at -487) ("To alleviate the risk relating to currency devaluation, LCS attempts to maximize the cash denominated in USD and EUR.").

[306] Cash Shortfall Memo at -066 ("As we cannot get Fx currency from the Central Bank of Syria, we buy it either on the grey market or from the commercial banks.").

224.    *Third*, Defendants' payments satisfied ISIS's and ANF's general preference for U.S. dollars.  Real-time public reports linked ISIS's fundraising prowess – and its recruiting success – to its stockpile of U.S. dollars.  As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money.  ***After joining [ISIS], people are paid in US dollars instead of Syrian liras***. . . . ISIS members receive additional incentives to fight for the group.  "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said].  "It cost $50 per month.  [ISIS] paid for the house, the electricity.  Plus, I was married, so I got an ***additional $50 per month*** for my wife.  If you have kids, you get ***$35 for each***.  If you have parents, they pay ***$50 for each parent***.  This is a welfare state."  And ***those financial benefits are not just limited to the organization's fighters.***[307]

225.    Investigative reports sourced to witnesses from inside ISIS's territory reinforce that connection.  For example, according to the *Independent*, a leading British newspaper that has covered ISIS extensively since its inception, the "Islamic State was already known to pay its recruits in [U.S.] dollars, sell[] oil and looted antiques for dollars, and accept extorted taxation and hostage money in dollars."[308]  ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having ***built a financial system entirely dependent on the US dollar***."[309]

226.    Defendants' reliance on New York banks helped them capture all these benefits of their U.S.-dollar payments.  New York is the global hub of cross-border U.S.-dollar transfers for good reason:  companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing.  Transacting through other clearing centers

---

[307] Jeremy Bender, *An ISIS Defector Explained A Key Reason People Continue Joining The Group*, Bus. Insider (Nov. 18, 2015), https://tinyurl.com/3ced6xs5.

[308] Lizzie Dearden, *ISIS' Attempt To Topple US Economy With Own Currency 'Failing' As Reliance On American Dollars Increases*, Indep. Online (UK) (Mar. 26, 2016), 2016 WLNR 9336286.

[309] *Id.*

is possible – there are other ways to move U.S. dollars in theory – but all present operational risks that New York clearing avoids. By routing the payments identified in Paragraph 155 through New York, Defendants maximized the potency of their terrorist funding.

227.    New York clearing enhanced the legitimacy of Defendants' U.S.-dollar payments and helped Defendants conceal their scheme from auditors. As noted above, Defendants chose to transact in U.S. dollars in part to make their payments look like ordinary "bank transfer[s]."[310] New York clearing helped achieve that effect. That is because the vast majority of U.S.-dollar transactions clear through CHIPS and flow through New York banks – so routing a U.S.-dollar payment through New York correspondent accounts would have represented business as usual for a legitimate company making legitimate business payments. Had Defendants routed their U.S.-dollar payments some other way, it would have stood out as unusual – risking the very type of outside attention from auditors and regulators Defendants were striving to avoid.

228.    Defendants worried constantly about satisfying their "external auditors."[311] In 2012, Pescheux began discussing with Tlass the need to "draft invoices that would not raise red flags,"[312] warning him that Tlass's sloppy invoices meant that "our financial statements for 2012 cannot be approved."[313] Pescheux thus demanded that Tlass form a company "in Dubai" and present new invoices from that company "with a minimum of formalism."[314] Defendants requested such formalism "even if we continue to settle the invoices in Syrian Pounds."[315] But as Pescheux repeatedly made clear, settlement in Syrian pounds was not his preference. He

---

[310] Preferred Option Email at 2.

[311] Ex. 110 (ATA0009234 at -234).

[312] Plea Statement ¶ 58.

[313] Ex. 110 (ATA0009234 at -234)

[314] Ex. 110 (ATA0009234 at -234).

[315] Ex. 110 (ATA0009234 at -234).

knew that shifting into U.S. dollars offered a safer course for satisfying LCS's auditors.[316]  "The best solution," he concluded, was for Lafarge to pay Tlass "***in foreign currency on a foreign account to a foreign entity***" – which is exactly what then happened, via a New York wire.[317]

229.    Defendants' ensuing efforts to pay Tlass demonstrate the value they ultimately reaped from New York clearing.  On agreeing to pay Tlass in U.S. dollars, LCS first attempted to pay him by wire originated from its LMEA account, through New York, but was stymied by the bank's "compliance department."[318]  So LCS was forced to wire Tlass his July 2013 payment in Euros instead.[319]  That was neither side's preference, and Defendants reverted to paying U.S. dollars in future months.  At the time, however, Tlass had not created a bank account capable of receiving U.S.-dollar wires from outside Lebanon, so Defendants had to devise a convoluted workaround.  First, they sourced U.S. dollars into LCS's own account at Audi Lebanon – sometimes from LCS's illegal LMEA account,[320] other times by approaching grey-market foreign-exchange dealers to convert Euros or Syrian pounds into dollars.[321]  Then, Defendants instructed Audi Lebanon to engage in an internal book transfer through which it moved the U.S.

---

[316] Ex. 111 (ATA0015463) (Pescheux telling Tlass, copying Mirakoff, that "we cannot continue to pay these amounts in Syrian p[o]unds"); Preferred Option Email at 2 (Pescheux reminding Tlass that "we cannot continue the way we are settling the turnover invoices" and that he "preferred" to make "a bank transfer in USD"); Suspicion Email at 1 (ordering U.S.-dollar "transfer[ ]" to Tlass's "offshore account" to "sever[ ] any suspicion in connecting LCS and FT");

[317] Ex. 111 (ATA0015463).

[318] Ex. 60 (ATA0004874 at -875).

[319] Ex. 60 (ATA0004874 at -874-75).

[320] *Supra* ¶¶ 185-88.

[321] *Infra* ¶ 237.

dollars from LCS's account into what Tlass called "my account" at the same bank.[322]  Finally, Tlass had an associate come withdraw the U.S. dollars out of his account in Lebanon.[323]

230.    Defendants expressed grave concerns about this book-transfer procedure and repeatedly pressured Tlass to change it.  On March 15, 2014, Pescheux told Tlass he had just "given the instruction for paying the monthly fee of February to your personal bank account in Lebanon," but reiterated that "***this situation is putting us at risk*** . . . as the confidentiality of the transaction is an illusion."[324]  Pescheux warned Tlass that he was "not in favor to continue the way we currently use for the March payment."[325]  Herrault replied by offering to "intervene with Firas" and remarking of the payment process:  "This is becoming ridiculous."[326]

231.    Pescheux followed up two weeks later, reminding Tlass that the continuing non-wire U.S.-dollar payments were "putting me in a difficult situation" with Defendants' "[e]xternal auditors." [327]  Any solution, Pescheux stressed, could no longer rely on book transfers into Tlass's "personal bank account."[328]  Although Tlass continued to pay off terrorists – updating Pescheux about "[o]ur negotiations with ISIS" – he resisted opening a non-Lebanese bank account capable of receiving normal U.S.-dollar wires.[329]  His delay prompted Defendants to withhold payment.  A few months later, Herrault reminded Tlass that Lafarge would not continue with the "monthly payment plan" because the convoluted payment process "***puts the company at***

---

[322] Ex. 112 (ATA0021127 at -128) (certified English translation); *see*, *e.g.*, *supra* ¶ 165 & n.166 (collecting bank instructions).

[323] Ex. 112 (ATA0021127 at -128) (certified English translation).

[324] Ex. 113 (ATA0021905) (certified English translation).

[325] Ex. 113 (ATA0021905) (certified English translation).

[326] Ex. 113 (ATA0021905) (certified English translation).

[327] Ex. 114 (ATA0009220).

[328] Ex. 114 (ATA0009220).

[329] Ex. 115 (ATA0009216 at -216).

*risk and it has to stop*."[330]  By July 2014, when Tlass expressed frustration that he had not "received the payment of $75000 in my account in Beirut," Pescheux responded tersely:  "We are still waiting for any progress in the opening of your company's bank account."[331]

232.    By early September, Lafarge and LCS had begun to devise "a way of remunerating FT in different manners."[332]  While those discussions continued, Defendants announced "we no longer wish" to make "the USD payment" to Tlass "from our account in Beirut."[333]  Although Tlass still requested payment into "his personal account in Beirut," Lafarge refused.  On the advice of Khodara and Lafarge's General Counsel, Lafarge emphasized that LCS could "no longer pay" through Audi Lebanon and "need[ed] to find a new way of operating."[334]  And any solution, Lafarge insisted, must involve a transfer into a new "company" account.[335]  The pressure worked.  On September 29, 2014, Jolibois reported to Khodara and a Lafarge Senior Finance VP that Tlass had "finally [been] able to open an account in Dubai."[336]

233.    Defendants immediately prepared to wire U.S. dollars into Tlass's new North Logistics account in Dubai.  But they realized they could not send the payments from Syria or Lebanon.  After opening the North Logistics account, Tlass asked LCS to promptly "transfer [the] overdue sums" into his new "bank account" in Dubai.[337]  Herrault exclaimed:  "It can no

---

[330] Ex. 105 (ATA0009218 at -218).

[331] Ex. 115 (ATA0009216 at -216-17).

[332] Ex. 116 (ATA0022824 at -824) (certified English translation).

[333] Ex. 117 (ATA0000166 at -167) (certified English translation).

[334] Ex. 117 (ATA0000166 at -166) (certified English translation).

[335] Ex. 117 (ATA0000166 at -166) (certified English translation).

[336] Ex. 117 (ATA0000166 at -166) (certified English translation).

[337] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1) (certified English translation).

longer be done from Syria!"[338]  And just a week earlier, Jolibois had reminded his colleagues that LCS could no longer reliably pay U.S. dollars "from our account in Beirut."[339]

234.    That led Lafarge to send a bank wire through New York's financial system, described above.[340]  Having convinced Tlass to create a shell company outside Syria, Defendants finally made good on their desire to effect payment through "a bank transfer in USD to the account of a duly registered company."[341]  Their machinations had solved their auditor problem: Defendants could now pay Tlass with an ordinary bank wire flowing through ordinary New York banking channels, rather than LCS's convoluted and highly suspicious book-transfer process. They had also solved their U.S. sanctions problem:  by wiring money between Cypriot and Dubai companies, Lafarge duped BNP Paribas and JP Morgan Chase into processing the wire.[342] Nobody else knew it was an illegal U.S.-dollar payment between two Syrian entities.[343]

235.    New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions.  During Defendants' scheme, a limited number of non-U.S. banks were able to clear cross-border U.S.-dollar wire transfers.  These alternative U.S.-dollar clearing centers were in Tokyo, Hong Kong, Singapore, and Manila.  But each presented extra cost and risk. Indeed, those banks were not commonly used by Western financial institutions, and the Federal Reserve allowed them to clear U.S.-dollar transfers only because of the time-zone difference with East Asia.  That arrangement did not permit Defendants to wire money from France into

---

[338] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1) (certified English translation).

[339] Ex. 117 (ATA0000166 at -167) (certified English translation).

[340] *Supra* ¶¶ 157-60.

[341] Preferred Option Email at 2.

[342] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[343] Plea Statement ¶¶ 96-103.

Dubai, Lebanon, Syria, or Egypt. Had Defendants routed those transactions through non-U.S. banks, rather than New York banks, they would have exposed themselves to credit and operational risk, and likely would have had to pay higher banking fees as well.

236. Defendants experienced those operational risks first-hand. By August 2011, U.S. sanctions were substantially constricting Defendants' ability to route U.S. dollars in and out of Syria. Defendants strongly preferred to transact in U.S. dollars: that is how Lafarge made its upstream payments until August 2011, and it is how Defendants wanted to proceed even after President Obama ratcheted up sanctions in August 2011. But U.S. sanctions effectively blocked Lafarge and LCS from continuing "to wire USD to Syria" because they stopped New York banks from clearing the wires.[344] In 2012, therefore, Lafarge had to start paying LCS by wiring money in Euros, after which LCS would "buy USD on shore."[345]

237. The need for LCS to buy U.S. dollars on shore in Syria created operational headaches. For one thing, the currency conversion process was complex, forcing LCS personnel to devote significant time to managing it.[346] For another, it was expensive: LCS (and thus Lafarge and Lafarge Cyprus) was forced to pay high prices to convert Euros and Syrian pounds into U.S. dollars by buying them from Syria's Central Bank, commercial banks, or private currency dealers on the grey market.[347] All this together compounded the financial challenges

---

[344] Ex. 89 (ATA0000383 at -392) ("We understand that due to recent restrictions on Syria, it is today very difficult and almost impossible to wire USD to Syria. We are still having discussions with some banks but at this stage, the only route that we can eventually considered is to wire EUR via LBMHE (to be confirmed).").

[345] Ex. 89 (ATA0000383 at -392); *see id*. at -383 ("We've ascertained that we can transfer EURO to Lafarge Cement Syria," even while Lafarge would "book" the loan "in USD").

[346] Ex. 49 (ATA0000503 at -505-14) (describing complex, five-phase "Forex Management Process"); Cash Shortfall Memo at -069 (similar); Ex. 42 (ATA0000938 at -938).

[347] Ex. 63 (ATA0018621 at -621) ("Since the application of US sanctions, we bear heavy exchange losses when effecting any transfer from or to our USD Operating Account."); Cash Shortfall Memo at -069-72 (detailing parallel-market FX deals); Ex. 49 (ATA0000503 at -507)

faced by Lafarge's Syrian business during the criminal conspiracy. As Pescheux told Herrault in June 2013, the "scarcity of USD" in Syria was "really a nightmare."[348] Wiring dollars through New York banks – which Defendants did whenever they could – was easier, faster, and cheaper.

238. Defendants knew from public U.S. enforcement actions that the sanctions regime they were flouting was designed to prevent U.S. banks from helping finance attacks by FTOs.[349] In 2015, moreover, the Treasury Department confirmed that FTOs like ISIS and ANF relied on their ability to leverage the U.S. financial system to facilitate U.S.-dollar transfers:

> Given the **central role U.S. banks play in facilitating global payments**, **the United States is vulnerable to the movement of funds associated with [terrorist financing]** through the banking system. To address this, the U.S. government has focused on developing and implementing preventive measures to reduce the vulnerability of these institutions to [terrorist financing], used additional tools and authorities to more effectively target [terrorist financing], and **imposed substantial financial penalties on noncompliant institutions**. Even with these measures, the U.S. banking system is exposed to residual [terrorist financing] risk, such as from foreign correspondents that may not have effective AML/CFT [i.e., Anti-Money Laundering/Countering the Financing of Terrorism] programs.[350]

239. The Treasury Department repeated a similar warning on October 16, 2014, eight days before Defendants' $210,000 wire to Tlass, when it sanctioned a violent, Syrian-regime-affiliated actor. The designation emphasized that U.S. sanctions on Syria sought to deprive

---

(noting LCS "ha[s] to add the spread demanded by the trader"). By mid-2013, even the Syrian Central Bank refused to sell U.S. dollars to LCS "at the official rate" and demanded pricing "at the 'intervention' rate, close to the pa[r]allel market." Ex. 119 (ATA0005001 at -001).

[348] Ex. 7 (ATA0009139).

[349] *See, e.g.*, U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 49 (Aug. 24, 2015).

[350] *Id.* at 60.

violent Syrian-related actors of U.S. dollars and force them to instead use a collapsing Syrian pound, reducing their ability to fund the kidnapping and murder of innocent victims in Syria.[351]

240.    New York prosecutors also pursued enforcement actions alerting Defendants that terrorist groups sought to leverage multinational corporations' choice to use the New York banking system.  In 2009, for example, after New York regulators announced counterterrorism-related enforcement actions against European banks, the Manhattan District Attorney told Bloomberg that New York was prosecuting "big cases," including "[o]ne involving Lloyd's [of London], where they were taking Iranian money, stripping the identification, and then sending it to U.S. . . . correspondent banks to get dollars to buy equipment for weapons" and observed that "[p]eople" – even terrorists – "still want to be paid in dollars," which was "the reason they go through U.S. banks."[352]  In 2014, likewise, the Manhattan District Attorney warned multinational corporations that, "if you are going to use the American banking system, particularly New York, for your dollar clearing transactions, you are going to have to abide by [America's] rules."[353]

241.    Defendants also witnessed the difference between speedy New York execution and unreliable foreign execution.  In March 2013, for example, a Taleb subcontractor sought payment in U.S. dollars through Bank of America, prompting LCS to warn Taleb that "we can't transfer to Bank of America, or any bank in USA," and to ask instead for a new "bank account" designating "Commerz Bank" as the correspondent.[354]  But the parties were unable to find an

---

[351] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[352] Robert Morgenthau, *quoted in* Margaret Brennan, *Manhattan District Attorney Robert Morgenthau on Bloomberg TV*, CEO Wire (Sept. 11, 2009), 2009 WLNR 17857284.

[353] Cyrus Vance, Jr., *quoted in Manhattan DA Cyrus Vance Jr. Intvd on Bloomberg TV*, Bloomberg TV (Aug. 6, 2014), 2014 WLNR 21514304.

[354] Ex. 101 (ATA0014184 at -190).

alternative execution route, despite exploring everything from Turkish banks to Chinese banks to Western Union.[355]  The resulting payment delays led the subcontractor to complain, spurring Taleb to explain that "we did transfer the payments but all the way failed" to clear through the subcontractor's preferred Bank of America correspondent account.[356]  Eventually, Taleb had to personally pay the subcontractor out of his own funds and then collect the money from LCS via "Audi Bank in Lebanon"[357] – the same risky process Lafarge later refused to continue with Tlass. These delays nearly ruined the project and ruptured Lafarge's relationship with Taleb.[358]

242.    When Defendants were able to exploit New York clearing, New York banks solved these problems for them.[359]  And Defendants valued the speed New York clearing delivered.  On many occasions, LCS's precarious cash position sparked a sense of urgency in demanding speedy upstream payment.[360]  And in October 2014, after Khodara had negotiated Defendants' illegal contract with Tlass, he too demanded urgency by instructing Benattar to effect payment "quickly."[361]  New York routing allowed Lafarge to achieve that objective.  Had Defendants tried to execute their U.S.-dollar wire transfers through some other means, their scheme would have become less effective, more expensive, and harder to conceal.

---

[355] Ex. 101 (ATA0014184 at -186-88).

[356] Ex. 101 (ATA0014184 at -187).

[357] Ex. 101 (ATA0014184 at -185).

[358] Ex. 120 (ATA0009942 at -942-43).

[359] *Supra* ¶¶ 147-88 (detailing New York-cleared transactions).

[360] Ex. 41 (ATA0005040 at -040) (conveying "urgency of payments" and stressing need to avoid "days" of delay); Ex. 28 (ATA0000220 at -222) (requesting fast transfer because of need to cover outgoing payment "urgently"); *id*. at -227 ("you are kindly requested to urgently ensure a transfer of 3 Musd ASAP allowing us to cover the daily Cash needs").

[361] Ex. 24 (ATA0032468 at -468) (certified English translation).

B.    **Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme**

243.    In carrying out their scheme to pay ISIS and ANF, Defendants also reached into the United States to avail themselves of U.S.-based email services.  Defendants' use of those services formed additional U.S. touchpoints and allowed Defendants to reap the benefit of their email providers' U.S. presence.  Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

244.    As Lafarge and LCS have admitted, their executives "used personal email accounts serviced by U.S-based email service providers, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy."[362]  Mainly, that was Gmail. During at least 2013 and 2014, Defendants regularly used U.S.-based Gmail accounts to plan their conspiracy.  On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

245.    Defendants and their agents routinely advanced their scheme to pay terrorists by sending emails to and from these U.S.-based accounts.  Plaintiffs set forth a few examples of

---

[362] Plea Statement ¶ 18.

these communications below.  These examples are illustrative, not exhaustive, and again reflect

information without discovery.  On information and belief, discovery will uncover many

additional email communications using these and other U.S.-based accounts:

a.  <u>Pescheux (Gmail) to Tlass (Gmail), July 2, 2013</u>:  Pescheux emailed Tlass to provide "clarifications" regarding Tlass's payments to armed groups in and around Jalabiyeh. The email identified more than 10 groups Tlass was paying on Defendants' behalf – including ANF specifically – and conveyed Pescheux's understanding that "you are dealing with a lot of different people and I have no problem with that."  Pescheux sent this email from his Gmail account to Tlass's Gmail account.

b.  <u>Tlass (Gmail) to Pescheux (Gmail), July 3, 2013</u>:  Tlass responded by providing Pescheux a "road map to know how we pay" the armed groups in and around the Jalabiyeh plant, listing at least 14 such groups, including ANF.  Tlass sent this email from his Gmail account to Pescheux's Gmail account.

c.  <u>Tlass (Gmail) to Pescheux (Gmail), March 31, 2014</u>:  Tlass emailed Pescheux, among others, describing the "security situation in and around the plant area."  In his email, Tlass described the "Skype" calls he conducted with ISIS's "Amir Minbej or Raqa" [likely a reference to Abu Luqman] and noted that Lafarge made "$2 million profit" per month while "pay[ing] less than 1/4 for protection," including to ISIS.  Tlass sent this email from his Gmail account to, among other addresses, Pescheux's Gmail account.

d.  <u>Tlass (Gmail) to Pescheux (Gmail), July 14, 2014</u>:  Tlass wrote to Pescheux updating him on Tlass's "negotiations with ISIS" and expressing "confiden[ce] that we can reach to a logical agreement with them."  Tlass sent this email from his Gmail account to Pescheux's Gmail account.

246.    Defendants' use of these email accounts was purposeful.  As Lafarge and LCS

admitted, their executives and agents used "U.S.-based email service providers," rather than their

"corporate email addresses," in a conscious effort "to conceal their conduct from others within

and outside of LAFARGE and LCS."[363]  That strategy implemented Lafarge's directive,

conveyed by Khodara, to avoid creating discoverable email records of terrorist payoffs.  As

Pescheux wrote in a September 8, 2014 email from his Gmail address to Jolibois's personal

---

[363] *Id.* ¶ 18.

email address, Khodara had instructed him not to email Herrault "at his professional address."[364]

That instruction followed Khodara's broader dictate that he not "receive anything" about the

conspiracy "by email."[365]  That is why Pescheux used Gmail to communicate about the ISIS

payoffs.  It reflected a conscious choice, in line with guidance from Lafarge's headquarters.

247.    Defendants' decision to carry out their criminal conspiracy via Gmail, rather than

corporate email, matched standard practice among terrorists and their funders.  According to

security analysts quoted by the *Associated Press*, "super-encrypted corporate emails are unlikely

to be used by militants, ***who prefer more anonymous technologies, like Gmail***."[366]

248.    Defendants' and their agents' use of these U.S.-based email accounts also entailed

substantial U.S. contacts.  In both opening and using those accounts, Defendants and their agents

reached into the United States in several ways.

249.    **Defendants Transacted With A U.S. Counterparty.**  Defendants' agents relied

on an email service owned and operated out of the United States by a U.S.-headquartered

company.  When they used their Gmail accounts, they agreed to Google's Terms of Service,

which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600

Amphitheatre Parkway, Mountain View, CA 94043, United States."  Defendants thus knew that

they were carrying out their conspiracy using a U.S.-based service "provided by" a U.S.-based

company.  Defendants also agreed that the "laws of California, U.S.A., excluding California's

conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the

Services," including Gmail.  Defendants further agreed that they would not "misuse" Gmail and

---

[364] *Id.* ¶ 88; *see* Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[365] Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[366] Assoc. Press, *republished in* Hamilton Spectator, *RIM Averts BlackBerry Ban In India* (Aug. 31, 2010).

that they would use Google's services "only as permitted by law." Defendants conveyed those agreements into the United States as a condition of accessing Gmail's U.S.-based service.

250. Defendants also obtained Gmail's services by sending their data to Google in the United States. In using Gmail, Defendants knowingly allowed their data to be transferred into the United States for Google's data-mining activities, which were used in the United States for (among other things) targeted search suggestions and ad sales. Defendants did so in part by agreeing that Google could scan the contents of their emails – a process directed by engineers in the United States – to "provide customized advertising to its email users."[367]

251. Defendants knew they were providing their valuable data to an American company because it was widely reported at the time. In one example, CNN reported in April 2014 that, although Google "may not charge for its Gmail accounts," it was "still collecting payment in the form of massive amounts of personal information about the people who use it."[368] Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using. But rather than sending a wire transfer delivering cash to their U.S. counterpart, they delivered their data.

252. **Defendants' Email Communications Relied On U.S. Infrastructure.** By using Gmail to carry out and conceal their scheme, Defendants and their agents exploited a service that was created, engineered, and maintained in the United States. During the time of Defendants' conspiracy, Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably. Those

---

[367] Anna Bernasek, *Encryption Protects Gmail From Everyone But Google*, Newsweek (July 4, 2014).

[368] Heather Kelly (CNN Money Reporter), *Why Gmail And Other E-mail Services Aren't Really Free*, CNN Business (Apr. 1, 2014), https://tinyurl.com/39jtbv83.

U.S.-based servers were important in part because they provided Google with the ability to back up Gmail customers' data in the United States, which minimized outages and enhanced reliability.  On information and belief, the bulk of Defendants' conspiracy-related Gmail communications traveled through or were stored at least in part on U.S.-based servers.

253.    **Defendants' Use Of U.S. Email Servers Offered Them The Benefits Of U.S. Law.**  Gmail's status as a U.S.-owned and -operated service also afforded Defendants protection from foreign law enforcement, including French prosecutors.  That is because U.S. law placed constraints on U.S.-based communications providers like Google when releasing customer data to foreign governments.  As one British paper explained, European law enforcement officials generally could not "get[] access to the secret Gmail . . . messages of terrorists" because, "[c]urrently, US internet giants are banned from handing over emails and private messages to foreign law enforcement officials in all but a tiny number of cases."[369]  That restriction was in place "[b]ecause Google is a US-based company," which meant that requests for Gmail data "f[ell] squarely under US law."[370]  Defendants thus knew that, had they chosen to use non-U.S.-based email, their communications would have been more susceptible to surveillance by French law enforcement – the authority otherwise most likely to discover their scheme, stop it, and bring criminal charges against the individuals involved.  Indeed, Lafarge and several of the executives outlined above are currently facing criminal charges in France for having funded terrorists.

---

[369] Ben Riley-Smith, *Britain On The Brink Of Gaining Access To Terrorists' Facebook And Gmail Messages For First Time*, Telegraph Online (Mar. 22, 2018), 2018 WLNR 8844426; *see* Daily Telegraph, *Net Closes On Terror As US Law Lifts Lid On Messaging* (Mar. 23, 2018), 2018 WLNR 8865323 ("[c]urrently, US internet giants hand over" "secret Gmail . . . messages sent by terrorists" "to foreign law enforcement bodies only in exceptional cases").

[370] Zack Whittaker, *What Google Does When A Government Requests Your Data*, ZDNet (Jan. 28, 2013), https://tinyurl.com/4ydf7v7j; *see id.* (when requests originated from "outside the US," Google "[didn't] really have the same level of requirement to hand over data to foreign governments or law-enforcement");

254.    The experience of India's counterterrorism agencies was typical of how terrorists leveraged Gmail's U.S. presence to stymie foreign law enforcement.  According to Indian officials, "since Google servers are based in US and their IP addresses are masked, it takes a long time to get the real IP addresses and log details of the culprits" who used Gmail for criminal purposes.[371]  For that reason, "Indian security agencies" had a "tough time in catching criminals and terrorists who are [customers] of Google-owned Gmail."  On information and belief, similar logic applied in France, Dubai, and Syria – where Defendants and their agents used Gmail to communicate about their criminal conspiracy with added protection from local law enforcement.

255.    These well-known features made Gmail especially attractive for terrorists and their funders.  In 2013, for example, the *Washington Post* published a high-profile story with the headline, "***Former NSA and CIA director says terrorists love using Gmail***."[372] The article then quoted General Michael Hayden observing, "***Gmail is the preferred Internet service provider of terrorists*** worldwide," and noting, "I don't think you're going to see that in a Google commercial, but it's free, it's ubiquitous, so of course it is" a frequently used platform for terrorist communications.[373]  As the *Post* reported, General Hayden also described "the Internet's origins in the United States" and stated, "We built it here, and it was quintessentially American."[374]  When Defendants used Gmail to advance their scheme, therefore, they knowingly exploited an iconic American service commonly used by terrorists around the globe.

---

[371] Economic Times, *Orkut Won't Let Cops Hack Terrorists* (Dec. 12, 2006), 2006 WLNR 27469168.

[372] Andrea Peterson, *Former NSA And CIA Director Says Terrorists Love Using Gmail*, Washington Post (Sept. 15, 2013) (emphasis added).

[373] *Id.*

[374] *Id.*

C.     **Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States**

256.    As alleged above (*supra* ¶¶ 79-86), Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

257.    ISIS was good for Lafarge's business in Syria.  Most fundamentally, ISIS's terrorist activities helped drive from Syria virtually every other Western company, leaving Lafarge with minimal competition for the Syrian market.[375]  So long as the terrorists remained in power, Lafarge's unusual willingness to do business with them gave it a unique opportunity to seize market share.  ISIS's protection racket also delivered Lafarge a more specific benefit:  the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors. That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in LCS's economic interest."[376]  Their commitment worked, at least for a time.  Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."[377]

258.    The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS"[378] – is undisputed and apparent on the face of Lafarge's guilty plea.  The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "***share the 'cake'***" of their mutual enterprise – with Lafarge executives reasoning that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well."[379]

---

[375] *Supra* ¶ 50.

[376] Plea Statement ¶ 73.

[377] *Id.* ¶ 15.

[378] *Id.* ¶ 18.

[379] *Id.* ¶ 73 (emphasis added).

That sentiment reflected Lafarge's recognition that ISIS could be good for business. As LCS's former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria." The resulting relationship went beyond passive payments. As Deputy Attorney General Monaco stated, Lafarge "***partnered with ISIS***, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."[380]

259.    Terrorist violence was vital to that agreement. For Lafarge to reap the benefits of its conspiracy with ISIS, two things had to be true: (1) ISIS had to retain control of its territory; and (2) ISIS's protection rackets had to remain effective against Lafarge's would-be competitors. Neither could work without terrorist violence and coercion. For example, as *Janes*, the iconic defense industry publication, observed, ISIS "relies on informants and operatives who threaten and pressure the local population to pay extortion money. Islamic State's ***frequent small arms and improvised explosive device (IED) attacks*** . . . ***act as a reminder*** of the imminent threat and presence of the militants."[381] Violence thus was crucial to the racket, because it lent credence to ISIS "intimidation" and "pressure" on local entities to "pay levies" the group demanded.[382]

260.    ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined. For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[ ] jihad"; and that ISIS's maintenance of the racket was backed by the threat of violence against others, including the

---

[380] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022) (emphasis added).

[381] Shady Alkhayer, *Money Flow: Islamic State Continues To Finance Operations In Central Syria Through Extortion And Intimidation*, Janes (Sept. 2, 2022), 2022 WLNR 27802943 (emphasis added).

[382] *Id.*

potential to execute ISIS's enemies.  Similarly, ISIS offered a purported religious mandate for its taxes, with punishments (including execution) threatened against those who did not pay.  When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

261.    In furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States.  In building their territorial control and strengthening their protection racket, ISIS committed many terrorist attacks aimed at the United States.  As Deputy Attorney General Monaco stated in connection with Lafarge's and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."[383]  ISIS publicly celebrated those acts and made clear, both before and during Defendants' conspiracy, that its efforts to grow its caliphate relied on an ongoing terrorist campaign aimed at the United States.[384]

262.    ISIS's specific attacks on Americans furthered the conspiracy.  For example, ISIS captured and beheaded James Foley and Steven Sotloff to send a message of intimidation and control, including by publicizing the brutal murders in videos titled "A Message to America" and "A Second Message to America," respectively.[385]  The capture of these American journalists helped ISIS's conspiracy with Defendants by strengthening ISIS's territorial control and bolstering the credibility of ISIS's threats against others, including Lafarge's competitors.

---

[383] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022).

[384] *Supra* ¶¶ 39-44.

[385] *Supra* ¶ 43.

263.    Scholarly analyses confirm that connection.  As terrorism scholars Clarke and Williams wrote, "Da'esh . . . used kidnapping as a weapon against its enemies—particularly the United States" given that the U.S. government "refused to pay[ ] ransoms for the release of its citizens" and therefore ISIS believed that attacks that targeted Americans could serve as "an important fund-raising method" like "was done with U.S. journalist James Foley" because "***the great virtue of kidnapping is that it can be used symbolically*** to spread fear and deliver a message of defiance."  They continued:

> This was done with U.S. journalist James Foley who was captured in 2012; a video of his execution was released in August 2014.  Although Da'esh in an e-mail communication with Foley's family had demanded millions for his release, how serious this was remains uncertain.  After Foley was executed, Da'esh, in what Cragin and Padilla contend was an attempt to ***embarrass and humiliate the United States***, claimed that Obama was to blame.  Yet the profit motive might also have been present:  the ***killing of Foley certainly increased the pressure to pay for the release of hostages*** from other countries to ensure they did not share the same fate.[386]

As that analysis illustrates, protection rackets work only if the threat of violence is credible.  And ISIS could make good on its promise block competing cement only if it convinced Lafarge's competitors that there would be consequences if they said no.

264.    There was no more effective way for ISIS to accomplish those goals than to publicly kill and maim Americans.  Given the United States' status as the sole global superpower, ISIS's public attacks on Americans conveyed unique credibility to its enemies.  For example, as Dr. Daniel Byman explained in 2014, ISIS perpetrated "[a]cts of senseless violence and unspeakable brutality" that targeted the United States because:

> Videos showing the beheadings of captured US . . . citizens in particular are ***designed to send a message to American . . . people***:  stay out of our business. . . . Islamic State believes that the people in [America] are reluctant to become entangled in yet another war in the Middle East and that savagely murdering an

---

[386] Clarke & Williams, *Da'esh In Iraq And Syria* at 33 (emphasis added).

American . . . each time the US . . . government starts to get involved will make them even more so. They [believe] that the United States does not have the stomach for a tough fight and will pull out of a conflict as soon as Americans start getting killed.[387]

265.    Given the United States' unique military credibility, ISIS's attacks on U.S. servicemembers, including Plaintiffs, likewise furthered the conspiracy. As Secretary of Defense Ashton Carter publicly observed in 2016, "ISIL has demonstrated a clear intent to target U.S. servicemembers and facilities."[388]

266.    ISIS's attacks targeting the United States, including its attacks seeking to kill and maim Americans in the Middle East and Africa, including Plaintiffs, also uniquely powered ISIS's recruitment of jihadists to commit attacks because ISIS relied upon a recruitment narrative centered upon ISIS's purported jihad against America. For example, as President Obama observed in 2015, "Al Qaeda and ISIL . . . are desperate for legitimacy" and "try to portray themselves as . . . holy warriors in defense of Islam": "That's why ISIL . . . propagate[s] the notion that America . . . is at war with Islam. That's how they recruit."[389]

267.    ISIS also reached into the United States to further the conspiracy. For example, ISIS transmitted threats to victims inside the United States, including to the Foley, Sotloff, and Mueller families, as part of its strategy to intimidate the United States. Other acts involved former residents of this District. For example, on May 24, 2022, a federal jury in this District convicted Mirsad Kandic – a former Brooklyn resident – of providing material support to ISIS,

---

[387] Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement: What Everyone Needs To Know* 175-77 (Oxford Univ. Press 2015).

[388] Secretary of Defense Ash Carter, *quoted in* Federal News Service Transcripts, *Secretary Of Defense Ash Carter Delivers Remarks At The NORAD And U.S. Northern Command Change-Of-Command Ceremony* (May 13, 2016), 2016 WLNR 14688349.

[389] President Barack Obama, *Remarks by the President in Closing of the Summit on Countering Violent Extremism*, White House (Feb. 18, 2015), https://tinyurl.com/mr3ek3zz.

including by assisting ISIS's media department and facilitating travel for ISIS terrorists.[390]  On February 7, 2023, another federal jury in this District convicted Ruslan Asainov, a former Brooklyn resident, of similar crimes for providing sniper training to ISIS fighters.[391]  ISIS also sought to finance other attacks in the United States including by sending thousands of dollars to Maryland resident Mohamed Elshinawy in 2016 to encourage terror attacks.

268.    ISIS also enticed hundreds of U.S. citizens to join its ranks by targeting the United States for recruitment.  Roughly 300 U.S. citizens joined or attempted to join ISIS, in part because ISIS tailored its propaganda to U.S. audiences.  For example, ISIS members sought to capitalize on unrest in Ferguson, Missouri and Baltimore, Maryland, asking protestors in those cities to join ISIS.  ISIS also sent money to U.S. citizens to fund terror attacks on U.S. soil and sought and received funding from U.S. citizens to finance operations in Syria and Iraq.

269.    The U.S. government has recognized, on a bipartisan basis, that ISIS specifically targeted the United States and Americans for attack.  For example, in 2022, the White House observed that "ISIS has directed terrorist operations targeting Americans . . . in the Middle East, Africa, and in South Asia,"[392] which echoed a White House observation in 2018 that "ISIS remain[ed] the . . . primary transnational terrorist threat to the United States" . . . "and its senior leaders continue to call for attacks against the United States,"[393] similar to the view expressed by

---

[390] Jury Verdict, *United States v. Kandic*, No. 17-cr-00449-NGG (E.D.N.Y. May 24, 2022), Dkt. 321.

[391] Jury Verdict, *United States v. Asainov*, No. 19-cr-00402-NGG (E.D.N.Y. Feb. 7, 2023), Dkt. 167.

[392] President Joseph R. Biden, Jr., *quoted in* White House, *Remarks by President Biden on a Successful Counterterrorism Operation* (Feb. 3, 2022), https://tinyurl.com/4vcfbsd6.

[393] White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 1, 2018).

the U.S. government, in 2015, that ISIS's "strength and expansionist agenda pose an ongoing threat to . . . U.S. facilities and personnel in [] the Middle East."[394]

270.    ISIS's contacts with the United States were foreseeable to Defendants. Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against U.S. citizens.  As Assistant Attorney General Olsen explained, Defendants partnered with ISIS and ANF "at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."[395]  And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end.[396]  That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East.  Indeed, Defendants specifically understood – in part through Tlass and LCS's former risk manager – that ISIS and ANF were AQI's successors and were continuing AQI's terrorist campaign against the United States.  The attacks on Plaintiffs and their families, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

271.    Given Defendants' knowledge of AQI's (and later ANF's and ISIS's) practice of targeting of U.S. nationals, including U.S. servicemembers, based on multiple U.S. government statements and warnings to that effect, Defendants' illegal payments directly to those groups independently constituted conduct that was expressly aimed at the United States.

---

[394] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment*, at 12 (Aug. 24, 2015).

[395] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

[396] *Supra* ¶¶ 41-43.

## VI.   PLAINTIFFS AND THEIR FAMILY MEMBERS WERE KILLED OR INJURED IN TERRORIST ACTS BY ISIS OR ANF

272.     ISIS and ANF killed and injured Plaintiffs and their family members in terrorist attacks committed in France, Turkey, and Niger.  Each act of international terrorism described below was committed by ISIS or ANF when both groups were designated FTOs.  The express purpose of those terrorist attacks was to target U.S. citizens, like Plaintiffs and their family members, to inflict injury felt in the United States and to effect a change in U.S. federal government policy made in the United States.

273.     Defendants' aid substantially assisted sophisticated "external" ISIS attacks against the United States (outside of ISIS's "caliphate" in Syria and Iraq).  That assistance aided the key ISIS terrorists and cells that conducted these attacks.  Both attacks occurred after Defendants began paying ISIS and so benefited directly from Defendants' payments.

274.     Defendants' material support was linked directly to each of these two attacks targeting the United States and its citizens in France, Turkey, and Niger, including through the direct involvement in each attack of ISIS's Leadership Cell, Raqqa Cell, and Intelligence Cell.

### A.   The November 13, 2015 Complex Attack in Paris (Amanda Palmucci and Gonzalez Family)

275.     On November 13, 2015, ISIS committed a complex attack involving a suicide bombing and small arms attack in Paris, France (the "November 13, 2015 Attack"). ISIS planned and authorized the November 13, 2015 Attack.

276.     The November 13, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

277.    When Defendants provided money to ISIS in Syria, they knew they were contributing to ISIS's ability to launch terrorist attacks not only in Iraq and Syria, but also in Western Europe. Many sources alerted Defendants that payments to ISIS core foreseeably aided ISIS attacks in Western Europe. Indeed, ISIS leader Baghdadi had long espoused a vision of exporting jihad to the West once ISIS's caliphate was established in Iraq and Syria.

278.    Unlike most terrorist attacks in Western Europe that were attributed to ISIS—which were generally locally funded and organized by ISIS's European cells—ISIS "core" committed, planned, and authorized the November 13, 2015 Attack. Indeed, several European counterterrorism experts have concluded that the Paris attack was planned in Syria at Baghdadi's urging and was funded and staffed by ISIS "core" as well. The mastermind and primary orchestrator of the November 13, 2015 Attack was identified as a Belgian-born terrorist named Abdelhamid Abaaoud, who spent substantial time in Syria in 2013 and 2014, where he joined ISIS, trained foreign fighters for ISIS "core", and became close with Baghdadi himself. He returned to Western Europe in late 2014/early 2015 but remained in close contact with ISIS "core" in Syria. Without the role of ISIS core, including its leadership, Abaaoud would have lacked the funds, trained fighters, and logistical support needed to execute the November 13, 2015 Attack.

279.    Amanda Palmucci was in Paris on vacation at the time of the November 13, 2015 Attack. The attack severely wounded Amanda Palmucci, who suffered from post-traumatic stress disorder requiring therapy to this day.

280.    Plaintiff Amanda Palmucci was a U.S. national at the time of the attack and remains one today.

281.    As a result of the November 13, 2015 Attack and her injuries, Amanda Palmucci has experienced severe physical and emotional pain and suffering.

282.    Nohemi Gonzalez was a student studying for a semester abroad at the Paris Strade School of Design and was having dinner with friends on Rue de Charrone at the time of the November 13, 2015 Attack. Nohemi Gonzalez was injured in the November 13, 2015 Attack. Nohemi Gonzalez died on November 13, 2015, as a result of injuries sustained during the attack.

283.    Nohemi Gonzalez was a U.S. national at the time of the attack and her death.

284.    Plaintiff Beatriz Gonzalez is the mother of Nohemi Gonzalez and a U.S. national. She brings claims both in her personal capacity and representative capacity on behalf of Nohemi Gonzalez's estate.

285.    Plaintiff Paul Gonzalez is the brother of Nohemi Gonzalez and a U.S. national.

286.    Plaintiff Reynaldo Gonzalez is the brother of Nohemi Gonzalez and a U.S. permanent resident.

287.    As a result of the November 13, 2015 Attack and Nohemi Gonzalez's injuries and death, each member of the Gonzalez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Nohemi Gonzalez's society, companionship, and counsel.

288.    As a result of the November 13, 2015 Attack, Nohemi Gonzalez was injured in her person and/or property. The Plaintiff members of the Gonzalez Family are the survivors and/or heirs of Nohemi Gonzalez and are entitled to recover for the damages she sustained.

**B.    The March 19, 2016 Suicide Bombing Attack in Istanbul (Greenfield Family)**

289.    On March 19, 2016, ISIS committed a suicide bombing attack in Istanbul, Turkey (the "March 19, 2016 Attack"). ISIS, an FTO, planned and authorized the March 19, 2016 Attack.

290.    The March 19, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

291.    Ron Greenfield was vacationing with his wife in Turkey at the time of the March 19, 2016 Attack. The attack severely wounded Ron Greenfield, who suffered from shrapnel injuries to both legs.

292.    As a result of the March 19, 2016 Attack and his injuries, Ron Greenfield has experienced severe physical and emotional pain and suffering.

293.    Plaintiff Ron Greenfield was a U.S. national at the time of the attack and remains one today.

294.    Plaintiff Pnina Greenfield is the wife of Ron Greenfield and an Israeli national.

295.    Plaintiff Gili Greenfield is the daughter of Ron Greenfield and a U.S. national.

296.    Plaintiff Liron Greenfield is the son of Ron Greenfield and a U.S. national.

297.    Plaintiff Shere Greenfield is the daughter of Ron Greenfield and a U.S. national.

298.    Plaintiff Shye Greenfield is the daughter of Ron Greenfield and a U.S. national.

299.    As a result of the March 19, 2016 Attack and Ron Greenfield's injuries, the Plaintiff members of the Greenfield Family have experienced severe mental anguish as well as emotional pain and suffering.

C.    **The October 4, 2017 Complex Attack in Tongo Tongo (Black and Johnson Families)**

300.    On October 4, 2017, ISIS committed, planned, and authorized a complex attack in Tongo Tongo, Niger that targeted American servicemembers in Africa (the "October 4, 2017 Attack").  The October 4, 2017 Attack would have violated the laws of war if these terrorists

were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

301.    The October 4, 2017 Attack was notable because it was ISIS's first (and only) effective attack targeting the United States in Niger during the period from 2014-2017. The October 4, 2017 Attack was also one of fewer than 10 effective ISIS attacks targeting the United States anywhere in Africa from 2014 through 2017.

302.    ISIS committed, planned, and authorized the October 4, 2017 Attack, acting through its "Core" branch in Syria and Iraq and its "external" ISIS branch in Niger (ISIS-GS). Adnan Abu Walid al-Sahrawi led ISIS-GS. Al-Sahrawi, on behalf of himself and the ISIS terrorists he led, pledged *bayat* to ISIS and Baghdadi in May 2015, and their pledge was "accepted" in October 2016 when ISIS posted the video of the pledge to its propaganda channel on Telegram.

303.    Baghdadi and the Leadership Cell planned, authorized, and contributed to the October 4, 2017 attack by (among other things) accepting Sahrawi's pledge of allegiance – which gave ISIS-GS vital credibility – and transferring substantial money, fighters, and weapons to ISIS-GS for use in attacks against Americans, including Plaintiffs. Indeed, ISIS core leadership published propaganda celebrating the attack and linking its commission to ISIS's caliphate in Syria, and Baghdadi in particular. Without the role of Baghdadi and the Leadership Cell, ISIS-GS would have lacked the funds, trainers, and logistical support needed to execute external attacks, including the October 4, 2017 Attack. Luqman and the Raqqa Cell likewise played a key role in facilitating this attack.

304.    Staff Sergeant Bryan Black served in Niger as a member of the U.S. Army at the time of the October 4, 2017 Attack. SSG Black was injured in the October 4, 2017 Attack. SSG Black died on October 4, 2017, as a result of injuries sustained during the attack.

305.    SSG Black was a U.S. national at the time of the attack and his death.

306.    Plaintiff Ezekiel Black is the son of SSG Black and a U.S. national.

307.    Plaintiff I.B., by and through next friend Michelle Black, is the minor son of SSG Black and a U.S. national.

308.    Plaintiff Jason Black is the brother of SSG Black and a U.S. national.

309.    As a result of the October 4, 2017 Attack and SSG Black's injuries and death, each member of the Black Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Black's society, companionship, and counsel.

310.    As a result of the October 4, 2017 Attack, SSG Black was injured in his person and/or property. The Plaintiff members of the Black Family are the survivors and/or heirs of SSG Black and are entitled to recover for the damages he sustained.

311.    Sergeant LaDavid Johnson served in Niger as a member of the U.S. Army at the time of the October 4, 2017 Attack. SGT Johnson was injured in the October 4, 2017 Attack. SGT Johnson died on October 4, 2017 as a result of injuries sustained during the attack.

312.    SGT Johnson was a U.S. national at the time of the attack and his death.

313.    Plaintiff Myeshia Johnson is the widow of SGT Johnson and a U.S. national.

314.    As a result of the October 4, 2017 Attack, SGT Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Johnson's society, companionship, and counsel.

315.    As a result of the October 4, 2017 Attack, SGT Johnson was injured in his person and/or property. The Plaintiff members of the Johnson Family are the survivors and/or heirs of SGT Johnson and are entitled to recover for the damages SGT Johnson sustained.

## CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2)
[Secondary Liability:  Aiding and Abetting]

316.    Plaintiffs incorporate their factual allegations above.

317.    Defendant aided and abetted, by knowingly providing substantial assistance to, ISIS and ANF in those groups' commission of the terrorist attacks that killed and injured Plaintiffs.  Defendants' aid to those groups was pervasive, systemic, and culpable.  In providing that assistance, Defendants were generally aware of their role in the unlawful activities that they were assisting, from which the attacks that killed and injured Plaintiffs were foreseeable.

318.    Continuously since 2004, the United States has designated ISIS and ANF as FTOs, using various names, under 11 U.S.C. § 1189.

319.    Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

320.    The terrorist attacks that killed or injured Plaintiffs or their family members were each acts of international terrorism committed by ISIS and/or ANF.  They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

321.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, France, Turkey, and Niger; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, France, Turkey, and Niger; and to affect the conduct of the governments of Syria, Iraq, the United States, France, Turkey, and Niger by means of mass destruction, assassination, and kidnapping.

322.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

323.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by ISIS and/or ANF.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

324.    As a result of Defendants' liability under 18 U.S.C. § 2333(d)(2), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) [Conspiracy Liability; Protection-Racket Predicate]

325.    Plaintiffs incorporate their factual allegations above.

326.    Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

327.    ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

328.    Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

329.    Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

330.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS and/or ANF.  They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

331.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, France, Turkey, and Niger; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, France, Turkey, and Niger; and to affect the conduct of the governments of Syria, Iraq, the United States, France, Turkey, and Niger by means of mass destruction, assassination, and kidnapping.

332.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

333.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by ISIS and/or ANF.  Plaintiffs suffered

economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

334.    As a result of Defendants' liability under 18 U.S.C. § 2333(d)(2), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) [Conspiracy Liability; Material-Support Predicate]

335.    Plaintiffs incorporate the allegations above.

336.    Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organization in violation of 18 U.S.C. § 2339B. Defendants, ISIS, and ANF also structured their transactions to disguise the nature of their support, in violation of 18 U.S.C. § 2339A.  These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge.

337.    Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

338.    Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

339.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS and/or ANF.  They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

340.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, France, Turkey, and Niger; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, France, Turkey, and Niger; and to affect the conduct of the governments of Syria, Iraq, the United States, France, Turkey, and Niger by means of mass destruction, assassination, and kidnapping.

341.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

342.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by ISIS and/or ANF.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

343.    As a result of Defendants' liability under 18 U.S.C. § 2333(d)(2), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

344.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

345.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)     Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)     Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  December 30, 2024

Respectfully submitted,

*/s/ Adam J. Goldstein*

Ryan R. Sparacino (*pro hac vice* forthcoming)
Adam J. Goldstein (No. 5123286)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
Fax: (202) 629-3658
ryan.sparacino@sparacinopllc.com
adam.goldstein@sparacinopllc.com

Joshua D. Branson (*pro hac vice* forthcoming)
Andrew E. Goldsmith (No. 4312740)
Lillian V. Smith (*pro hac vice* forthcoming)
Christopher C. Goodnow (*pro hac vice* forthcoming)
James A. Ruck (*pro hac vice* forthcoming)
Chase H. Robinett (*pro hac vice* forthcoming)
Eric J. Maier (*pro hac vice* forthcoming)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
lsmith@kellogghansen.com
cgoodnow@kellogghansen.com
jruck@kellogghansen.com
crobinett@kellogghansen.com
emaier@kellogghansen.com

*Counsel for Plaintiffs*